Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
Sam S. Shaulson
Carrie A. Gonell
101 Park Avenue
New York, New York 10178
(212) 309-6000 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

ANDREW WHALEN,                                  )
                                                )
                      Plaintiff,                )
                                                )
        v.                                      )   Case Number 01 CV 6492L(B)
                                                )
JP MORGAN CHASE BANK,                           )
                                                )
                      Defendant.                )
-------------------------------------------------------X

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS SUMMARY JUDGMENT MOTION AND IN**
<u>**OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTIONS**</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................ 3

    A.    Litigation Background ................................................................ 3

    B.    Plaintiff's Job As An Underwriter .............................................. 4

    C.    Chase's Credit Policy ................................................................ 7

    D.    Plaintiff Had Authority To, And Did, Grant Variances ................. 9

    E.    Every Loan Request Was Different ............................................ 13

ARGUMENT ............................................................................................ 14

I.    CHASE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM BECAUSE HE WAS EXEMPT UNDER THE ADMINISTRATIVE EXEMPTION ...................................................................................... 14

    A.    Plaintiff Performed Office Or Non-Manual Work ......................... 16

    B.    Plaintiff Was Paid On A Salary Basis ......................................... 16

    C.    Whalen's Primary Duty Was Administrative ................................. 16

        1.    DOL Regulations And Caselaw Demonstrate Plaintiff Was Exempt ...... 17

        2.    The Undisputed Facts Demonstrate That Whalen Performed Administrative Work. ....................................... 20

        3.    None of Plaintiff's Arguments Change The Fact That His Primary Duty Was Administrative. ........................ 22

            a.    Plaintiff Misstates The Law ...................................... 22

            b.    Plaintiff's Work "Related To" The Extension of Credit Is Exempt Work. ................................. 23

            c.    Any Use of The Term "Production" at Chase Is Irrelevant to Plaintiff's Exempt Status. ....................... 27

d.   The Fact That Chase Employed More than One
     Underwriter Has No Effect On Plaintiff's Exempt Status. .......... 30

e.   Chase's Payment of Additional Compensation To Plaintiff
     Has No Effect On His Exempt Status. ......................................... 30

f.   Any "Spreadability" of Work Is Irrelevant to Plaintiff's
     Performance of Administrative Duties. ....................................... 31

D.   Plaintiff's Primary Duty As An Underwriter Included Discretion and
     Independent Judgment. ...................................................................... 33

     1.   Defining The Use Of Discretion And Independent Judgment ................ 33

     2.   The DOL and Courts Have Concluded That Individuals Who Make
          Credit Decisions Exercise Discretion and Independent Judgment. ......... 35

     3.   Plaintiff Exercised Discretion and Independent Judgment in
          Making Credit Decisions On Behalf Of Chase. ................................... 37

     4.   Plaintiff's Arguments That He Did Not Exercise Discretion and
          Independent Judgment Are Without Merit. ..................................... 44

          a.   Adherence To Guidelines Does Not Destroy An
               Employee's Use Of Discretion And Independent Judgment. ...... 44

          b.   Making Credit Decisions Requires Judgment And Not
               Simply The Application Of Learned Skills. ............................... 49

          c.   Jobs That Do Not Involve Decisionmakers Who Bind Their
               Employer Are Not Analogous to Plaintiff's Underwriter
               Position. ................................................................................ 49

II.   EVEN IF CHASE WERE NOT ENTITLED TO SUMMARY JUDGMENT,
      PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE
      DENIED.............................................................................................................. 52

CONCLUSION.............................................................................................................. 55

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

Ale v. Tennessee Valley Auth.,
   269 F.3d 680 (6th Cir. 2002) ...................................................................................51

Aly v. Butts County, GA.,
   841 F. Supp. 1199 (M.D. Ga. 1994) .......................................................................31

Anunobi v. Eckerd Corp.,
   2003 WL 22368153 (W.D. Tex. Oct. 17, 2003) .....................................................31

Bosch v. Title Max Inc.,
   2005 WL 357411 (N.D. Ala. Feb. 7, 2005) ......................................................46, 48

Bratt v. County of Los Angeles,
   912 F.2d 1066 (9th Cir. 1990) ...............................................................................15

Brennan v. Westinghouse Credit Corp.,
   1973 WL 1031 (E.D. Tenn. 1973) .....................................................................19, 37

Burke v. County of Monroe,
   225 F. Supp. 2d 306 (W.D.N.Y. 2002) ...................................................................51

Callahan v. Bancorpsouth Ins. Servs.,
   244 F. Supp. 2d 678 (S.D. Miss. 2002) ..................................................................19

Casas v. Conseco Finance Corp.,
   2002 WL 507059 (D. Minn. Mar. 31, 2002) .....................................................25, 50

Cooke v. Gen. Dynamics Corp.,
   993 F. Supp. 56 (D. Conn. 1997) ...........................................................................26

Cowart v. Ingalls Shipbuilding, Inc.,
   213 F.3d 261 (5th Cir. 2000) .................................................................................28

Dambreville v. City of Boston,
   945 F. Supp. 384 (D. Mass 1996) ..........................................................................18

Donovan v. Burger King Corp.,
   675 F.2d 516 (2d Cir. 1982) ..................................................................................45

Dymond v. United States Postal Serv.,
   670 F.2d 93 (8th Cir. 1982) ..............................................................................34, 46

Edwards v. Audubon Ins. Grp.,
   2004 WL 3119911 (S.D. Miss. 2004)...........................................20, 21, 26, 27, 36,

37, 39, 43, 46, 49

In re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litig.,
   336 F. Supp. 2d 1077 (D. Ore. 2004)........................................................................20

Fife v. Harmon,
   171 F.3d 1173 (8th Cir. 1999) .................................................................................31

Gates v. Selsky,
   2005 U.S. Dist. LEXIS 37787 (W.D.N.Y. Sep. 2, 2005) ...........................................54

Hartman v. Arlington Co., Va.,
   720 F.Supp 1227 (E.D. Va. 1989) ............................................................................31

Havey v. Homebound Mortgage, Inc.,
   2005 WL 1719061 (D. Vt. July 21, 2005) .............................1, 18, 19, 20, 27, 35, 36
                                                                38, 40, 42, 43, 45, 46

Haywood v. N. Am. Van Lines, Inc.,
   121 F.3d 1066 (7th Cir. 1997) ...........................................14, 20, 34, 47, 48

Hills v. Western Paper Co.,
   825 F. Supp. 936 (D. Kan. 1993)...............................................................19, 20

Hippen v. First Nat'l Bank,
   1992 WL 73554 (D. Kan. Mar. 19, 1992) .....................................19, 20, 33, 37, 44

Icicle Seafoods, Inc. v. Worthington,
   475 U.S. 709 (1986)...............................................................................15

Kennedy v. Commonwealth Edison Co.,
   2003 WL 21785219 (C.D. Ill. June 23, 2003) ...........................................26

Marting v. Crawford & Co., 2006 WL 681060 (N.D. Ill. Mar. 14, 2006)................................46, 47

McAllister v. Transamerica Occidental Life Ins. Co.,
   325 F.3d 997 (8th Cir. 2003) ...............................................34, 39, 43

McComb v. Robert W. Hunt Co.,
   172 F.2d 751 (7th Cir. 1949) ...............................................................50

Molinari v. McNeil Pharm.,
   WL 5922 (E.D. Pa. May 22, 1986) ........................................................44

Morales v. Zondo, Inc.,
   2001 WL 64745 (S.D.N.Y. Jan. 25, 2001) .............................................15

Mulverhill v. State of New York,
   1989 WL 154827 (N.D.N.Y. Dec. 19, 1989)...........................................46, 47, 48

Nairne v. Manzo,
     1986 WL 12934 (E.D. Pa. Nov. 14, 1986) ..............................................................44

NAS Elecs., Inv. Transtech Elecs. Pte Ltd
     262 F. Supp. 2d 134 (SDNY 2003).........................................................................54

NLRB v. Kentucky River Community Care, Inc.,
     532 U.S. 706 (2001)...............................................................................................49

Palacio v. Progressive Ins. Co.,
     244 F. Supp. 2d 1040 (C.D. Cal. 2002) ................................................................39

Piscione v. Ernst & Young, LLP,
     171 F.3d 527 (7th Cir. 1999) ............................................................................28, 44

Rainey v. Am. Forest & Paper Assoc.,
     26 F. Supp. 2d 82 (D.D.C. 1998)...........................................................................51

Reich v. Haemonetics,
     907 F. Supp. 512 (D. Mass. 1995) ........................................19, 20, 21, 34, 37, 42

Reich v. John Alden Life Ins. Co.,
     126 F.3d 1 (1st Cir. 1997)...........................................................................23, 24, 47

Reich v. State of New York,
     3 F.3d 581 (2d Cir. 1993)................................................................................25, 27

Renfro v. Indiana Michigan Power Co.,
     370 F.3d 512 (6th Cir. 2004) ............................................18, 23, 25, 27, 28, 46

Roe-Midgett v. CC Services, Inc.,
     2006 WL 839443 (S.D. Ill. Mar. 29, 2006) .........................................................46

Shaw v. Prentice Hall Computer Publ. Inc., 151 F.3d 640 (7th Cir. 1998) .......................25, 28, 30

Van Gorder v. Workman,
     2005 U.S. Dist. LEXIS 27325 (W.D.N.Y. Oct. 11, 2005).....................................54

Webster v. Public School Employees of Washington,
     247 F.3d 910 (9th Cir. 2001) .................................................................................26

Wright v. Aargo Sec. Servs., Inc.,
     2001 WL 91705 (S.D.N.Y. Feb. 2, 2001).........................................................15, 31

## FEDERAL STATUTES, REGULATIONS, AND RELATED MATERIALS

29 C.F.R. § 207(a) .................................................................................................2

29 C.F.R. § 208(c) ....................................................................................18, 21, 22

29 C.F.R. § 541.205(c)...................................................................................18, 21

29 C.F.R. § 541.0 et seq ....................................................................................14

29 C.F.R. § 541.103 .............................................................................................16

29 C.F.R. § 541.118(b) ........................................................................................31

29 C.F.R. § 541.2 ..........................................................................................14, 16

29 C.F.R. § 541.201 (2004) ...........................................................................16, 28

29 C.F.R. § 541.202 (2004) ...........................................................................35, 48

29 C.F.R. §541.203 (2004) ....................................15, 18, 21, 23, 35, 40

29 C.F.R. § 541.205 ...............................17, 20, 21, 23, 25, 28, 30

29 C.F.R. § 541.207 ...................................2, 23, 33, 34, 41, 42

29 C.F.R. § 541.208(c)....................................................................35, 38, 42

29 C.F.R. §§ 541.2(a)(1) ...............................................................................14, 33

29 C.F.R. § 541.704 (2004) ...........................................................................46, 47

29 C.F.R. § 703(b)(7) (2004) ..............................................................................18

69 Fed. Reg. U.S.C. 221259 (Apr. 23, 2004) .....................................................27

69 Fed. Reg. U.S.C. 22145 (Apr. 23, 2004) .......................................................15

29 U.S.C. § 207 (a) .............................................................................................14

## PRELIMINARY STATEMENT

This lawsuit started when Michael Davis, a home equity mortgage Underwriter at De fendant JPMorgan Chase Bank ("Chase"), was terminated in 2001 for "cherry-picking" certain loan requests to underwrite so that he could maximize his incentive compensation. Following his termination, Davis went to an attorney to challenge his termination. But rather than filing that lawsuit, Davis instead filed this action seeking overtime pay. Davis alleged, with four other named Plaintiffs, that they and a class of similarly-situated Underwriters should have received overtime pay under the federal Fair Labor Standards Act (the "FLSA") and the New York State Labor Law. The parties subsequently agreed to litigate the FLSA overtime claim of originally-named Plaintiff Andrew Whalen ("Whalen" or "Plaintiff") as a "test plaintiff" pursuant to the terms of a Stipulated Order filed under seal with the Court.

As demonstrated below, Chase is entitled to summary judgment on Plaintiff's overtime claim because Plaintiff, by his own admissions, satisfies the four requirements for the administrative exemption under the FLSA: (1) Plaintiff was paid on a salary basis; (2) he performed office or non-manual work; (3) his primary duty was administrative, rather than production, in nature; and (4) his primary duty included the exercise of discretion and independent judgment. In fact, the U.S. Department of Labor (the "DOL") and every court to consider the exempt status of underwriters and other employees who make credit decisions – including one from this Circuit – have concluded that such employees are exempt. See, e.g., Havey v. Homebound Mortgage, Inc., No. 2:03-CV-313, 2005 WL 1719061, at *5 (D. Vt. July 21, 2005) (granting summary judgment to employer and holding that home mortgage underwriter was exempt).

First, Plaintiff testified that he received a salary for the work he performed as an Underwriter and that the salary did not change regardless of the number of hours he worked in a week.

Second, Plaintiff stipulated that he performed office or non-manual work as an Underwriter.

Third, Plaintiff testified that his primary duty was to "evaluate the creditworthiness of [Chase's] customers" who were applying for home equity loans. Plaintiff testified that in doing so, he spent approximately 90 percent of his time making credit decisions, including evaluating potential borrowers' financial information to enable him to make those decisions. As the DOL and every court to have considered the issue have ruled, these are quintessentially administrative duties, not duties involving the production of a product. Indeed, Plaintiff himself testified under oath that he did **_not_** produce any product of Chase.

Fourth, Plaintiff repeatedly testified that in carrying out his Underwriter duties, he exercised his own judgment and discretion, which the DOL has defined as "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). Plaintiff admitted that he decided, among other things: to approve a loan request; to decline a loan request; to make a counteroffer in an amount less than what the borrower requested; to make a variance or exception to Chase's policies in approving a loan request; to waive a customer's obligation to produce certain financial documents that were otherwise required; and whether a customer's explanation for a derogatory credit item or bankruptcy was reasonable. Plaintiff likewise testified that he followed numerous provisions of Chase's credit policy which specifically required him to exercise his own judgment and discretion. As Plaintiff admitted, Underwriters "are using their judgment on

whether something meets [Chase's policies] or does not meet" those policies.  In just three and

one-half years as an Underwriter, Plaintiff was responsible for making credit decisions involving

over two and a half billion dollars.  As the DOL and the courts have stated in no uncertain terms,

this precise type of work – making credit decisions – involves the use of discretion and

independent judgment.

As for Plaintiff's two motions for summary judgment, both should be denied because the

undisputed record evidence demonstrates that Plaintiff performed administrative duties and

exercised discretion in performing those duties.  Indeed, although Plaintiff seeks two summary

judgment rulings from the Court – that he did not perform administrative duties and that he did

not use discretion in his job – he does not proffer in his Rule 56.1 Statements of Undisputed

Facts *a single* fact concerning the job duties he performed.  Not only are Plaintiff's summary

judgment motions unsupported by the record evidence in this case, but the DOL and the courts

are unanimous in their view that financial services industry employees who collect and review

financial information, evaluate creditworthiness, and make decisions that bind their employers

and expose them to millions of dollars in loss are exempt.  Accordingly, Plaintiff's motions

should be denied, Chase's motion should be granted, and Plaintiff's claim should be dismissed.

## STATEMENT OF FACTS

### A.    Litigation Background.

This litigation was initiated by Michael Davis, an Underwriter in Chase's Rochester

Home Equity group who was terminated for "cherry picking" loan applications to underwrite so

as to maximize his incentive compensation at the expense of other Underwriters.  (Davis Dep.

134-35, 138; Smith Dep. 192, 197-99.)[1]  Following his termination, Davis sought counsel to

---

[1] Relevant portions of the depositions cited to herein are addended as Exhibits to the Affidavit of
Carrie Gonell ("Gonell Aff.") as set forth in the index contained in Paragraph 3 of the Gonell

challenge his termination. (Davis Dep. 138-39.)  After Davis's attorney "not, Davis, came up with the idea of suing Chase for overtime pay on behalf of underwriters," Davis then solicited others to join in the lawsuit:  Plaintiffs Elena Post-Lombardo; Daniel McGraw; Carol Smith; and Andrew Whalen.[2]  (Davis Dep. 114-15; Statement of Joe Bellone ¶ 13 ("Bellone Stmt."), attached as Exh. K to the Gonell Aff.  Although Plaintiffs claim that they and a group of similarly-situated underwriters should have been paid overtime under the FLSA and the New York Labor Law, the parties have agreed to litigate the FLSA overtime claim of Plaintiff Andrew Whalen on a "test plaintiff" basis pursuant to an agreement filed under seal with the Court. (Docket No. 31.)

### B.   Plaintiff's Job As An Underwriter.

Chase is a global financial services firm that offers a wide variety of products, services, and advice, including but not limited to loans.  (Defendant's Responses And Objections To Plaintiff's First Request For Admission dated Aug. 31, 2004 ("Defendant's RFA Responses"), attached as Exh. Y to the Gonell Aff.)  Chase's products included "home equity lines of credit, home equity loans and various types of mortgages."  (Whalen Dep. 237.)  Chase had employees other than Underwriters who were responsible for developing and designing home equity loan products that Chase offered to customers, as well as employees who were responsible for selling those loan products to customers.  (Whalen Dep. 237, 344-45.)

Plaintiff Andrew Whalen ("Plaintiff") worked for Chase as an Underwriter in its Home Equity group in Rochester, New York from November 1998 until May 2002.  (Resume of

---

Aff.  Citations to deposition testimony in this brief will appear as, for example, "Whalen Dep. 1," for a citation to the deposition of Andrew Whalen at page 1.

[2] Following the deposition of originally-named Plaintiff Dan McGraw in July of 2006, counsel for Plaintiffs informed counsel for Defendant that he no longer represented McGraw, McGraw wished to withdraw from the litigation, and McGraw had agreed to execute a stipulation of dismissal of his claims against Chase with prejudice.

Andrew Whalen (hereinafter "Whalen Resume"), attached as Exh. Z to the Gonell Aff.; Whalen Dep. 37.)  As an Underwriter, also referred to as a Credit Analyst, Plaintiff testified that his primary job duty was to "evaluate the creditworthiness of [Chase's] customers."  (Affidavit of Andrew Whalen ¶ 21 ("Whalen Aff."), attached as Exh. U to the Gonell Aff.; Whalen Dep. 35.; see also Post-Lombardo Dep. 258 (testifying that "[i]t's the main part of our job, is to evaluate the creditworthiness, to review the files and make sure they're within policy," including with an exception or variance).)  To minimize the risk of providing loans to customers who might prove to be credit risks, Chase wanted to evaluate the creditworthiness of its potential borrowers, and employed Underwriters, like Plaintiff, to perform this management or risk control function. (Whalen Dep. 213, 217; Post-Lombardo Dep. 157, 162; Statement of Rita Prince ¶ 3 ("Prince Stmt."), attached as Exh. O to the Gonell Aff.; Statement of Jim Richards ¶ 3, attached as Exh. Q to the Gonell Aff.; Bellone Stmt. ¶ 10.)  Plaintiff spent 90 percent of his time as an Underwriter making credit decisions – deciding whether an applicant was creditworthy – and reviewing documents about customers' finances relating to those decisions.  (Whalen Dep. 227-28; see also Smith Dep. 146 (testifying that she spent at least 75% or more of her time "reviewing documents, applying the policy and making a decision"); McGraw Dep. 142-43 (testifying that he spent 90-95% of his time making credit decisions and reviewing the underlying documentation necessary to make those credit decisions and that "[he didn't] know what else [he] would have been doing").)

To make a credit decision for a particular borrower, Plaintiff analyzed financial income documents to determine the annual cash flow of an applicant, reviewed past credit histories to determine strengths or weaknesses of the mortgage application, and determined whether or not the collateral held sufficient value to offset the risk to Chase.  (Whalen Resume, Gonell Aff. Exh.

Z.)  Among the materials that an Underwriter regularly reviewed in deciding whether to grant or

deny home equity loans were credit reports, financial statements, profit-and-loss statements,

individual and partnership tax returns, trust agreements, divorce decrees, property appraisals,

letters of explanation, and other similar documents.  (Whalen Resume, Gonell Aff. Exh. Z;

Whalen Dep. 47-49, 57-59; Post-Lombardo Dep. 58-60, 91-92; Statement of Melissa Curtis ¶ 5

("Curtis Stmt."), attached as Exh. L to the Gonell Aff.; Prince Stmt. ¶ 4.)  At Plaintiff's

discretion, he could seek additional information beyond what was initially provided by the

customer, or he could waive the customer's obligation to provide certain documentation,

including documentation verifying the customer's current and historical income.  (Whalen Dep.

57-60, 263; Post-Lombardo Dep. 47-48.)  If there were inconsistencies between information

provided in the application and documents obtained at Plaintiff's request, or if there was

something troubling in the applicant's credit history, Plaintiff could request that the customer

provide either a verbal or written explanation.  (Whalen Dep. 80-81, 133.)  Plaintiff had to

evaluate the reasons offered for the inconsistencies or derogatory credit items and decide

whether they were reasonable.  (Whalen Dep. 74-76, 80-81 (testifying that it was his "job as an

underwriter to evaluate that explanation and whether it was reasonable"), 116-25; Post-

Lombardo Dep. 58.)

Based on a review of all of the documentation in a particular borrower's file and an

evaluation of the borrower's creditworthiness, it was Plaintiff's job to "make a credit decision"

on behalf of Chase.  (Whalen Resume, Gonell Aff. Exh. Z.; Post-Lombardo Dep. 131 (testifying

that she made a decision on behalf of Chase – "my decision to approve a loan").)  Plaintiff could

make any one of a number of credit decisions regarding a particular loan request:

- approve the loan request without a variance or exception to Chase's policies and/or
guidelines;

- approve the loan request with one or more variances and/or exceptions to Chase's policies and/or guidelines;

- decline the loan request;

- make a counteroffer on the loan request for an amount less than the borrower requested and in an amount that Plaintiff established;

- make a counteroffer on the loan request for an amount less than the borrower requested and in an amount that Plaintiff established within his authority and also make one or more variances and/or exceptions; or

- send the loan request to a supervisor with a recommendation to take one of the foregoing actions if the loan request was in an amount greater than his lending authority (i.e., up to $500,000).

(Whalen Dep. 160, 201-05, 208-09 (describing the "decisions [he] could make"), 228-29, 263, 280, 403-04, 407-10; Smith Dep. 93-95; Post-Lombardo Dep. 72-73, 154; McGraw Dep. 85 (testifying that there were "a million different ways you could handle" a particular file); Prince Stmt. ¶ 6.)

### C.   Chase's Credit Policy.

During the time period when Plaintiff was an Underwriter, Chase had a Credit Policy that existed to guide Underwriters in assessing "who [wa]s a good credit risk for Chase." (Whalen Dep. 217; Smith Dep. 162 (describing the Credit Policy as an "important policy of Chase's").) Underwriters administered the Credit Policy, and they were the only employees charged with carrying out this important administrative Chase policy. (Whalen Dep. 217; Smith Dep. 162; McGraw Dep. 28-30.)

Whalen confirmed that he followed the Credit Policy, including specifically those provisions requiring an Underwriter to use judgment and discretion in making credit decisions and analyzing the borrower's financial profile to make those decisions. For example:

- "[T]he judgment of the underwriter plays a critical role in the determination of borrower income. . . ." (Credit Policy, § 2.2.6; Whalen Dep. 153.)[3]

- "Prudent judgment should be exercised in evaluating the debt service of first/second mortgage payments on other real estate holdings . . . ." (Credit Policy, § 2.3.1, ¶ 15; Whalen Dep. 158.)

- "Reasonable judgment should be applied to determine such verifications/statements are from an independent third party. . . ." (Credit Policy, § 2.4.2, ¶ 9c(3); Whalen Dep. 166.)

- "The underwriter must exercise his/her judgment to determine if numerous inquiries reported on the credit bureau report require an explanation from the borrower and/or an investigation to uncover if any new credit obligations resulted from the inquiries . . . ." (Credit Policy, § 2.5.2, ¶ 7; Whalen Dep. 167.)

- A credit risk score is only "a part of the decision making process. It must only be used to supplement, not to replace, an informed decision which has been based on an appropriate level of analytical review and the use of a considered, objective judgment." (Credit Policy, § 2.5.4; Whalen Dep. 173-74.)

- "At underwriter's discretion, another appraisal from another appraiser may be obtained." (Credit Policy, § 2.6.17, ¶ 6c; Whalen Dep. 173.)

Plaintiff admitted at his deposition that he followed each of the foregoing provisions of the Credit Policy that required the use of judgment and discretion as an Underwriter. (Whalen Dep. 127, 153, 158, 166-67, 173-74.) He testified that Underwriters "are using their judgment on whether something meets the credit policy or does not meet the credit policy." (Whalen Dep. 222.) He also conceded that his supervisors verbally directed Underwriters to use their judgment. (Whalen Dep. 340-43; Post-Lombardo Dep. 261-62.) Plaintiff testified to several examples of how he used his own judgment in performing his job duties. For example, Plaintiff evaluated borrowers' explanations for loss of income to determine whether the explanation was reasonable. (Whalen Dep. 81.) He used his logic to make a determination as to whether an

---

[3]   Relevant excerpts of the Credit Policy Guide 2000 ("Credit Policy") are attached as Exh. AA to the Gonell Aff.

explanation for a bankruptcy was acceptable or not.  (Whalen Dep. 122.)  Plaintiff also took what

he learned from others and applied it to new situations.  (Whalen Dep. 125.)

### D.   Plaintiff Had Authority To, And Did, Grant Variances.

Many potential borrowers did not meet the standard guidelines of the home equity loan

product for which they were applying.  (Lopa Dep. 122.)  Underwriters did not automatically

decline those loan requests, however.  Rather, an Underwriter could use his judgment to make a

"variance" or "exception" to a particular requirement or parameter of the Credit Policy and

approve a borrower's loan request even though they did not meet one or more requirements or

parameters of the Policy.  (Whalen Dep. 235.)

As an Underwriter, Plaintiff had the authority to grant exceptions and variances –

meaning that an "underwriter who had authority" (such as Plaintiff) "determine[d] whether a

variance is to be granted or not."  (Whalen Dep. 160.)  The Credit Policy did not dictate that a

variance be granted in any particular situation but, rather, left that decision to the Underwriter.

(Id.)

> Q:   As an underwriter, when you had authority, variance or exception authority, were
> you encouraged to use your judgment to make an exception or variance to make a
> customer's deal work if it was possible?
> A.   If it was logical and fit the Chase credit guidelines, yes.

(Whalen Dep. 235.)

To determine whether to grant an exception or variance, Plaintiff had to assess the

strengths and weaknesses of a file (and a file could have multiple strengths and weaknesses), and

determine whether a given strength was an adequate "compensating factor" to offset any

weakness.  (Whalen Dep. 98-99, 305-06; Post-Lombardo Dep. 107-08.)  Examples of

"compensating factors" included stability in the borrower's employment or in the home, low

loan-to-value ratio, assets, or high credit score.  (Whalen Dep. 161, 232-33; see also Prince Stmt.

9

¶ 8.) Thus, not only did an Underwriter have to identify a compensating factor, but the Underwriter also had to evaluate the compensating factor against the weakness in the file because, in Plaintiff's words, "[t]he compensating factor had to offset the piece that did not meet the credit policy." (Whalen Dep. 305-06.)

For example, Plaintiff testified that if a product's standard guidelines provided that a borrower should have a certain debt-to-income ratio (DTI) to qualify, and the borrower's DTI ratio was higher (in other words, it may be riskier to lend to them), an Underwriter could nonetheless make a "variance" and approve that borrower for the loan. (Whalen Dep. 260.)[1] As another example, Plaintiff stated that if the Credit Policy asked for an applicant to submit a letter of explanation regarding disputed credit items in the applicant's credit history, he could use a variance to waive that explanation letter. (Whalen Dep. 263.)

Plaintiff had the authority to and did grant multiple exceptions or variances on the same loan request – i.e., approving a loan request even though it did not conform to Chase's policy in multiple respects. (Whalen Dep. 280; Parmar Dep. 123.) He also could decide to make a variance in combination with a counteroffer. (Whalen Dep. 204-05.) For example, if an Underwriter analyzed a loan request where a customer's DTI (debt-to-income) ratio was too high for the particular loan product, the Underwriter could make a variance, or make a counteroffer at a lesser amount (thus lowering the borrower's DTI ratio), or make a counteroffer at

---

[1] As Plaintiffs testified, none of a borrower's indicia of creditworthiness are evaluated in a vacuum. For example, a potential borrower with a higher DTI ratio **_may_** be less creditworthy than a borrower with a lesser DTI, but an Underwriter could not make that assessment without a review of the rest of the borrower's financial information. (McGraw Dep. 37-38; see also Post-Lombardo Dep. 53 (an Underwriter had to "look at the whole file," not just certain financial information about the borrower, to make a credit decision); Statement of John Yonkoski ¶ 5, attached as Exh.W to the Gonell Aff. (an Underwriter "look[s] at all of the information, taken together, to evaluate the customer's financial position so that [he] can determine whether they are generally doing well financially, or whether they are in some sort of financial trouble").)

a lesser amount (thus lowering the borrower's DTI ratio), or make a counteroffer at a somewhat higher amount but still lower than the requested amount, in combination *with* a variance from the product's generally applicable DTI standards (because the DTI ratio was still too high for the product). (Smith Dep. 101-04; Whalen Dep. 260-61.) Those decisions would each be consistent with the Credit Policy. (Smith Dep. 104.)

Plaintiff was encouraged to use his judgment to make an exception or variance to make a customer's deal work if it was logical and if it fit within the guidelines. (Whalen Dep. 235.) As he testified: "I always wanted to see if something could fit within the Credit Policy, so if something didn't fit, I would look for it to see if I could make it fit with a variance which would have been in the Credit Policy." (Whalen Dep. 281; Post-Lombardo Dep. 171-72.) In fact, Plaintiff estimated that he made exceptions or variances on 15 percent of the loan requests on which he made a decision and that he "considered" making a variance or exception on a quarter of all decisions he made. (Whalen Dep. 280-81.) Plaintiff Smith likewise testified that she "look[ed] to do it [make an exception or variance] on every file." (Smith Dep. 124-25.)

Like Plaintiff Whalen, his fellow Plaintiffs testified that they used their discretion and judgment in performing their Underwriter job duties. For example, Plaintiff Post-Lombardo testified that she evaluated strengths and weaknesses of files and surveyed the situation for every file and decided how to proceed. (Post-Lombardo Dep. 137-38, 151.) Plaintiff Smith testified that an Underwriter used discretion and judgment by determining whether a file met the policy and determining if a variance or exception should be made:

> Q.   In what ways does an underwriter use their discretion and judgment within the credit policy?
>      Mr. Thomas:   Objection.
> A.   Again, in reviewing a file, in determining if it meets the policy. If something is outside of the policy, to determine if a variance or exception could be made.

(Smith Dep. 92-93.) Plaintiff Smith also acknowledged that there are "gray areas with respect to the [sic] underwriting a final decision on a file." (Smith Dep. 157; see also id. 77-78 (testifying that there could be a question as to whether a customer's letter of explanation for a weakness in their loan applicant was sufficient).) Plaintiff McGraw testified that he "would contend that the judgment that is involved is in determining whether or not the loan application fits in our Credit Policy guidelines." (McGraw Dep. 135.)[5]

Other current and former Underwriters who worked in Chase's Home Equity group in Rochester – individuals who Plaintiffs initially purported to represent in this action – corroborate Plaintiffs' testimony that their jobs involved judgment and discretion. For example, Mary Ellen Bark testified that "Chase has general guidelines which help inform the underwriter's credit decision, but ultimately it is the judgment of the underwriter as to what decision to make with respect to a particular loan request." (Statement of Mary Ellen Bark ¶ 4, attached as Exh. J to the Gonell Aff.) Joe Bellone testified that "an underwriter's primary job function is to manage the risk to Chase of lending money to loan applicants by determining the credit worthiness of those applicants. There is a lot of judgment involved in an underwriter's job." (Bellone Stmt. ¶ 3.) Ahn Le stated that "an underwriter's job is to make a judgment as to whether Chase should lend money to a borrower, looking at the borrower's loan application as a whole." (Statement of Ahn Le ¶ 2, attached as Exh. M to the Gonell Aff.) Rita Prince, one of Plaintiff's former supervisors,

---

[5] During their depositions, Plaintiffs testified in several instances that they made a decision based on their "feel" for what the outcome should be. (McGraw Dep. 43-44 (whether income was reasonable in a line of business); Smith Dep. 66 (advising underwriters to waive income documentation if they "feel comfortable" with the income that could be verified), id. 142 (wouldn't waive requirement that pizza delivery person claiming to make $250,000 in income submit income documentation because that income "wouldn't seem it [reasonable] to me"); id. 72 (would "feel better" about making an exception or variance on a file where there were more compensating factors); Post-Lombardo Dep. 42-43 (indicating she would recommend that a supervisor review a loan request with a less than 620 credit score, which would generally be denied, if she "felt it should be reviewed" for possible approval).)

testified that "underwriters are encouraged to use judgment to make an exception or variance or counteroffer or other means to make a customer's deal work." (Prince Stmt. ¶ 9.) Cheryl Woodberry stated that "Chase has general guidelines that help inform the underwriter's credit decision, but that credit policy is only a guideline, and is subject to interpretation to the underwriter. It is an underwriter's job to carry out the credit policy." (Statement of Cheryl Woodberry ¶ 3, attached as Exh. V to the Gonell Aff.; see also additional Statements attached as Exhibits N, R, T, and X to the Gonell Aff.)

### E.   Every Loan Request Was Different.

Plaintiff testified that it took him up to three or four hours to underwrite a loan request, and that no two loan requests that he reviewed as an Underwriter were the same. (Whalen Dep. 195, 317-19.) Two applicants would not have the same profile with respect to factors such as income, job stability, credit history, debt-to-income ratio, and other factors that went into making credit decisions. (Whalen Dep. 197.) In addition, Plaintiff conceded that two reasonable Underwriters, each applying Chase's Credit Policy, could reach different conclusions on the same application. (Whalen Dep. 241-42; Post-Lombardo Dep. 123, 323.) In fact, Plaintiffs in their depositions testified that they would have reached different credit decisions than Plaintiff Whalen reached on loan requests he decisioned. (See, e.g., Affidavit of Hansa Parmar ¶¶ 10-11 ("Parmar Aff.").) Two Underwriting supervisors could likewise reach different conclusions on the same borrower's application. (Smith Dep. 59.) Chase required Underwriters to document "how [they] applied the policy" so that, among other reasons, loan officers and other Chase employees could understand how the Underwriter had applied the Credit Policy to that particular borrower's request. (Smith Dep. 117; Whalen Resume, Gonell Aff. Exh. Z.)

## ARGUMENT

I.   **CHASE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM
     BECAUSE HE WAS EXEMPT UNDER THE ADMINISTRATIVE EXEMPTION.**

Section 7 of the FLSA requires employers to pay overtime compensation to any non-exempt employee who works in excess of forty hours in a regular workweek. 29 U.S.C. § 207(a). Section 13(a)(1) of the FLSA, however, expressly exempts from this overtime pay requirement any employee who is paid a salary and works in a "bona fide executive, administrative, or professional capacity." Id. § 213(a)(1). Although the terms "executive," "administrative," and "professional" employee are not defined in the Act, the Secretary of Labor has defined these terms under authority granted in the FLSA. 29 C.F.R. § 541.0 et seq.

During the period when Plaintiff worked as an Underwriter for Chase, the DOL defined the requirements for the administrative exemption to include an employee who is compensated "on a salary or fee basis at a rate of not less than $250 per week" and "whose primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers" which "includes work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.2. Thus, Chase is entitled to summary judgment if: (1) Plaintiff received a salary of at least $250 per week; (2) Plaintiff's primary duty as an Underwriter consisted of the performance of office or non-manual work; (3) Plaintiff's primary duty directly related to management policies or general business operations; and (4) Plaintiff's primary duty included the exercise of discretion and independent judgment. 29 C.F.R. §§ 541.2(a)(1), 541.2(e)(2), and 541.214(a).[6]

---

[6]   Prior to August 23, 2004, the DOL had promulgated two different tests for the administrative exemption: a "long test," which applied to employees earning a salary more than $155 per week but less than $250 per week; and a "short test," which applied to employees earning more than $250 per week. See 29 C.F.R. § 541.2 and 541.211; Haywood v. N. Am. Van Lines, Inc., 121

In August of 2004, the DOL issued new Regulations (the "2004 Regulations") regarding the administrative exemption. Those 2004 Regulations made no substantial change to the test for administrative exemption, but did attempt to clarify application of the exemption for the specific purpose of avoiding litigation. See 69 Fed. Reg. 22145 (Apr. 23, 2004). For example, the 2004 Regulations specifically provide that "employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing, or promoting the employer's financial products." 29 C.F.R. §541.203(b) (2004).[7]

Whether an employee's duties qualify as administrative under the FLSA is a question of law. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986); Bratt v. County of Los Angeles, 912 F.2d 1066, 1068 (9th Cir. 1990) (noting that "[t]he question [of] whether [employees'] particular activities excluded them from the overtime benefits of the FLSA is a question of law") (citation omitted); Wright v. Aargo Sec. Servs., Inc., 2001 WL 91705, at *11 (S.D.N.Y. Feb. 2, 2001); Morales v. Zondo, Inc., No. 00 Civ. 3494, 2001 WL 64745, at *4 (S.D.N.Y. Jan. 25, 2001). As explained below, Plaintiff was properly classified as an exempt administrative employee because each of the four requirements for exemption has been met.

---

F.3d 1066, 1069 (7th Cir. 1997) (holding that if a plaintiff earns more than $250 per week "the short test therefore governs [the court's] review").

[7] While the DOL's 2004 Regulations were adopted after Plaintiff was no longer an Underwriter, the DOL expressly noted that the provisions regarding financial services employees were intended to be "consistent with existing case law" (in other words, case law that applied during the period when Plaintiff was an Underwriter). 69 Fed. Reg. 22145 (Apr. 23, 2004). Citations to 29 C.F.R. herein are to the pre-August 2004 regulations unless otherwise indicated. Any citation to the post-August 2004 citations are noted with the "2004" parenthetical.

### A.   Plaintiff Performed Office Or Non-Manual Work.

Plaintiff has stipulated that he performed office or non-manual work. (Whalen Dep. 39-40.)  Thus, Plaintiff satisfied the first requirement for exemption, and Chase is entitled to a summary judgment ruling that Plaintiff performed office or non-manual work while he was an Underwriter with Chase.

### B.   Plaintiff Was Paid On A Salary Basis.

As to the second requirement for exemption, Chase paid Plaintiff an annualized salary, broken down over the course of the year into equal payments, of more than $250 per week. (Whalen Dep. 356-57; Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on the Issue of Employment In a Bona Fide Capacity ("Pl. Admin. Br.") at 2 (citing the DOL's short test as applying to this case).)  Plaintiff testified that the salary he received did not change "regardless of the number of hours that [he] worked per week." (Whalen Dep. 356-58).  Plaintiff's compensation as an Underwriter ranged between $36,384 and $65,179 annually.  (Parmar Aff. ¶ 3.)  Accordingly, Plaintiff satisfied the second requirement for exemption, and Chase is entitled to a summary judgment ruling that Plaintiff was paid on a salary basis.

### C.   Whalen's Primary Duty Was Administrative.

With respect to the third administrative exemption requirement, the DOL Regulations provide that the employee's primary duty relate to "management policies or general business operations" of the employer.  29 C.F.R. § 541.2.  The DOL has defined work related to the "management or general business operations" of the employer as "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a) (2004).  Additionally, the Regulations define an

employee's primary duty as one on which an employee spends more than 50 percent of his time, but also state that "[t]ime alone, however, is not the sole test." 29 C.F.R. § 541.103.

Here, Plaintiff's primary job duty is undisputed:  Plaintiff testified under oath that his primary duty as an Underwriter was to evaluate the creditworthiness of Chase's customers and that he spent close to 90 percent of his time making credit decisions, including evaluating potential borrowers' financial information to enable him to make those decisions.  (Whalen Aff. ¶ 21; Whalen Dep. 227-28.)[8]  Plaintiff's primary duty of helping Chase manage risk in the making of credit decisions is clearly administrative work directly related to Chase's management policies or general business operations.   Indeed, as shown below, the DOL's own Regulations and every court that has ever considered the exempt status of underwriters or other employees who make credit decisions has concluded that such employees are exempt.

### 1.   DOL Regulations And Caselaw Demonstrate Plaintiff Was Exempt.

The Department of Labor's Interpretative Regulations provide some examples of the type of work that the DOL considers to be "administrative," including:  carrying out the company's policies, "representing the company," and "business research and control." 29 C.F.R. § 541.205(b)-(c).  Whalen not only carried out and administered Chase's credit policies, controlled business risk, and represented Chase by making binding credit decisions and preventing loan officers and other employees paid on a commission basis from writing bad loans (Whalen Dep. 352-53; see also McGraw Dep. 65), but he also performed the exact type of work the DOL has specifically said falls squarely within the administrative exemption.

The DOL has consistently regarded the making of credit decisions as exempt work:

---

[8] The other Plaintiffs also testified that their primary duty was to evaluate the creditworthiness of Chase's customers and make credit decisions, and that they spent the vast majority of their time as Underwriters doing so.  (See, e.g., Affidavit of Carrie Smith ¶ 20; Smith Dep. 146; Affidavit of Post-Lombardo ¶ 20; Post-Lombardo Dep. 256-58.  The Affidavits are attached as Exhibits S and P, respectively, to the Gonell Aff.)

Another illustration is the credit manager who makes and administers the credit policy of his employer. Establishing credit limits for customers and authorizing the shipment of orders on credit, including the decisions to exceed or otherwise vary these limits in the case of particular customers, would be exempt work of the kind specifically described in Section 541.2. Work which is directly and closely related to these exempt duties [and therefore exempt] may include such activities as checking the status of accounts to determine whether the credit limit would be exceeded by the shipment of a new order, removing credit reports from the files for analysis and writing letters giving credit data and experience to other employers or credit agencies.

29 C.F.R. § 541.208(c); 29 C.F.R. § 703(b)(7) (2004).[9]

Also, the DOL has set forth its specific opinion as to what constitutes administrative work in the financial services industry: "Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as . . . collecting and analyzing information regarding the customer's income, assets, investments or debts." 29 C.F.R. § 541.203(b) (2004).

In addition to the DOL Regulations, every court to examine the exempt status of underwriters, employees who make credit decisions, and other similar employees has held *as a matter of law on summary judgment* that those employees are exempt. Most significantly, a case from this Circuit – not cited at all by Plaintiff – holds that *home mortgage underwriters* are administratively exempt. In Havey v. Homebound Mortgage, Inc., No. 2:03-CV-313, 2005 WL 1719061, at *5 (D. Vt. July 21, 2005), a home mortgage underwriter who underwrote loans for a

---

[9] Moreover, the DOL's Regulations are explicit that an employee need not have been responsible for "making" policy to qualify for the exemption: "Employees whose work is "directly related" to *management policies* or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or *carry it out*." 29 C.F.R. § 541.205(c) (emphasis added); see also DOL Op. Ltr., June 29, 2006, available in 2006 WL 2158424 (stating that "interpret[ing] management policies" was exempt work); Dambreville v. City of Boston, 945 F. Supp. 384, 392-93 (D. Mass 1996) (holding that coordinator in Mayor's Office of Neighborhood Services was sued administrator because he carried out policies of the Mayor's Office, despite the fact that he did not make policies or recommendations about policies, "either formally or informally"); Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 518 (6th Cir. 2004) (holding that production planners who "carr[ied] out the plant policies" were exempt).

company, argued that she performed "production" and not "administrative" work. The court

soundly rejected her argument, holding as a matter of law that she had "responsib[ility] for

underwriting loans by reviewing the applications and recommending whether loans should be

accepted or rejected. This is plainly nonmanual work related to Homebound's business." Id.

Likewise, in Edwards v. Audubon Ins. Grp., Inc., No. 3:02-CV-1618-WS, 2004 WL

311911, at *7 (S.D. Miss. 2004), the court held that an insurance underwriter was an

administratively exempt employee as a matter of law. The court found that underwriters, who

"decide what risks the company would take" perform "clearly exempt work." Id. at *5. The

court in Callahan v. Bancorpsouth Ins. Servs., 244 F. Supp. 2d 678, 687 (S.D. Miss. 2002),

similarly held that an employee performing underwriting duties was exempt.

In Hills v. Western Paper Co., 825 F. Supp. 936, 938 (D. Kan. 1993), the plaintiff "was

responsible for keeping track of bills, payments, and insuring that customers to whom Western

extended credit were creditworthy." Accordingly, the court held that "Hills' duties directly

relate to both Western's management policies and its general business operations." Id.; see also

Hippen v. First Nat'l Bank, No. Civ. A. No. 90-2024-L, 1992 WL 73554 (D. Kan. Mar. 19,

1992) (holding that bank employee who "had authority to approve loans of up to $50,000

without seeking prior approval" from her supervisor was "clearly" exempt); Brennan v.

Westinghouse Credit Corp., No. 6431, 1973 WL 1031, at *4 (E.D. Tenn. 1973) (holding that

credit managers that, inter alia, make decisions concerning "the extension of credit" perform

exempt work).

Additionally, the U.S. District Court for the District of Massachusetts has held as a matter

of law that a business analyst who, like Plaintiff performing his Underwriter or Credit Analyst

position, made decisions about whether or not to approve a potential business deal was exempt.

Reich v. Haemonetics, 907 F. Supp. 512, 518 (D. Mass. 1995).  Haemonetics' business analysts, who decided whether a proposed deal met Haemonetics' revenue goals (which the business analysts did not set), were held to perform work directly related to the management policies or general business operations of, and that was of substantial importance to the Company.  Id.

The DOL and the courts have been clear that employees, like Plaintiff, who help manage a company's risk, such as underwriters, other employees who make credit decisions, and business analysts, perform exempt work.

### 2. The Undisputed Facts Demonstrate That Whalen Performed Administrative Work.

Plaintiff's description of his own duties – corroborated by the testimony of his fellow Plaintiffs – clearly demonstrates that his primary duty was related to the policies or general business operations of Chase:

- *Up to as much as $500,000 per loan request, Plaintiff had the authority to approve or deny a loan without any higher-level review, and in doing so he made decisions involving over two and a half billion dollars in loans and lines of credit.*  (Whalen Dep. 202, 259, 321; Parmar Aff. ¶ 4.)  See 29 C.F.R. § 541.205(a) (exempt work is "of substantial importance to the management or operation of the business of his employer or his employer's customers"); Edwards, 2004 WL 311911, at *6 (holding that underwriters whose "decisions resulted in Audubon providing millions in insurance coverage, thereby exposing Audubon to millions in exposure and losses and, conversely, providing millions in insurance coverage to accounts" affected the company's business operations to a substantial degree); Haywood, 121 F.3d at 1070 (affirming summary judgment for employer on the basis that plaintiff was exempt administrator where she "settled over $100,000 in cargo claims in 1994 alone"); In re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litig., 336 F. Supp. 2d 1077, 1104 (D. Ore. 2004) (holding that automobile and property (home) claims representatives with more than $3,000 in claims authority were exempt).

- *Plaintiff's primary duty was to "evaluate the credit-worthiness of [Chase's] customers," and he spent close to 90% of his time making credit decisions, including evaluating potential borrowers' financial information to enable him to make those decisions.*  (Whalen Aff. ¶ 21; Whalen Dep. 227-28.)  See, e.g., Havey, 2005 WL 1719061, at *5 (holding exempt underwriter's work in "recommending whether loans should be accepted or rejected"); Hills, 825 F. Supp. at 938 (finding exempt individual who made credit decisions); Hippen, 1992 WL 73554, at *7 (same).

- *Plaintiff represented Chase when managing risk to Chase by administering, or carrying out, the Credit Policy – Plaintiff made a decision as to whether, in his words, "to lend" to a borrower.* (Whalen Dep. 217, 255 ("Lending authority consisted of a dollar amount up to which a lending – up to which an underwriter could lend to under the credit policy.").) See 29 C.F.R. 541.205(b)-(c) (providing that "representing the company" and performing "business...control" functions are exempt work); 29 C.F.R. § 208(c) (providing that "authorizing the shipment of orders on credit" was exempt work); Edwards, 2004 WL 311911, at *5 (finding exempt underwriter's work in "decid[ing] what risks the Company would take"); Haemonetics, 907 F. Supp. at 518 (finding exempt work involving assessing the risk to the Company posed by certain business deals).

- *In deciding whether to extend credit to a borrower, Plaintiff was to ensure that a loan applicant was creditworthy and that lending to that applicant was consistent with Chase's Credit Policy.* (Whalen Aff. ¶ 21.) See Haemonetics, 907 F. Supp. at 514 (holding that Haemonetics' business analysts, who were tasked with ensuring that a deal proposed by a sales representative was consistent with Haemonetics' "revenue goals," were exempt).

- *Chase's Credit Policy was a management policy in effect to help Chase assess "who is a good credit risk for Chase," and Plaintiff administered, or carried out, Chase's Credit Policy.* (Whalen Dep. 217). See 29 C.F.R. 541.205(c) (providing that employees are exempt when their work "affects [management] policy or whose responsibility it is to carry it out").

- *Plaintiff reviewed financial documentation and information from borrowers in connection with the credit decisions he made.* (Whalen Resume, Gonell Aff. Exh. Z; Whalen Dep. 97, 225). See 29 C.F.R. § 541.208(c) (stating that "checking the status of a [borrower's] accounts" and "removing credit reports from the files for analysis" were exempt duties); 29 C.F.R. § 541.203(b) (2004) (noting that "collecting and analyzing information regarding the customer's income, assets, investments or debts" are exempt duties).

- *Plaintiff granted variances and exceptions, deviating from the guidelines set forth in Chase's Credit Policy.* (Whalen Dep. 261; 280-81.) See 29 C.F.R. § 541.208(c) (providing that making "decisions to exceed or otherwise vary [credit] limits" was exempt work); Haemonetics, 907 F. Supp. at 514 (finding that exempt business analysts could modify terms of a proposed deal that did "not make sense for the Company . . . until a satisfactory outcome for the company is found").

- *In representing Chase, Plaintiff, rather than a loan officer or branch employee that received a sales commission, ensured that the loan officer or branch employee did not put his or her desire to earn a commission ahead of Chase's financial interests.* (Whalen Dep. 352-53; McGraw Dep. 65). See Haemonetics, 907 F. Supp. at 514 (finding that business analyst "ensures that the sales representative does not put his or her desire to make a sale and earn a commission ahead of Haemonetics' bottom line").

These duties, which Plaintiff testified under oath he performed, are precisely what the

Department of Labor and the courts have uniformly found to be administratively exempt duties.

### 3.   None of Plaintiff's Arguments Change The Fact That His Primary Duty Was Administrative.

Plaintiff's summary judgment motions speak volumes about what he truly believes about

his case both on the facts and the law.   In two briefs totaling nearly fifty pages, Plaintiff never

once tells the Court that he testified under oath that his primary duty was to "evaluate the

creditworthiness of [Chase's] customers." (Whalen Aff. ¶ 21.)   Likewise, Plaintiff never once

tells the Court that the DOL Regulations addressing the administrative exemption specifically

state that employees who authorize the extension of credit are exempt from overtime.   29 C.F.R.

§ 541.208(c).   He also never once cites any of the many decisions, including one from this

Circuit, that hold on summary judgment that underwriters are "clearly" and "plainly" exempt.

Instead, as explained below, what he does is misstate the law and asserts a host of arguments that

have been expressly rejected time and time again.

### a.   Plaintiff Misstates The Law.

Not only does Plaintiff fail to cite this Court to DOL regulations and court decisions right

on the point, but he also misstates what little authority he does offer.   For example, Plaintiff

relies on a May 17, 1999 DOL Opinion Letter regarding loan officers, alleging that "[t]he

Department of Labor itself has found that employees performing work similar to Mr. Whalen are

not entitled to exempt status . . . .because the work was "production in nature." (Pl. Admin. Br.

at 15.)   Putting aside the fact that the loan officers at issue in the Opinion Letter did not make

credit decisions, but rather, "develop[ed] new business for the employer," Plaintiff does not tell

the Court that the DOL *reversed* this Opinion Letter on the very issue for which Plaintiff cites it.

DOL Op. Ltr. May 17, 1999, available in 1999 WL 1002401.   In 2001, in "a reconsideration of

our opinion of May 17, 1999," the DOL states that "we agree that the primary duty of the loan officer consists of the performance of office or nonmanual work directly related to the management policies or general business operations of the employer or the employer's customers." DOL Op. Ltr. Feb. 16, 2001, <u>available</u> <u>in</u> 2001 WL 1558764.  Moreover, the DOL stated on September 8, 2006 that mortgage loan officers who, among other duties, "collect and analyze the customer's financial information and assess the customer's financial circumstances to determine whether the customer and the property qualify for a particular loan", are exempt administrative employees.  (DOL Op. Ltr. Sept. 8, 2006 at 2, a copy of which is attached as Exhibit BB to the Gonell Aff.)

Plaintiff also tells this Court that the DOL Regulations expressly list "underwriters" as "examples in the regulations" of non-exempt employees, citing 29 C.F.R. § 541.207 and 29 C.F.R. § 541.203 (2004).  Neither citation contains a reference to "underwriters," although they do expressly mention every other position Plaintiff lists.  (Pl. Admin. Br. at 10.)

**b.      Plaintiff's Work "Related To" The Extension of Credit Is Exempt Work.**

Plaintiff next argues that he performed production, rather than administrative, work because his work "***related to***" the extension of credit to Chase's customers.  (Pl. Admin. Br. at 16.)  The DOL and the courts, however, have soundly rejected this argument.  The DOL Regulations differentiate "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work." 29 C.F.R. § 541.205(a).  To determine whether an employee performs production work, the Court must decide whether an employee's "job is to generate (<u>i.e.</u>, 'produce') the very product or service that the employer's business offers to the public." <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 9 (1st Cir. 1997); <u>Renfro v. Indiana Michigan Power Co.</u>, 370 F.3d 512, 517 (6th Cir.

2004).  Employees who perform duties that are "ancillary" to production, therefore, are not

production employees.  <u>Renfro</u>, 370 F.3d at 517.

In <u>John Alden Life</u>, for example, the First Circuit analyzed the exempt status of

marketing representatives who keep John Alden agents "up to date on all aspects of John Alden's

product line."  126 F. 3d at 4.  The court held that "John Alden is in the business of designing,

creating, and selling insurance policies to the public. . . . *As the marketing representatives are in*

*no way involved in the design or generation of insurance policies, the very product that the*

*enterprise exists to produce and market, they cannot be considered production employees*."

126 F.3d at 8 (emphasis added).

Here, Plaintiff concedes that Chase is a global financial services firm in the business of

offering a wide variety of products, services, and advice to its customers, including but not

limited to loans.  (Pl. Admin. Br. at 2 (<u>citing</u> Defendant's RFA Responses).)  Plaintiff also

admitted that his "principal job duty" was to "evaluat[e] the creditworthiness of customers" at

Chase, not to produce any product or service of Chase.  (Whalen Aff. ¶ 21.)  Specifically,

Plaintiff testified that he did **_not_** produce loan products:

> Q:   What products or services did Chase offer to the public?
> A:   Home equity lines of credit, home equity loans, various types of mortgages.
> Q:   Are you finished?
> A:   Yes.
>
> &ast;   &ast;   &ast;
>
> Q:   When you were an underwriter at Chase, who was responsible for developing
>        home equity loan products that Chase offered to the public?
> A:   I don't know.
> Q:   Were you?
> A:   No.

(Whalen Dep. 237, 344; <u>see also</u> McGraw Dep. 131-32; Smith Dep. 173; Post-Lombardo Dep.

248-250.)  As Plaintiffs testified, the loan products already existed at the time Underwriters made

a credit decision as to whether an applicant was creditworthy.  (McGraw Dep. 132; Post-

Lombardo Dep. 249-50; Prince Dep. 95).[10]  Whalen also did not sell loan products. (Whalen Dep. 344-45).[11]

Plaintiff's testimony demonstrates that he did not "produce" the loans that Chase was in the business of offering to borrowers.  Instead, he was representing Chase and controlling risk to the business by making a binding decision on behalf of the Bank as to whether an applicant was creditworthy.  29 C.F.R. § 541.205(b) (c) (providing that representing the company and business research and control are exempt functions).[12]  Plaintiff's citation to <u>Reich v. State of New York</u>, 3 F.3d 581 (2d Cir. 1993), to argue otherwise is unavailing.  (Pl. Admin. Br. at 16-17.)  In <u>State of New York</u>, the court held that police investigators were non-exempt because they "produced" investigations, and the product or service that the police department offered to the public was investigating crime.  <u>Id.</u> at 587-88.  In contrast, Plaintiff testified that Chase's products were loans and lines of credit and that he never produced them.  (Whalen Dep. 344-45.)  The fact is that Plaintiff and every one of his fellow plaintiffs testified under oath that their principal duty

---

[10]  Plaintiff also testified that Chase is ***not*** in the business of selling credit decisions (or, in other words, underwriting services). (Whalen Dep. 238; McGraw Dep. 122; Post-Lombardo Dep. 250.)

[11]  In light of Plaintiff's testimony, Plaintiff's citation to <u>Casas v. Conseco Fin.</u>, Civ. No. 00-1512, 2002 WL 507059, at *9 (D. Minn. Mar. 31, 2002) (<u>See</u> Pl. Admin. Br. at 14-15) actually supports Chase's position that Plaintiff performed exempt work. There, the court held that Conseco's "primary business purpose is to design, create and sell home lending products" and that the loan originators' were non-exempt because their primary duty was to sell lending products. <u>Id.</u> at *9. Even if Chase's primary business was "to design, create and sell lending products," Plaintiff has testified that he did not design, create, or sell lending products. (Whalen Dep. at 344-45.)

[12]  Even if Plaintiff's duties are not clearly exempt by virtue of the fact Plaintiff was representing Chase, controlling risk to the business, and carrying out an important management policy – which they are – the DOL Regulations also expressly provide that employees who "service" the employer, or perform special projects, are administratively exempt. <u>Renfro</u>, 370 F.3d at 518 (holding that the duties of planners who created electricity production plans "[w]hile not precisely 'administrative,' the planners' duties form the type of 'servicing' ('advising the management, planning' etc.) that the FLSA deems administrative work directly related to [the employer's] general business operations"); <u>Shaw v. Prentice Hall Computer Publ'g, Inc.</u>, 151 F.3d 640, 644 (7th Cir. 1998) (finding that "production editor" performed special projects and was exempt).

was to evaluate the creditworthiness of customers and that they did not create or sell any loan product that Chase offered to the public.

Having admitted that he does not produce any product of Chase, what Plaintiff tries to argue is that he is automatically a "production" worker because his work "relat[ed] to the extension [ ] of credit to customers." (Pl. Admin. Br. at 16.) The District of Connecticut is one of the numerous courts that have rejected precisely the same argument:

> [T]he fact that defendant has admitted that plaintiffs' duties related to the "production" of submarines does not dispose of this issue. Presumably the same could be said of almost every employee who worked for defendant. As defendant points out, the administrative/production dichotomy focuses not on whether an employee worked for an enterprise engaged in production activity, but whether the employee's primary duty was producing the product in question. Indeed, the regulations specifically cite the example of an administrative assistant to an executive in the *production* department of the business as being an administrative employee. Therefore, the fact that plaintiffs' job duties and responsibilities related to the production of submarines is insignificant.

Cooke v. Gen. Dynamics Corp., 993 F. Supp. 56, 61 (D. Conn. 1997) (internal citations omitted); see also Webster v. Public School Employees of Washington, 247 F.3d 910, 915 (9th Cir. 2001); Shaw, 151 F.3d 640 (7th Cir. 1998); Edwards v. Audubon Ins. Grp., 2004 WL 3119911, at *5 ("Edwards' assertion – that an insurance company's products are its policies; that he was employed by an insurance company; and that, therefore, he was a 'production' worker – must be rejected."); Kennedy v. Commonwealth Edison Co., No. 00-4053, 2003 WL 21785219, at *4 (C.D. Ill. June 23, 2003). As these courts have all recognized, Plaintiff's argument is baseless and, taken to its logical conclusion, would render every job non-exempt.

In an effort to sidestep the fatal admissions of all five Plaintiffs, Plaintiff invokes the so-called "administrative/production dichotomy." (Pl. Admin. Br. at 12-13.) Rather than supporting Plaintiff, however, application of the administration/production dichotomy to Plaintiff's job duties further demonstrates that Chase correctly classified him as exempt.

As the DOL and the courts have now firmly recognized, the administrative/production

dichotomy has limited usefulness.  In its 2004 Regulations, the DOL emphasized that it does not

"believe that the dichotomy has ever been or should be a dispositive test for exemption.  The

final regulation is consistent with the Ninth Circuit's approach in *Phase Metrics*:  the 'production

versus staff dichotomy' is 'one analytical tool' that should be used 'toward answering the

ultimate question,'. . .and *is only determinative if the work 'falls squarely on the production*

*side of the line*.'"  69 Fed. Reg. 221259 (Apr. 23, 2004) (emphasis added); see also Edwards,

2004 WL 3119911, at *5 (same); Renfro, 370 F.3d at 517-18.  Consistent with the DOL's recent

pronouncement, the Second Circuit has held that the administrative/production dichotomy is not

controlling authority and should only be used "to the extent it assists [the court] in applying the

statute and the legislative rules."  Reich v. State of New York, 3 F.3d 581, 587 (2d Cir. 1993).

The administrative/production dichotomy provides no help to Plaintiff here.  All five

Plaintiffs testified that their principal duty was to evaluate the creditworthiness of customers and

that they in fact had no responsibility for developing or selling Chase's products.  Plaintiff's

work cannot be said to "fall[ ] squarely on the production side of the line," given these

admissions and given that that courts have held that the duties Plaintiff performed are "plainly"

and "clearly" administrative and exempt.  Havey, 2005 WL 1719601, at *5; see also Edwards,

2004 WL 311911, at *5.

   c.  **Any Use of The Term "Production" at Chase Is Irrelevant to**
      **Plaintiff's Exempt Status.**

Plaintiff next argues that his primary duty was not administrative because some

supervisors used the term "production" when referring to underwriters.  (Pl. Admin. Br. at 17.)

Plaintiff's argument is directly contrary to the DOL's regulations and a uniform body of case law

holding that exempt status is determined based on the job duties actually performed and that

formal job titles and job descriptions (much less informal references or labels) do not affect an

employee's exempt status. <u>See, e.g.</u>, 29 C.F.R. § 541.201(b); 29 C.F.R. § 541.205(b) (providing

that an "administrative assistant to an executive in the production department" can perform

administratively exempt work); <u>Cowart v. Ingalls Shipbuilding, Inc.</u>, 213 F.3d 261, 267 (5th Cir.

2000) (holding that production planners who were responsible for planning "production work"

were administratively exempt); <u>Renfro v. Indiana Michigan Power Co.</u>, 233 F. Supp. 2d 1174,

1187 (W. D. Mich. 2002) (holding that production planners who "produce[d] standard work

packages to support the scheduled work" were performing an administrative function because

"their decisions play a critical role in determining how [the employer's] resources will be

committed before that work is even begun"), <u>aff'd</u>, 370 F.3d 512 (6th Cir. 2004); <u>Shaw v.</u>

<u>Prentice Hall Computer Publ'g, Inc.</u>, 151 F.3d 640, 644 (7th Cir. 1998) (holding that a

"production editor" was an administrative employee exempt from overtime); <u>Piscione v. Ernst &</u>

<u>Young, LLP</u>, 171 F.3d 527, 538-39 (holding that employee who "produced" reports, which

might be viewed as "production" work, was nonetheless exempt).  Thus, if Plaintiff's job title

had been "Production Underwriter" (which it was not), this would not render him a non-exempt

employee; surely a supervisor's use of the term "production" in describing Underwriters or their

work does not strip Plaintiff of his exempt status.

> Many more examples could be cited to show that titles are insufficient as yardsticks.  As
> has been indicated previously, the exempt or nonexempt status of any particular
> employee must be determined on the basis of whether his duties, responsibilities and
> salary meet all the requirements [for the exemption].

29 C.F.R. § 541.201(b)(2).[13]

---

[13]  As part of his repeated attempt to rely upon labels and characterizations rather than job duties,
Plaintiff alleges that he was purportedly not part of an employee group that may have been
referred to as "Operations," that he "reported up through the production channel", and that one
Chase employee testified that Underwriters were involved in making "widgets."    (Pl. Admin Br.
at 4, 17).  Again, these allegations are immaterial because job titles and labels have no bearing on

Moreover, even if a supervisor's use of the term "production" had some bearing on Plaintiff's exempt status – which it does not – the undisputed testimony demonstrates that to the extent the term was used, it was shorthand for the fact that Chase measured the "productivity" of Underwriters in terms of the number of credit decisions they made.  (Cary Dep. 101-02 (testifying that "production" was "loose terminology in the department when we refer to the productivity of an underwriter based on – I guess we measure it by the number of decisions that they would make, how productive they were, that sort of thing; just a performance management tool as far as to see how many decisions they would make in a given time period, that they were being productive"); Parmar Dep. 227.)  Plaintiffs themselves acknowledge that this language came from the fact that their productivity was measured.  For example, when asked for the factual basis of their belief that Underwriters were production workers, Smith testified that "Underwriters are measured on how many files they can review in a day," and Post-Lombardo testified that it was because she was making multiple decisions.  (Smith Dep. 225; Post-Lombardo Dep. 282.)  Of course, the fact that Chase measures how many credit decisions an Underwriter makes is also irrelevant to his or her exempt status.  The productivity of nearly all employees is measured by their employer – from measuring the timetable on which a judge renders decisions to measuring the number of claims that a claims adjuster handles.  This does not change the fact that the *__duties__* Plaintiff admits he performed are administrative duties, no matter how many times he performed them.

        **d.**        **The Fact That Chase Employed More than One Underwriter Has No Effect On Plaintiff's Exempt Status.**

Similarly, the fact that there were other Underwriters who Plaintiff alleges performed

---

an employee's exempt status. 29 C.F.R. 541.201(b)(2). Moreover, with respect to the widget comment, Plaintiff fails to cite the witness's testimony where she defines a "widget" as a "loan" and states that an Underwriter's role in lending money to an applicant is limited to "making the credit decision" on behalf of Chase. (Prince Dep. 95.)

similar duties does not mean that Plaintiff is not exempt. (Pl. Admin. Br. at 17.) This is yet another argument that has been rejected by the DOL Regulations and applicable caselaw. The DOL has provided that "[t]he fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work does not affect the determination" of whether they are administratively exempt employees. 29 C.F.R. § 541.205(c)(6). Similarly, the Seventh Circuit held that:

> The work that a single employee can do is limited, and as a company grows larger and larger, the percentage of the total output represented by each employee's efforts becomes smaller and smaller. [Even if] Shaw managed only about 2% of the book projects that Macmillan published while she was working there . . . that small percentage means nothing more that that Macmillan is a large company employing many people to do the same work Shaw did.

Shaw, 151 F. 3d at 645. Because Plaintiff performed administrative *duties*, the fact that others may have performed similar duties is irrelevant to the question of whether Plaintiff's duties were exempt.

### e. Chase's Payment of Additional Compensation To Plaintiff Has No Effect On His Exempt Status.

Plaintiff also argues that he was exempt because Chase paid him "additional compensation" on top of his guaranteed salary. (Pl. Admin. Br. at 17.) Chase did pay Underwriters a quarterly incentive amount based on the number of credit decisions each made, as well as premium pay during one particularly busy time, in addition to their salary. (Post-Lombardo Dep. 263-64; Pl. Admin Br. at 5.) However, without exception, courts and the DOL have made crystal clear that additional compensation beyond a salary is in no way inconsistent with an employee's exempt status. Employers are free to pay an employee additional compensation, even including overtime based on hours worked, without stripping the employee of his exempt status. See 29 C.F.R. § 541.118(b) (additional compensation besides the salary is not inconsistent with the salary basis of payment); Wright v. Aargo Security Serv., Inc., No. 99

Civ. 9115, 2001 WL 91705, at *5 (S.D.N.Y. Feb. 2, 2001) ("[C]ourts have consistently held that

an employee's receipt of additional amounts, including overtime, above his predetermined base

compensation does not destroy the employee's otherwise valid salary status."); Fife v. Harmon,

171 F.3d 1173 (8th Cir. 1999); Anunobi v. Eckerd Corp., No. Civ.A.SA-02-CV-0820, 2003 WL

22368153 (W.D. Tex. Oct. 17, 2003); Aly v. Butts County, GA., 841 F. Supp. 1199 (M.D. Ga.

1994); Hartman v. Arlington Co., Va., 720 F.Supp 1227 (E.D. Va. 1989).  As the Department of

Labor has expressly stated, "[a]dditional compensation besides the guaranteed salary...is not

inconsistent with the salary basis of payment and does not invalidate an otherwise applicable

exemption." DOL Opinion Letter, March 17, 1997, available in 1997 WL 998013.

> **f.     Any "Spreadability" of Work Is Irrelevant to Plaintiff's Performance of Administrative Duties.**

Plaintiff attempts to inject an element of social policy by suggesting that the work of

Underwriters was non-exempt because it was "spreadable," presumably meaning that it is

capable of being performed by more than one individual. (Pl. Admin Br. at 18.) The question of

whether an employee meets the administrative exemption is not whether the work they perform

is "spreadable," (Pl. Admin Br. at 15), as all work is spreadable to some degree. There is no

employee who could not complete more job duties in more hours – judges could adjudicate more

cases, doctors could see more patients, claims adjusters could adjust more claims, and

underwriters could make more credit decisions.[14]  Indeed, nowhere in the FLSA or the DOL

Regulations is the "spreadability" of the work a factor in determining exemption status.

Moreover, as Plaintiff has conceded, Chase's Home Equity Underwriters were not the kind of

employees that could clock out when the whistle blew, leave a loan request that they were in the

---

[14] The examples Plaintiff relies upon underscore the point.  A personnel administrator *could* conduct more job interviews and hire more candidates by working longer hours, and a tax specialist *could* review the tax compliance of more business deals by working more hours in a day or week.  (Pl. Admin. Br. at 18.)

middle of underwriting, and pass it to the next Underwriter.  Ironically, it is Plaintiff's own pre-litigation statement, made while he was managing Underwriters at Chase, that explains it best.  In response to the fact that Plaintiff believed some of the Underwriters who reported to him were leaving work "early," he wrote: "The uw's are exempt employees which requires them to work until the 'job' has been completed."  (Thomas Aff. (Prod). Exh. D.; Whalen Dep. 377-78.)  As Plaintiff testified, an Underwriter is assigned to decision a particular loan request and generally stays assigned to that request until it is completed, even if the decisionmaking process spans hours or days as the underwriter waits for more information from the applicant.  (Whalen Dep. 317-18.)

Even if the Court were inclined to accept Plaintiff's invitation to to decide this case based on social policy rather than the statute and regulations, this would favor a finding that Plaintiff was properly classified as exempt.  Plaintiff's salary covered all hours that he worked.  (Whalen Dep. 357-59.)  Moreover, Chase paid incentive pay to Underwriters, which compensated them for any extra time they worked.  (Post-Lombardo Dep. 263-64.)  Permitting Plaintiff to now recover overtime pay in addition to his base salary, incentive compensation, and premium pay would amount to double, it not triple, dipping.  Indeed, when asked about his compensation as an Underwriter at Chase in his deposition, Plaintiff testified that he "was okay with it," but that "[o]ne could always want more."  (Whalen Dep. 392.)

Of course, Plaintiff needs more than his "[o]ne could always want more" money philosophy to justify prevailing in this lawsuit – he needs an actual basis for his claims based on his job duties.  The Department of Labor and every court to consider the exempt status of employees performing the job duties that Plaintiff testified he performed, however, have concluded that those duties are administratively exempt.  It would be a major departure from

existing case law for this Court to conclude for the first time anywhere that a financial services

employee who evaluates creditworthiness and makes binding decisions that expose a company to

millions (if not billions) of dollars of potential loss is somehow a mere production employee who

must punch a time-clock and receive overtime pay.  Accordingly, Plaintiff's position satisfied the

third requirement for exemption and Chase is entitled to a summary judgment ruling that

Plaintiff's primary duty was administrative.

> **D.** **Plaintiff's Primary Duty As An Underwriter Included Discretion and Independent Judgment.**

> **1.** **Defining The Use Of Discretion And Independent Judgment**

Plaintiff's job duties easily satisfy the fourth element of the administrative exemption test,

the use of discretion and independent judgment.  The DOL Regulations define discretion and

independent judgment as follows:

> In general, the exercise of discretion and independent judgment involves the comparison
> and the evaluation of possible courses of conduct and acting or making a decision after
> the various possibilities have been considered.  The term . . . implies that the person has
> the authority or power to make an independent choice, free from immediate direction or
> supervision, and with respect to matters of significance.

29 C.F.R. § 541.207(a).

Under the short test that applies here, Chase need only show that Plaintiff's position as an

underwriter ***included*** the exercise of some discretion and independent judgment, not that

Plaintiff regularly did so.  29 C.F.R. §§ 541.2(a)(1), 541.2(e)(2), and 541.214(a); <u>Hippen</u>, 1992

WL 73554, at *8 ("One important ramification of the 'short test' . . .is that . . .the employee's

work need only <u>include</u> work requiring the exercise of discretion and independent judgment, as

opposed to <u>customarily and regularly</u> exercising such discretion and judgment.") (emphasis in

original); <u>see also Dymond v. United States Postal Serv.</u>, 670 F.2d 93, 95 (8th Cir. 1982).

The DOL Regulations also explicitly recognize that the decisions made by exempt administrative employees in the course of performing their duties need not even be final decisions and may be subject to review:

> [D]iscretion and independent judgment as used in the regulations . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations . . . .

29 C.F.R. § 541.207(e)(1) (internal quotations omitted); see also Dymond, 670 F.2d at 96 (holding that employees performed work requiring the exercise of discretion and independent judgment where their decisions were subject to approval or even reversal by higher level management); Haywood, 121 F.3d at 1073; Haemonetics, 907 F. Supp. at 518.

In addition, the discretion and independent judgment exercised must be with respect to a matter of significance or consequence. 29 C.F.R. § 541.207(d). "Employees make decisions as to matters of significance when they 'exercise authority within a wide range to commit their employer in substantial respects financially or otherwise.'" McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1001 (8th Cir. 2003) (finding that claims coordinator who had disbursement authority of up to $50,000 and authority to approve claims up to $150,000 made decisions on matters of significance as defined by the regulations).

### 2. The DOL and Courts Have Concluded That Individuals Who Make Credit Decisions Exercise Discretion and Independent Judgment.

As noted above, conspicuously absent from Plaintiff's Brief on the Issue of Discretion and Independent Judgment ("Pl. Discr. Br.") are any citations to the DOL Regulations or the many court decisions uniformly concluding that underwriters and individuals who make credit decisions exercise discretion and independent judgment and are exempt. Plaintiff makes no

mention of either the pre- or post-2004 DOL Regulations providing that a credit manager who administers the credit policy of his employer, "[e]stablish[es] credit limits for customers and authoriz[es] the shipment of orders on credit, including the decisions to exceed or otherwise vary these limits in the case of particular customers," and "review[s] credit reports" and other documents to perform these functions performs exempt work. 29 C.F.R. § 541.208(c); 29 C.F.R. § 541.202(c) (2004). Plaintiff also makes no mention of the new Regulations providing that employees in the financial services industry who "collect[] and analyz[e] information regarding the customer's income, assets, investments or debt" generally meet the duties requirement for the administrative exception. 29 C.F.R. § 541.203(b) (2004).

Applying these Regulations, courts in this Circuit and others have uniformly held that underwriters and individuals who make credit decisions are exempt administrative employees who exercise discretion and independent judgment. For example, in Havey v. Homebound Mortgage Co., 2005 WL 1719061, discussed supra, the federal district court in Vermont held that *home mortgage underwriters* not only performed administrative duties, but that they also exercised discretion and independent judgment in making credit decisions. The Homebound underwriters' duties included "reviewing and clearing income, credit and asset conditions by determining that documentation provided meets Investor guidelines; reviewing appraisals to ensure that the appraisals met Investor guidelines and were reasonable . . . ; and determining the degree of risk for each mortgage application by ensuring the proper programs had been selected, and making counteroffers if necessary." Id. at *6.

The underwriters in Havey did not have authority to make any variances from the underwriting guidelines, and they used a computer program to determine whether a mortgage fit into certain lenders' criteria and to determine to which lenders a particular loan could be sold. Id.

Nevertheless, the court rejected plaintiffs' argument that the job was automatic and did not

involve discretion because: (a) they could not approve any loans denied by the automatic

underwriting software; (b) supervisors reviewed the underwriter's loan denials; (c) the <u>Havey</u>

underwriters were required to apply various standards and adhere to a series of guidelines; and

(d) they "merely reviewed the criteria and checked off boxes on a form, which then determined

whether a loan would be approved or denied." <u>Id.</u> at *5, 7.  The court found that the fact that the

underwriters would sometimes "percolate on [loan decisions] for a while and ... think about

what's in the file to be sure [they] are meeting the guidelines" demonstrated that the process

required sufficient discretion and independent judgment.  <u>Id.</u> at *6.  Thus, the court concluded

that the underwriters were exempt and granted summary judgment to the employer.

Similarly, the <u>Edwards</u> court dismissed an underwriter's overtime claim on summary

judgment, holding that making good risk decisions so that the company will make more money

in premiums than it loses in losses "inherently included the exercise of discretion and

independent judgment." <u>Edwards</u>, 2004 WL 3119911, at *6.  Although the underwriter was

required to follow a detailed underwriting manual and could negotiate terms of insurance

policies only within prescribed ranges, the court concluded that the underwriter's decisions

exposed the company to the risk of financial loss, and that the plaintiff's discretion was

unfettered within the prescribed ranges.  <u>Id.</u> at *6-7.  The court stated emphatically that

"[i]nsurance underwriting clearly involves the exercise of discretion and independent judgment."

<u>Id.</u> at *6.

Numerous other courts from around the country likewise have found as a matter of law

that making credit decisions is exempt work that includes the exercise of discretion and

independent judgment. <u>E.g.</u>, <u>Hippen</u>, 1992 WL 73554, at *5 (holding that an employee's

authority to approve loans of up to $50,000, in and of itself, demonstrates the necessary exercise of discretion and independent judgment to satisfy the administrative exemption); <u>Brennan</u>, 1973 WL 1031, at *3-4 (finding that employees whose primary duties were to determine, on a case-by-case basis, which customers and dealers qualified for credit and which did not, were exempt employees who "exercise[d] their discretionary powers"). Similarly, in <u>Haemonetics</u>, discussed <u>supra</u>, the court found on summary judgment that business analysts who reviewed and restructured deals involving the sale and lease of medical equipment were administratively exempt. Although the analysts worked within pre-set target margins and revenues and could only propose (not require) a modified sale or lease plan to the sales representative and manager, the court held that the analysts exercised discretion and independent judgment by reviewing proposed agreements to ensure that sales representatives did not put their desire to make a sale and earn a commission ahead of the company's bottom line. 907 F. Supp. at 514.

### 3.   Plaintiff Exercised Discretion and Independent Judgment in Making Credit Decisions On Behalf Of Chase.

Plaintiff, and his fellow plaintiffs, admitted in their depositions to exercising the exact type of discretion the DOL and courts have concluded satisfy the administrative exemption.

First, in Plaintiff's pre-litigation resume, he described his duties as:

- Analyze financial income documents to determine an annual cash flow.
- Review past credit histories to determine strengths or weaknesses of mortgage application.
- Determine whether or not the collateral holds value to offset risk.
- Make a credit decision based on capacity, credit, collateral, character, and conditions of that particular applicant.
- Be able to substantiate each decision according to the business credit policy to both internal and external customers.

(Whalen Resume, Gonell Aff. Exh. Z.)[15] These activities alone are more than enough to show that Plaintiff exercised *some* discretion and independent judgment. See 29 C.F.R. § 541.208(c) (individual who authorizes the extension of credit exercises discretion and independent judgment). Indeed, Plaintiff fully acknowledged that underwriters "are using their judgment on whether something meets the credit policy or does not meet the credit policy." (Whalen Dep. 222; see also Post-Lombardo Dep. 137-38.) See Havey, 2005 WL 1719061 (home mortgage underwriters who determined whether income, credit, and asset information of applicants met certain guidelines for approving mortgages exercised discretion and independent judgment).

Second, it is beyond dispute that Plaintiff made decisions on matters of significance. Plaintiff admitted that he made credit decisions every day, multiple times a day, on matters involving up to $500,000. (Whalen Dep. 259, 317-19.) Over the course of his three-plus year tenure as an Underwriter at Chase, Plaintiff was responsible for making credit decisions involving over two and one-half billion dollars in loans. (Parmar Aff. ¶ 4; Whalen Dep. 320-21 (testifying that he did not know the total monetary amount of all loans he approved as an Underwriter, but that it was over $10 million in loans).) Each loan approved by Plaintiff put Chase at risk of loss for that amount in the event of a default. (Whalen Dep. 334.) Each loan declined by Plaintiff cost Chase potential revenue. (Whalen Dep. 334-35.) Courts have held that employees in the financial services or insurance industries who are responsible for decisions affecting amounts as little as several thousand dollars – and certainly as much as millions (if not

---

[15] Plaintiff McGraw similarly described his duties as an Underwriter in his resume as, *inter alia*, to: "[m]anage credit risk within acceptable policy and product parameters" and "work independently with minimal supervision while exercising decision making flexibility." (Resume of Daniel McGraw, attached as Exh. DD to the Gonell Aff.) Plaintiff Davis described his duties in his resume as "[u]nderwriting and making ultimate approval or denial final decisions for all home equity loans and lines of credit applications." (Resume of Michael Davis, attached as Exh. CC to the Gonell Aff.)

billions) of dollars, like Plaintiff – exercise discretion on matters of significance. See, e.g., DOL Opt. Ltr. June 29, 2006, available in, 2006 WL 2158424 (providing that Acquisition Agents who worked with real estate exercised discretion because they could "bind the client financially on significant matters"); McAllister, 325 F.3d at 1001 ("McAllister clearly had the authority to approve contestable claims up to $150,000 ... and had disbursement authority up to $50,000, which are matters of significance as defined by the regulations."); Edwards, 2004 WL 3119911, at *6 (holding that an underwriter who committed his employer to millions of dollars in insurance coverage was an exempt administrative employee); Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1048 (C.D. Cal. 2002) (holding that claims adjuster exercised meaningful discretion and judgment within her range of settlement authority ($5,000-$7,500)).

Third, Plaintiff admitted that before he even made a credit decision for a particular loan applicant, he used discretion and judgment in analyzing the loan file. As Plaintiff conceded, he often had to analyze "complex" materials in connection with each loan application, including credit reports, individual, corporate, and partnership tax returns, profit-and-loss statements, divorce decrees, and trust agreements. (Pl. Discr. Br. at 26; Whalen Dep. 47-49, 57-58; Post-Lombardo Dep. 58-60, 91-92, 202 (testifying that she "reviewed and analyzed" the loan requests she underwrote); Curtis Stmt. ¶ 5; Prince Stmt.¶ 4; see also Post-Lombardo Dep. 84 (indicating that she had to review comparable properties contained in the appraisal to "see if the comparable they sent in was an actual comparable, if it was similar to their home").) At his discretion, he could seek additional information beyond what was initially provided by the customer or he could waive the customer's obligation to provide certain documentation, including documentation verifying the customer's current and historical income. (Whalen Dep. 57-60, 263; Post-Lombardo Dep. 47-48.) If there were inconsistencies between information provided in

the application and documents obtained at his request, or if there was something troubling in the applicant's credit history, he could request that the customer provide either a verbal or written explanation. (Whalen Dep. 80-81, 133.) Plaintiff had to evaluate the reasons offered for the inconsistencies or derogatory credit items and decide whether they were reasonable. (Whalen Dep. at 74-76, 80-81, 116-25.) This process of analysis and evaluation in-and-of-itself involved the use of discretion and judgment. See, e.g., 29 C.F.R. § 541.203(b)(2004); Havey, 2005 WL 1719061, at *6 (holding that plaintiff exercised discretion and independent judgment where she "check[ed] the contents of the file against the underwriting guidelines").

Fourth, not only did Plaintiff's analysis of a loan request require him to use discretion and independent judgment, so too did the credit decision itself. Plaintiff testified that the ultimate decision on a customer's loan request involved the consideration of several options, including: (1) approve the request without a variance or exception: (2) approve the request with one or more variances and/or exceptions to Chase's policies and/or guidelines; (3) decline the request; (4) make a counteroffer on the request for an amount less than the borrower requested and in an amount that Plaintiff established within his authority; (5) make a counteroffer on the request for an amount less than the borrower requested and in an amount that Plaintiff established and also make one or more variances and/or exceptions; or (6) send the file that was outside of his lending authority of up to $500,000 to a supervisor with a recommendation to take one of the foregoing actions. (Whalen Dep. 160, 201-05, 208-09, 228-29, 263, 280, 403-04, 407-10; Smith Dep. 93-95; Parmar Aff. ¶¶ 5-9; Prince Stmt. ¶ 6.)

There can be no dispute that deciding among these various alternatives based on a review of "complex" documents involved "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered."

See 29 C.F.R. § 541.207(a). Indeed, Plaintiff testified that his primary duty was to "evaluate the creditworthiness of [Chase's] customers," and he defined the term "evaluate" to mean: "to get the facts and make a determination." (Whalen Dep. 139.) Plaintiff Post-Lombardo similarly testified that on every file, she "survey[ed] the situation and decid[ed] how to proceed." (Post-Lombardo Dep. 137-38; 253). Plaintiff also testified that two Underwriters, both knowledgeable about Chase's credit policy, could reach different conclusions on the same loan request and those different decisions could still be consistent with the credit policy. (Whalen Dep. 241-42; Post-Lombardo Dep. 123, 323.) The fact that two underwriters could reach different credit decisions based on the same facts destroys any conceivable argument that Plaintiff exercised no independent discretion in his job.[16]

Fifth, Plaintiff testified that he had the authority to grant exceptions and/or variances to Chase's established policies or guidelines and that he routinely exercised that authority. (Whalen Dep. 160.) In fact, Plaintiff testified that he had the authority to grant multiple variances or exceptions on the same loan request, that he exercised his variance authority to approve loans that did not otherwise meet the standards of the credit policy up to 15% of the time, and that he "considered" granting an exception or variance on 25% of the loan requests he decisioned. (Whalen Dep. 280-81; see also Smith Dep. 124-25 (when asked how often she made an exception or variance on a file, testifying that she "look[ed] to do it on every file").)

Deciding whether to grant a variance or exception certainly involved discretion and independent judgment. These decisions were not automatic, as evidenced by the fact that two knowledgeable Underwriters could reach different decisions on the same file. (Whalen Dep.

---

[16] Not only did Plaintiff Post-Lombardo similarly testify that two Underwriters could reach different decisions (Post-Lombardo Dep. 123, 323), but several of the Plaintiffs testified in their depositions that they would have made different decisions than Plaintiff Whalen made on applications that he decisioned when he worked as an Underwriter. (Parmar Aff. ¶¶ 10-11.)

241; see also Post-Lombardo Dep. 104 (testifying that although she could not recall whether she had ever granted a variance to approve a file with a credit score of less than 700, an underwriter could "do that if they wanted to").) As Post-Lombardo testified, discretion was used to decide whether to make a variance. (Post-Lombardo Dep. 255-56.) See, e.g., 29 C.F.R. § 541.208(c) (employee who makes decision to exceed or otherwise vary established credit limits in the case of particular customers is exempt); Haemonetics, 907 F. Supp. at 514 (finding judgment and independent discretion where employee could propose modifications to the business deal).[17] Given Plaintiff's authority to grant variances and exceptions, Plaintiff actually exercised more discretion and independent judgment than the underwriters found to be exempt in Havey, who had no such authority and who could only accept or reject the loan outright or seek additional approval. 2005 WL 1719061, at **6-7.[18]

Sixth, Plaintiff testified that Chase encouraged him to find a way to say "yes" to approve as many loan requests as possible. (Whalen Dep. 281; Pl. Discr. Br. at 4). Approving a loan (i.e., saying "yes") often required creative thinking and sound judgment. If Chase did not care about saying "yes," loan applications that did not meet Chase's guidelines would always be

---

[17] Even where an Underwriter did not have the authority to make a particular variance but believed that the variance should be made, he or she could send the loan request to his or her supervisor with a recommendation that the variance be granted. (Post-Lombardo Dep. 127-28.)
[18] Plaintiff contends that he did not have decision-making authority during his brief training period with Chase. (Pl. Discr. Br. at 11.) Even without such final lending authority at the beginning of his employment as an Underwriter, however, Plaintiff conceded that he did make decisions by making recommendations on loan applications, including whether variances of exceptions should be made to make the deal work. (Whalen Dep. 180.) The DOL Regulations address this situation. They state that "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(e). Moreover, the decision need not have "finality that goes with unlimited authority and a complete absence of review." Id.; see also Haemonetics, 907 F. Supp. at 518 (business analysts did not need to possess ultimate authority to exercise discretion and independent judgment). In any event, Plaintiff testified that during his training, he did not typically "put in what we define as overtime" and, in fact, may well have "put in less than eight hours a day on some occasions." (Whalen Dep. 364.)

denied. There would be no exceptions or variances. Underwriters would not consider compensating factors that might suggest creditworthiness of a borrower. Underwriters would not make counteroffers. In fact, however, Plaintiff has admitted doing all of these things. As in McAllister, 325 F.3d at 1001, where the manual followed by claims coordinators directed the employees to "bend over backward" to seek ways to pay claims and the claims coordinators were found to exercise discretion and independent judgment, so too is Chase's encouragement to Plaintiff to say yes to loan requests evidence that he was required to use discretion and independent judgment.

Finally, Plaintiff testified that after he made a decision to approve, decline, or make a counteroffer on a loan request, the decision was final and binding on Chase. (Whalen Dep. 202.) No one else reviewed the decision before the commitment letter from Chase went out. (Post-Lombardo Dep. 182.) Like the underwriters in Havey and Edwards, Plaintiff had final authority, independent of any supervision, to commit his employer. See Havey, 2005 WL 1719061, at *6-7; Edwards, 2004 WL 3119911, at *6.

Any one of these seven examples of Plaintiff's admitted use of discretion and independent judgment in his job as an Underwriter would be sufficient alone to satisfy the fourth element of the test for the administrative exemption and entitle Chase to summary judgment. See Hippen, 1992 WL 73554, at *8 (administrative duties need only *include* work requiring discretion and independent judgment). In fact, there are many examples of the exercise of discretion and use of judgment by Plaintiff, all of which occurred on a daily basis, fully satisfying the discretion and independent judgment element of the administrative employee exemption.

**4.     Plaintiff's Arguments That He Did Not Exercise Discretion and Independent Judgment Are Without Merit.**

Choosing to ignore his own sworn admissions about his job duties, and choosing once again to ignore the Regulations and case law specifically addressing the exempt status of employees that make credit decisions, Plaintiff makes a number of baseless arguments on the issue of discretion.  None of these arguments, as explained below, change the undisputed facts that his Underwriter job included the exercise of discretion.[19]

**a.     Adherence To Guidelines Does Not Destroy An Employee's Use Of Discretion And Independent Judgment.**

Plaintiff claims that he did not use discretion and independent judgment because he only decided if the loan applications met the Credit Policy rather than making unfettered, subjective decisions on creditworthiness based entirely on his personal view of whether he thought the applicant was a good credit risk. (Pl. Discr. Br. at 4, 26-27.)  Initially, as demonstrated above, the determination of whether a loan application, each different from an other, met the requirements of the Credit Policy itself required the exercise of discretion and independent judgment, as the Havey court concluded and Plaintiffs have conceded. (See Section I.D.3, supra.)  In addition, as a matter of law, an employer is not required to allow an administrative employee to make decisions entirely on his or her own, unfettered by any employer controls or

---

[19]  Plaintiff's unsupported conclusion that he had no discretion and exercised no independent judgment cannot prevent summary judgment. See, e.g., Nairne v. Manzo, No. Civ. A. 86-0206, 1986 WL 12934, at *5 (E.D. Pa. Nov. 14, 1986) (granting summary judgment to employer where "[p]laintiff's only evidentiary support for this allegation ... [that he was 'highly supervised, without discretion to exercise professional judgment'] was his own deposition testimony in which he insisted he had exercised no professional judgment"); Molinari v. McNeil Pharm., No. Civ. A. 84-5085, 1986 WL 5922, at *5 (E.D. Pa. May 22, 1986) (holding that "plaintiff's assertion that he did not perform professional work, without more, is not sufficient to withstand a motion for summary judgment"), aff'd, 810 F.2d 1164 (3d Cir. 1987); see also Piscione v. Ernst & Young, LLP, 171 F.3d 527 (7th Cir. 1999) (granting summary judgment for employer and finding employee administratively exempt through an analysis of the job duties actually performed, and discounting the affidavit of the plaintiff which characterized his duties as nonexempt).

guidelines. To the contrary, the law is clear that adherence to company standards does not negate the use of discretion and independent judgment.

The Second Circuit has held that an employee who was required to follow "detailed instructions" and uniform company standards nonetheless exercised discretion and independent judgment. Donovan v. Burger King Corp., 675 F.2d 516, 521-22 (2d Cir. 1982) ("Donovan I"). In Donovan I, the assistant managers at Burger King, like Plaintiff, claimed that any discretionary powers they had were wholly dictated by the detailed instructions issued by Burger King. Id. at 521-22. The Court rejected this argument and found that the assistant managers applied independent judgment and discretion while operating within Burger King's guidelines. Id. The court recognized that "the economic genius of the Burger King enterprise lies in providing uniform products and service . . . . The exercise of discretion, however, even where circumscribed by prior instruction, is as critical to that success as adherence to 'the book.'" Id. The court explained that the managers exercised discretion while using the guidelines: "Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made." Id.[20]

District Courts within the Second Circuit and from around the country have reached similar conclusions, finding that adherence to detailed guidelines does not negate the use of independent judgment and discretion. E.g., Havey, 2005 WL 1719061, at *7 (finding that "[t]he

---

[20] Although Plaintiff similarly alleges that he was precluded from exercising discretion because the Fair Lending laws required that every borrower would be treated the same way, this argument has been rejected by the Second Circuit, which held that consistency in an employer's procedures and requirements does not negate judgment and independent discretion. (See Pl. Discr. Br. at 7); Donovan I, 675 F.2d at 521-22. The fact that Chase has procedures to ensure that applicants are not treated differently in the credit decision-making process because of their race does nothing to undermine Plaintiffs' testimony that no two applications were the same and discretion and judgment was part of their Underwriter jobs. (Whalen Dep. 127, 153, 158, 166-67, 173-74, 195, 222-23; Smith Dep. 64, 149, 155-57; Davis Dep. 41-42.)

fact that an automated program guided their decision-making process or directed loan approval is not sufficient to permit a jury to find that Plaintiffs exercised no judgment and discretion in their duties"); Mulverhill v. State of New York, No. 87-cv-1989, 1989 WL 154827, at *4 (N.D.N.Y. Dec. 19, 1989) (finding that plaintiffs exercised independent judgment and discretion despite being obligated to follow detailed handbook procedures); Marting v. Crawford & Co., No. 00-cv-7132, 2006 WL 681060, at *8 (N.D. Ill. Mar. 14, 2006) ("The Seventh Circuit has repeatedly stated that both before-the-fact guidelines and after-the-fact supervision are not incompatible with the exercise of discretion.") (citation omitted); Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 519 (6th Cir. 2004); Dymond, 670 F.2d at 95; Roe-Midgett v. CC Services, Inc., No. 04-CV-4051-DRH, 2006 WL 839443, at *15 (S.D. Ill. Mar. 29, 2006); Bosch v. Title Max Inc., No. Civ. a. 03 ar-0463-s, 2005 WL 357411, at *8 (N.D. Ala. Feb. 7, 2005).

The overwhelming support for this proposition is not limited to case law. The Department of Labor, in its 2004 FLSA regulations, states that the use of manuals or guidelines does not preclude FLSA exemption because "[s]uch manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status." 29 C.F.R. § 541.704 (2004); see also Edwards, 2004 WL 3119911, at *7 (finding under both old and new DOL Regulations that, even if the plaintiff "was required to follow detailed manuals, that does not mean he did not exercise discretion and independent judgment") (citation omitted) (citing 29 C.F.R. § 541.704 (2004)).

As the DOL regulations and case law, including Second Circuit case law, confirm, following a policy manual does not defeat the FLSA exemption where the job includes the use of discretion. Even if it could, however, the undisputed facts here are that Chase's Credit Policy specifically directed underwriters such as Plaintiff to use "discretion" and "judgment" and that

Plaintiff followed those provisions. (See, e.g., Credit Policy, §§ 2.2.6, 2.3.1 ¶ 15, 2.4.2 ¶ 9c(3), 2.5.2 ¶ 7, 2.5.4, 2.6.17 ¶ 6c, & 2.8; Whalen Dep. 127, 153, 158, 166-67, 173-74, 222-23; Smith Dep. 64, 149, 155-57; Davis Dep. 41-42; Post-Lombardo Dep. 201, 208-09, 222-23, 238, 245-48; McGraw Dep. 170.) Plaintiff's supervisor or manager also encouraged him "to use [his] judgment on whether something fit the credit policy . . . ." (Whalen Dep. 342-43.) Such discretionary language in a manual, and such direction by higher-level management that an employee use their discretion, supports application of the exemption. See Mulverhill, 1989 WL 154827, at *4 (holding that state environmental conservation officers used independent judgment and discretion despite following detailed handbook procedures because the handbook itself provided for the plaintiffs to "exercise their own discretion in matters of consequence..."); Haywood, 121 F.3d at 1073 n.8 (finding that the company guidelines the plaintiff followed gave her "considerable latitude to negotiate a settlement" and did not constrain her independent judgment and discretion because the guidelines specified that "not all the answers are in the guidelines"); John Alden Life Ins. Co., 126 F.3d at 13; Marting, 2006 WL 681060, at *10.

Not only did the Credit Policy direct Plaintiff to use his judgment and discretion, but it is also undisputed that Plaintiff had the authority to grant exceptions and variances to the Policy and that he exercised that authority. (Whalen Dep. 160, 280). Plaintiffs Smith and Post-Lombardo testified that deciding whether to make a variance or exception required discretion and judgment. (Smith Dep. 159-60; Post-Lombardo Dep. 149, 175-76, 255-56.) As the DOL Regulations recognize, an employee is exempt where he "has authority to waive or deviate from established policies and procedures without prior approval." 29 C.F.R. § 541.202(a) (2004). Although Plaintiff claims that his variance or exception authority was circumscribed by Chase's policies, this is irrelevant to the determination. Courts have held that employees working within

company guidelines exercise independent discretion and judgment even when the boundaries of permissible variances are dictated by the guidelines themselves. See, e.g., Bosch, 2005 WL 357411, at *2-3 (finding employee used independent discretion when the "range or tolerance" she was permitted was $50 when she believed the wholesale value of a vehicle was around $600); see also Haywood, 121 F.3d at 1072 n.8 (finding independent judgment existed when guidelines advised that, in any instance when the answer was not in the guidelines, the employee should "always seek advice from your leader and assistant leader in those cases").[21]

Plaintiff's contention that he did not exercise discretion and independent judgment because he followed Chase's Credit Policy (Pl. Discr. Br. at 26-27) flies in the face of well-settled decisions in this Circuit and others, the DOL's Regulations, and his own deposition testimony.

**b.      Making Credit Decisions Requires Judgment And Not Simply The Application Of Learned Skills.**

Plaintiff contends that he merely used skill, not discretion and judgment, because he decided to accept or reject a credit risk based on prescribed standards and his training. (Pl. Discr. Br. at 7, 18-19, 28.) In NLRB v. Kentucky River Community Care, Inc., 532 U.S. 706, 714-15 (2001), however, the U.S. Supreme Court held that the NLRB erred as a matter of law in determining that nursing supervisors did not exercise judgment because the judgment was exercised pursuant to professional or technical training and experience. Id. at 713. The Supreme

---

[21] Plaintiff's allegation that his job was only to decide whether the application met the Credit Policy is no more than a disingenuous word game. (Pl. Discr. Br. at 3, 26, 27.) In making this allegation in his opening brief, Plaintiff does not tell the Court that the Credit Policy authorized, and indeed directed, him to use his judgment and discretion and to grant exceptions and variances to the Policy. (See Statement of Facts, § C.) Of course, as a matter of law and a matter of common sense, an employee does not lose his exempt status because his employer expressly authorizes the employee to use his judgment and discretion. See, e.g., Mulverhill, 1989 WL 154827, at *4 (holding that environmental conservation officers used independent judgment and discretion despite following detailed handbook procedures because the handbook itself provided for them to "exercise their own discretion in matters of consequence").

Court found that there was no basis for rejecting the judgment exercised by the supervisors simply because it was informed by professional or technical skill or experience. Id. at 714-15. To the contrary, the Supreme Court suggested, sound judgment is based upon professional or technical skill or experience. Id. Citing Kentucky River and applying it to the determination of the exempt status of underwriters, the court in Edwards held that underwriters plainly exercised discretion and independent judgment and did not simply use skill in evaluating accounts and negotiating terms of insurance policies within prescribed ranges. Edwards, 2004 WL 3119911, at *6-7.

### c. Jobs That Do Not Involve Decisionmakers Who Bind Their Employer Are Not Analogous to Plaintiff's Underwriter Position.

Plaintiff assiduously avoids the caselaw and DOL regulations pertaining to the job that he actually performed and, instead, tries to redirect the Court's focus to lumber graders, inspectors, investigators, and other positions that have nothing in common with underwriters in the financial services industry. In general, the individuals in the positions relied upon by Plaintiff in his Brief were not decisionmakers but, rather, simply collected or reported on information. In stark contrast, Plaintiff, like the underwriters in the cases cited above, used his judgment to make final, unreviewed decisions on whether millions of dollars would be extended to customers, thereby exposing his employer to substantial financial risk.

For example, the loan originator and loan officer decisions cited by Plaintiff are inapposite. Casas v. Conseco Finance Corp., No. Civ. 00-1512, 2002 WL 507059 (D. Minn. Mar. 31, 2002), actually supports Chase's position. In that case, the court found that loan originators were not exempt administrative employees because their primary duty was sales and because they did not exercise discretion and judgment. Id. at *9-10. But in doing so, the court specifically distinguished loan originators, who had no authority to approve a loan absent

approval from the underwriting department, with the underwriters at Conseco, who did have authority to approve loans. Id. at *10.  Similarly, the loan officers discussed in the February 16, 2001 Wage and Hour Opinion Letter cited by Plaintiff worked with customers to create a loan package, but lacked the authority to approve or reject the loan application. DOL Op. Ltr. Feb. 1, 2001, available in 2001 WL 1558764.  Unlike loan originators or officers who merely collect information, Underwriters like Plaintiff here analyzed that information and ***decided*** whether the information establishes that an applicant is creditworthy.  This exempt-level decision-making by Chase Underwriters clearly differentiates them from loan originators or loan officers who do not make decisions.[22]

The inspector and investigator decisions cited by Plaintiff are also distinguishable because those individuals did not make final decisions on behalf of their employer. See, e.g., McComb v. Robert W. Hunt Co., 172 F.2d 751, 752, 754 (7th Cir. 1949) (finding that senior inspectors who inspected structural steel, cement, concrete, and other general engineering materials and equipment using "yardsticks" and simply passed along findings in reports to clients who may or may not accept the findings were non-exempt); DOL Op. Ltr. Aug. 19, 2005, available in 2005 WL 3308592 (opining that investigators who had no decision-making authority on matters of significance, but rather gathered information allowing other employees to determine whether a subject would be granted security clearance, were not exempt); DOL Op. Ltr. Mar. 11, 1998, available in 1998 WL 852755 (opining that public inspectors and planners who had no authority to make decisions were not exempt).  Underwriters like Plaintiff, in

---

[22]  In addition, the DOL has recently opined that mortgage loan officers who, among other duties, "collect and analyze the customer's financial information and assess the customer's financial circumstances to determine whether the customer and the property qualify for a particular loan" are exempt administrative employees who exercise discretion and judgment. (DOL Op. Ltr. Sept. 8, 2006 at 2, a copy of which is attached as Exhibit BB to the Gonell Aff.)

con trast to those investigators and inspectors, used Chase's Credit Policy (which directed them to use  their judgment) to make binding and final decisions about whether Chase should accept a credit risk.

Other positions to which Plaintiff tries to compare himself in his Brief are even more far afield than the investigators, inspectors, and loan originators.  In each case, the court found the employees to be non-exempt because they did not consider options and make decisions.  See Burke v. County of Monroe, 225 F. Supp. 2d 306, 320-21 (W.D.N.Y. 2002) (finding nonexempt computer network administrators who "made no independent decisions on matters of great importance to the [employer's] business"); Ale v. Tennessee Valley Auth., 269 F.3d 680, 686 (6th Cir. 2002) (finding nonexempt a training officer who followed inherited lesson plans and administered pre-existing tests to power plant employees, did not "compar[e] and evaluat[e] possible courses of conduct or mak[e] decision[s] after consideration of the various possibilities"); Rainey v. Am. Forest & Paper Assoc., 26 F. Supp. 2d 82, 89 (D.D.C. 1998) (finding nonexempt personnel assistant who performed clerical work).[23]

Chase has cited DOL Regulations and decision after decision where underwriters and other individuals who make credit decisions have been, without exception, found to be exempt. Clearly, the responsibilities of the employees at issue in those decisions are far more comparable to those performed by Plaintiff than the job duties of lumber graders, paralegals, and inspectors. Moreover, Plaintiffs here have testified to all that is necessary to show that their job *included* *some* discretion and independent judgment – e.g., that the Credit Policy directed them to use their judgment and discretion, that they followed the Credit Policy in that regard, that there is

---

[23] Underwriters also have very little in common with paralegals, who do not and cannot exercise sufficient independent judgment in legal matters because there are strict prohibitions against the unauthorized practice of law in most jurisdictions, as explained in the Opinion Letter cited by Plaintiff.  DOL Op. Ltr. Feb. 19, 1998, available in 1998 WL 852691.

judgment within the Credit Policy, that two underwriters can reach different decisions on the same file and both decisions can be consistent with Chase's policies, and that they exercised discretion to decide when to grant exceptions and variances to the policies. Under all of the legal authority cited above, Chase has satisfied the final prong of the administrative exemption test and is entitled to a summary judgment ruling that Plaintiff's underwriter job included the exercise of discretion and independent judgment.

## II.    EVEN IF CHASE WERE NOT ENTITLED TO SUMMARY JUDGMENT, PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED.

For all the reasons set forth above, Plaintiff's own admissions and the governing law entitle Chase to summary judgment. At a minimum, however, those same admissions demonstrate that Plaintiff is not entitled to summary judgment. Plaintiff has admitted to performing a quintessentially administrative function – evaluating creditworthiness – as his principal job duty, and has also conceded that he produces no product of Chase. (Whalen Aff. ¶ 21; Whalen Dep. 344.) Moreover, Plaintiff has admitted to using his own discretion and judgment in the performance of his job duties. He testified that his duties as an Underwriter were to "make credit decisions," "analyze" financial documents, "determine strengths or weaknesses of mortgage application[s]," and "evaluate the creditworthiness of customers" (Whalen Resume, Gonell Aff. Exh. Z; Whalen Aff. ¶ 21.) He agreed that the Credit Policy required him to use his judgment and discretion, that he followed those specific provisions of the Policy requiring him to do so, and Underwriters "are using their judgment on whether something meets [Chase's policies] or does not meet" those policies. (Whalen Dep. 153, 158, 166-67, 173-74.) He also exercised discretion and independent judgment by making final and binding credit decisions and by granting exceptions or variances to Chase's established policies and guidelines. (Whalen Dep. 160, 202, 208-09, 228-29.) Standing alone, those admissions establish that Chase

is entitled to summary judgment and completely refute any argument that Plaintiff is entitled to summary judgment.

Plaintiff's summary judgment motions should be denied for two separate and independent additional reasons. First, Plaintiff does not support either motion with undisputed material facts that entitle him to judgment in his favor. Plaintiff seeks two summary judgment rulings: (1) that his job duties "were not of a bona fide administrative capacity" and (2) that he "did not exercise judgment and independent discretion in his job." (See Pl. Nots. Mot. at 1.) Plaintiff is entitled to neither ruling, as his supporting 56.1 Statements list no facts at all regarding his job duties, let alone facts sufficient to support his motions. Plaintiff simply cannot obtain the relief he seeks based on the *three* facts he proffers in his 56.1 Statement of Undisputed Facts: (1) Defendant is an enterprise engaged in interstate commerce; (2) Defendant has a business volume of at least $500,000 per year; and (3) Defendant classified plaintiff as exempt from the overtime requirements of the FLSA. (See Pl. 56.1(a) Statements). This alone mandates the denial of Plaintiff's motions.

Second, Plaintiff's failure to proffer facts in support of his motions constitutes a violation of this Court's Local Rule governing summary judgment motions. Western District of New York Local Rule ("Local Rule") 56.1(a) states that "[u]pon any motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." Plaintiff's 56.1 Statements do not even come close to satisfying Local Rule 56.1.[24] As the Local Rule plainly states, this Court has denied summary

---

[24] Plaintiff mistakenly refers to his 56.1(a) Statements as "56.1(b) statements."

judgment motions where the moving party – here, Plaintiff – fails to comply with Local Rule 56.1 and has not set forth facts in his 56.1 statement that entitle him to judgment as a matter of law.  See Local Rule 56.1(a); see also Gates v. Selsky, Case No. 02-CV-496, 2005 U.S. Dist. LEXIS 37787 (W.D.N.Y. Sep. 2, 2005) (denying summary judgment to party for failure to comply with Rule 56.1); Van Gorder v. Workman, Case No. 03-CV-6409, 2005 U.S. Dist. LEXIS 27325 (W.D.N.Y. Oct. 11, 2005) (same); see also NAS Elecs., Inc. v. Transtech Elecs. Pte Ltd., 262 F. Supp. 2d 134 (S.D.N.Y. 2003) (same).

Because Plaintiff has violated Local Rule 56.1, and has not (because he cannot) provide facts sufficient to support his motions for summary judgment, his motions should be denied.[25]

## CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment should be granted, Plaintiff's Complaint should be dismissed in its entirety with prejudice, and Plaintiff's motions should be denied.

---

[25] To the extent the Court does not deny Plaintiff's motions for his failure to allege facts in support of his motions and his violation of Rule 56.1, and the Court were to entertain any "facts" and "characterizations" alleged in Plaintiff's briefs that are not contained in his 56.1 Statements, those "facts" similarly fail to support his motions because they are, for all the reasons set forth above, immaterial (e.g., the fact that Plaintiff received additional pay is irrelevant to his exemption status , see supra Section I.C.3.e).  If the Court were to find that any statements contained in Plaintiff's briefs, but not in his 56.1 Statements, are material to his motions – which Defendant respectfully submits they are not – those facts are disputed by Defendant.



Dated: September 18, 2006

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: _____

Sam S. Shaulson
Carrie A. Gonell

101 Park Avenue, 37th Floor
New York, New York 10178
(212) 309-6000
(212) 309-6273 (Fax)

Attorneys for Defendant JPMorgan Chase Bank


and

**JONES DAY**
Samuel Estreicher
222 East 41st Street
New York, New York 10017-6702
(212) 326-3488
(212) 755-7306 (Fax)


and

**JPMORGAN CHASE LEGAL DEPARTMENT**

Todd Gutfleisch
One Chase Manhattan Plaza
26th Floor
New York, New York 10006
(212) 552-0913
(212) 552-1630 (Fax)

Attorneys for Defendant
  JPMorgan Chase Bank

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served a true and correct copy of: Defendant's

Memorandum of Law In Support of Its Motion for Summary Judgment and In Opposition to

Plaintiff's Motions for Summary Judgment; Defendant's Rule 56.1 Statement of Undisputed

Facts in Support of Its Motion for Summary Judgment; the Affidavit of Hansa Parmar, and the

exhibits attached thereto; and the Affidavit of Carrie A. Gonell, and the exhibits attached thereto

by Federal Express, this 18th day of September, 2006, on:

Nelson Thomas, Esq.
Dolin, Thomas & Solomon LLP
693 East Avenue
Rochester, New York   14607

Jessica Porter

Sworn to and subscribed before me
this 18th day of September, 2006

Notary Public

LESLIE HALSEY
Notary Public, State of New York
No. 01HA5039390
Qualified in Queens County
Commission Expires February 21, 20 _07_