**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

ANDREW WHALEN,                              )
                                           )
                          Plaintiff,        )
                                           )
v.                                         )          Case Number 01 CV 6492L(B)
                                           )
JP MORGAN CHASE BANK,                      )
                                           )
                          Defendant.        )
-----------------------------------------------------------X


**REPLY MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT....................................................................................................................................4

I.     WHALEN'S PRIMARY DUTY WAS ADMINISTRATIVE...........................................4

     A.    Plaintiff's Attempt To Avoid The Law Against His Position Is Baseless..............4

     B.    Plaintiff's Arguments About The Duties An Employee Must Perform To Be Exempt In The Financial Services Industry Misread the DOL Regulations and Caselaw ...............................................................................5

          1.    The DOL Regulation Listing Examples of Financial Services Employees Who Perform Exempt Work Is Not An Exhaustive List of Exempt Positions in the Financial Services Industry. ...........................5

          2.    There is No Legal Basis For Plaintiff's Attempted Distinction Between "Non-Credit Industries" And "Credit" Industries. ....................6

     C.    Plaintiff Need Not Set The Terms Of The Credit Policy To Be Exempt .............7

     D.    Plaintiff's "Ancillary" Work Was Exempt Work...................................................8

     E.    Plaintiff Did Not "Produce" Nor "Generate" Sales Of Chase's Products.............9

     F.    Some Managers' Use Of The Terms "Production" Or "Operations" Is Legally Irrelevant. ...........................................................................................11

II.    WHALEN EXERCISED DISCRETION AND INDEPENDENT JUDGMENT IN PERFORMING HIS JOB DUTIES.................................................................................13

     A.    Plaintiff Misconstrues The DOL's Regulations On Point. ..................................14

     B.    Chase's Credit Policy Did Not Prohibit, But Indeed Required, Plaintiff's Exercise of Discretion ......................................................................................15

     C.    Two Underwriters Could Reach Different Conclusions On The Same File ........21

     D.    Encouraging Underwriters To "Say Yes" Demonstrates The Importance of Judgment and Sound Exercise of Discretion by Underwriters.............................24

     E.    Plaintiff Was Evaluated By Chase On His Exercise of Discretion .....................25

     F.    Plaintiff's Attempt To Average The Time He Spent Making Decisions On Loan Requests Proves Nothing...................................................................26

     G.    Plaintiff Made Decisions Of Substantial Importance to Chase ...........................27

     H.    Plaintiff Was Not A Clerical Worker .................................................................27

III.   PLAINTIFF WAS AN ADMINISTRATIVELY EXEMPT EMPLOYEE DURING HIS "TRAINING PERIOD"...............................................................................29

IV.   PLAINTIFF'S "SOCIAL POLICY" ARGUMENT IS NOT RELEVANT TO HIS OVERTIME CLAIM................................................................................................30

# TABLE OF AUTHORITIES

## CASES

Page(s)

Brennan v. Westinghouse Credit Corporation,
   No. 6431, 1973 WL 1031 (E.D. Tenn. 1973) .........................................6, 10

Cooke v. General Dynamics Corporation,
   993 F. Supp. 56 (D. Conn. 1997)................................................................12

DOL Opinion Letter, FLSA2001-7,
   2001 WL 1558764 (Feb. 16, 2001).............................................................28

DOL Opinion Letter, FLSA2002-11,
   2002 WL 32406601 (Nov. 19, 2002)..............................................................3

DOL Opinion Letter, FLSA2006-31,
   2006 WL 2792445 (Sept. 5, 2006)........................................................10, 28

Dambreville v. City of Boston,
   945 F. Supp. 384 (D. Mass. 1996) ...............................................................7

Donovan v. Burger King Corporation,
   675 F.2d 516 (2d Cir. 1982)................................................................16, 21

Edwards v. Audubon Insurance Group, Inc.,
   No. 3:02-CV-1618-WS, 2004 WL 3119911 (S.D. Miss. 2004) ......................2, 12, 15

In re Farmers Insurance Exchange,
   466 F.3d 853 (9th Cir. 2006) ....................................................................27

Havey v. Homebound Mortgage, Inc.,
   No. 2:03-CV-313, 2005 WL 1719061 (D. Vt. July 21, 2005).........2, 4, 5, 6, 10, 15, 16

Hippen v. First National Bank,
   No. Civ. A 90-2024-L, 1992 WL 73554 (D. Kan. Mar. 19, 1992).....................2, 6, 10

Jastremski v. Safeco Insurance Companies,
   243 F. Supp. 2d 743 (N.D. Ohio 2003)....................................................8, 11

Margo v. Weiss,
   213 F.3d 55 (2d Cir. 2000)..........................................................................9

McAllister v. Transamerica Occidental Life Insurance Company,
   325 F.3d at 997 (8th Cir. 2003).................................................................25

Mulverhill v. State of New York,
   No. 87-CV-853, 1989 WL 154827 (N.D.N.Y. Dec. 19, 1989)...................................18

O'Bryant v. City of Reading,
    No. 05-4259, 2006 WL 2034590 (3d Cir. July 20, 2006)............................................9

Reich v. Haemonetics,
    907 F. Supp. at 512 (D. Mass. 1995) .........................................................................10

Reich v. State of New York,
    3 F.3d 581 (2d Cir. 1993)...........................................................................................4

Renfro v. Indiana Michigan Power Company,
    233 F. Supp. 2d 1174 (W.D. Mich. 2002) ................................................................16

Renfro v. Indiana Michigan Power Company,
    370 F.3d 512 (6th Cir. 2004) .......................................................................................7

Rutlin v. Prime Succession, Inc.,
    220 F.3d 737 (6th Cir. 2000) .......................................................................................8

Shaw v. Prentice Hall Computer Publishing, Inc.,
    151 F.3d 640 (7th Cir. 1998) .....................................................................................11

## STATUTES

29 U.S.C. § 251(a)(4-5) ..........................................................................................................30

29 C.F.R. § 541 ......................................................................................................................10

29 C.F.R. § 541.1(f) ...............................................................................................................11

29 C.F.R. § 541.2(a)(1)...............................................................................................3, 8, 13, 15

29 C.F.R. § 541.201(b) ..........................................................................................................12

29 C.F.R. § 541.202(c)........................................................................................................8, 15

29 C.F.R. § 541.203 ............................................................................................................5, 6

29 C.F.R. § 541.205(c)...............................................................................................3, 7, 8, 11
    12, 27

29 C.F.R. § 541.207(a)...............................................................................................3, 15, 21
    28, 29

29 C.F.R. § 541.208(c)...............................................................................................2, 3, 8,
    9, 15

29 C.F.R. § 541.704 (2004) ...................................................................................................16

29 C.F.R. § 703(b)(7) (2004) ........................................................................................3

Fed. R. Civ. P. 56(e) ....................................................................................................9

## PRELIMINARY STATEMENT

Plaintiff's own admissions make clear that Plaintiff's primary duty was administrative in nature and that he exercised discretion in performing his duties. Chase, therefore, is entitled to summary judgment that Plaintiff was as an administrative employee exempt from overtime pay.

As to Plaintiff's performance of administrative work, Plaintiff articulates the question before the Court as whether Plaintiff's "job [wa]s to generate (or produce) the very product or service that the employer's business offers to the public." (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl. Br.") at 1). The undisputed answer to this question though is "no." Plaintiff testified that he was not "responsible for developing home equity loan products that Chase offered to the public" and did not "sell the home equity product to the customers." (Whalen Dep. at 237, 344-45; see also Pl. Br. at 3-4 ("[T]he parties agree that underwriters . . . [d]id not develop or design loans" and "did not sell the credit products.")).[1]

In addition to admitting that he did not produce any product of Chase, Plaintiff affirmatively concedes that the primary duty he did perform was administrative. First, Plaintiff admits that it was his primary job duty to "evaluat[e] the creditworthiness of [Chase's] customers," (Plaintiff's Response to Defendant's Rule 56 Statement of Facts Not in Dispute ("56.1 Resp.") ¶ 3), and "make determinations as to whether Chase should lend money or extend credit to applicants." (Plaintiff's Supplemental Statement of Material Facts Not in Dispute ("Pl. Supp. Stmt.") ¶ 7.) In fact, Plaintiff not only concedes that his primary job duty as an Underwriter was to evaluate the creditworthiness of customers and that he spent 90 percent of his time making credit decisions and reviewing documents about customers' finances relating to

---

[1]   Relevant portions of the depositions cited to herein are addended as Exhibits to the Affidavit of Sam Shaulson ("Shaulson Aff.") as set forth in the index contained in Paragraph 3 of the Shaulson Aff. Citations to deposition testimony in this brief will appear as, for example, "Whalen Dep. 1," for a citation to the deposition of Andrew Whalen at page 1.

those decisions, but he also readily admits that making credit decisions is exempt administrative work. (Pl. Br. at 16; Affidavit of Andrew Whalen ¶ 21 ("Whalen Aff."), attached as Exh. U to the Gonell Aff.; Whalen Aff. ¶ 21; 56.1 Resp. ¶ 7; Whalen Dep. 227-28; see also Smith Dep. 146; McGraw Dep. 142-43).

The conclusion that someone, like Plaintiff, who makes credit decisions is exempt has been reached by the U.S. Department of Labor ("DOL") and every court to ever consider the issue. 29 C.F.R. § 541.208(c) (providing that employee who makes credit decisions is exempt); Havey v. Homebound Mortgage, Inc., No. 2:03-CV-313, 2005 WL 1719061, at *5 (D. Vt. July 21, 2005) (holding that home mortgage underwriter who was "responsible for underwriting loans by reviewing the applicants and recommending whether loans should be accepted or rejected" performed exempt administrative work); Edwards v. Audubon Ins. Grp., Inc., No. 3:02-CV-1618-WS, 2004 WL 3119911, at *7 (S.D. Miss. 2004); Hippen v. First Nat'l Bank, No. Civ. A 90-2024-L, 1992 WL 73554 (D. Kan. Mar. 19, 1992); see also additional citations at Defendant's Memorandum of Law in Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Summary Judgment Motions ("Def. MSJ") 17-20. Even Plaintiff admits that employees who make such "credit decisions are generally going to be administering the business . . . [by] helping the overall business run efficiently which is paradigmatic administrative work." (Pl. Br. at 16).

Second, Plaintiff also concedes that Chase's Credit Policy is an important administrative policy of Chase, that the Policy helped control business risk, that it was his responsibility to carry out the Policy, and that carrying out an administrative policy is an exempt duty. (Pl. Br. at 2-8; 56.1 Resp. ¶¶ 8-9; see also Whalen Dep. at 217). Indeed, according to the DOL:

> The regulations interpreting whether work is of substantial importance provide that the exemption is not limited to employees who participate in the formulation of management policies or in the operation of the business as a whole. Rather, it covers employees whose work affects policy or ***whose responsibility it is to execute or carry it out,***

2

including those "whose work affects business operations to a substantial degree, *even though their assignments are tasks related to the operation of a particular segment of the business*."

DOL Op. Ltr., FLSA2002-11, underline in 2002 WL 32406601 (Nov. 19, 2002) (finding exempt claims adjusters with as little as $3,000 of claims settlement authority and citing 29 C.F.R. § 541.205(c) (stating that work involving "business research and control" is exempt))(emphasis added ).[2]  Thus, there can be no question that Plaintiff performs administrative work.

Chase is also entitled to summary judgment that Plaintiff's primary duty, by his own admission, "include[d] work requiring the exercise of discretion and independent judgment." See, e.g., 29 C.F.R. §§ 541.2(a)(1), 541.2(e)(2), and 541.214(a); Def. MSJ 33-52.  Plaintiff testified under oath that Underwriters "are using ***their judgment*** on whether something meets the credit policy or does not meet the credit policy."  (Whalen Dep. 222 (emphasis added)).  Plaintiff, however, went even further in his testimony.  He testified that his primary duty was to "evaluate the creditworthiness of [Chase's] customers," and he defined the term "evaluate" to mean:  "to get the facts and make a determination."  (Whalen Dep. 139). This is exactly what the DOL means by exercising discretion and independent judgment under the FLSA.  29 C.F.R. § 541.207(a) (defining the term to mean the "comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered").[3]

Because Plaintiff admits that his primary duty was to evaluate the creditworthiness of customers and to make credit decisions and that he carried out Chase's Credit Policy –

---

[2]  The DOL specifically refers to an employer's "credit policy" as an example of an administrative management policy.  29 C.F.R. § 541.208(c) and 29 C.F.R. § 703(b)(7) (2004).

[3]  See also Post-Lombardo. Dep. 137-38, 253 (testifying that on "every file" she used her "judgment," which she defined as "survey[ing] the situation and decid[ing] how to proceed" as an underwriter); Smith Dep. 64 ("There is judgment within the policy"); Whalen Dep. 165 (testifying that having "discretion" meant "to have the ability to do [something] or [the] ability not to do it.").

quintessentially exempt administrative duties according to the DOL and the courts – and he admits that he exercised discretion in carrying out his primary duty, no trial is needed to determine that Plaintiff performed exempt work. As demonstrated below, nothing Plaintiff says in his opposition papers changes this conclusion.

## ARGUMENT

### I.    WHALEN'S PRIMARY DUTY WAS ADMINISTRATIVE.

#### A.    Plaintiff's Attempt To Avoid The Law Against His Position Is Baseless.

Plaintiff fails to offer a ***single*** case indicating that any individual who makes a credit decision is a nonexempt employee. In fact, Plaintiff does not take issue with the courts' holdings that making credit decisions for employers, including mortgage companies and banks, is exempt work. Plaintiff states that "[a]lmost without exception, plaintiff is in full agreement with [sic] holdings in each of these cases." (Pl. Br. at 13).

With respect to Havey, Plaintiff attempts to dismiss a direct holding by another court in this Circuit because, according to him, its conclusion that Havey performed administrative work was not the "main issue" in the case. (Pl. Br. at 21). Putting Plaintiff's characterization aside, the fact is that the Havey court held that a home mortgage underwriter who made mortgage credit decisions, like Plaintiff here, was not involved in the production of mortgages and that plaintiff's "responsib[ility] for underwriting loans by reviewing the applications and recommending whether loans should be accepted or rejected...is plainly nonmanual work related to Homebound's business." 2005 WL 1719061, at *5. Moreover, such conclusions were essential to the court's judgment that plaintiff met all requirements for the administrative exemption. Id.[4]

---

[4]  Plaintiff also erroneously criticizes Havey on the ground that the Court's decision in Havey did not analyze the Second Circuit's decision in Reich v. State of New York, 3 F.3d 581 (2d Cir. 1993). Havey, however, is fully consistent with the decision in Reich. In Reich, the court held

4

In a further attempt to avoid the result in <u>Havey</u>, ***which Plaintiff concedes would be
dispositive of his claim*** (Pl. Br. 21), Plaintiff argues that the court's decision could have been
decided on the theory that "the plaintiffs were performing work related to their employer's
business *operations.*" (Pl. Br. at 22).  Of course, this proposed rationale for the <u>Havey</u> decision
applies with equal force to Plaintiff.  Both Plaintiff and Havey were underwriters for employers
engaged in the mortgage business.  Plaintiff was an exempt administrative employee at Chase for
the same reason that the plaintiff in <u>Havey</u> was – his determination as to whether loans should be
accepted or rejected is "plainly nonmanual work related to [the Company's] business." 2005
WL 1719061, at *5.

### B. Plaintiff's Arguments About The Duties An Employee Must Perform To Be Exempt In The Financial Services Industry Misread the DOL Regulations and Caselaw.

#### 1. The DOL Regulation Listing Examples of Financial Services Employees Who Perform Exempt Work Is Not An Exhaustive List of Exempt Positions in the Financial Services Industry.

In light of Plaintiff's admission that he evaluated the creditworthiness of loan applicants
for Chase, and the undisputed legal authority that such evaluation is an administrative function,
Plaintiff is left to distorted readings of the relevant legal authority.  One such attempt is
Plaintiff's suggestion that the functions enumerated in 29 C.F.R. § 541.203 are an exhaustive
listing of the only way any financial services industry employee can be exempt.  (Pl. Br. at 10
("The new regulations explain that to be exempt under this provision, a financial services
employee ***must***, among other things:  advise the customer regarding the advantages and
disadvantages of different financial products and market, service or promote the employer's
financial products.")).  This is simply not what the Regulations say.  By its express terms, this

---

that police investigators were non-exempt because they "produced" investigations, and the
product or service that the police department offered to the public was investigating crime. <u>Id.</u> at
587-88.  Here, in contrast, Plaintiff testified that Chase's products were loans and lines of credit
and that he never produced them.  (Whalen Dep. 344-45).

section of the DOL's regulations provides only *examples* of how some financial services

industry employees are exempt:

> **Administrative exemption** *examples.* ...   Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work *such as* collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.

29 C.F.R. § 541.203(b) (emphasis added)).

### 2.    There is No Legal Basis For Plaintiff's Attempted Distinction Between "Non-Credit Industries" And "Credit" Industries.

Fatal to Plaintiff's claim is his own inescapable concession that employees who "make

credit decisions are generally going to be 'administering' the business. . . . *[by] helping the*

*overall business run efficiently which is paradigmatic administrative work.*"  (Pl. Br. at 16

(emphasis added)).  Knowing his claim for overtime cannot survive this admission, he suggests

that there is some distinction in the law between those employees making credit decisions in the

so-called "credit industry," and those who make such decisions elsewhere.

Not surprisingly, Plaintiff has *no* support whatsoever for his position.  To the contrary,

Plaintiff's position ignores the fact that every case involving individuals who make credit

decisions, including employees in the so-called "credit industry," have held that making credit

decisions is exempt administrative work.  See, e.g., Havey, 2005 WL 1719061, at *5; Hippen v.

First Nat'l Bank, No. Civ. A 90-2024-L, 1992 WL 73554 (D. Kan. Mar. 19, 1992) (finding

exempt bank employee who had authority to approve loans of up to $50,000); Brennan v.

Westinghouse Credit Corp., No. 6431, 1973 WL 1031, at *4 (E.D. Tenn. 1973) (holding exempt

individuals who make decisions concerning "the extension of credit" for "a national concern

engaged in the loan business in various states").  Plaintiff's position also ignores the fact that the

DOL concluded in its September 8, 2006 Opinion Letter that "collect[ing] and analyz[ing] the

6

customer's financial information and assess[ing] the customer's financial circumstances to determine whether the customer and the property qualify for a particular loan" while working for a mortgage lender is administratively exempt work. (DOL Op. Ltr. Sept. 8, 2006 at 2, a copy of which is attached as Exhibit BB to the Gonell Aff.). Tellingly, in Plaintiff's list of cases he cites in support of his proposition that making credit decisions in "non-credit industries" (and only such industries) is exempt work, he deliberately omits all of the cases cited by Defendant holding that individuals who make credit decisions in the "credit industry" are exempt. (See Pl. Br. 16-17).

**C.      Plaintiff Need Not Set The Terms Of The Credit Policy To Be Exempt.**

In another attempt to save his claims from dismissal, Plaintiff argues that he cannot be exempt because he did not personally set the terms of Chase's Credit Policy. (Pl. Br. at 25). He cites no authority for his proposition, nor could he: it is clear that an employee need not draft or make policy to be exempt. See 29 C.F.R. § 541.205(c); Dambreville v. City of Boston, 945 F. Supp. 384, 393 (D. Mass. 1996) ("[A]dministrative exemption [regulations] cover not just the primary policy advisers and formulators, but also those employees 'whose work affects policy or whose responsibility it is to execute or carry it out.'" (citing 29 C.F.R. § 541.205(c))); Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 518 (6th Cir. 2004).

Failing at this argument, Plaintiff then makes the strawman argument that not every employee who carries out *__any__* policy of a Company is exempt. (Pl. Br. at 19). Defendant does not disagree. But Plaintiff did not carry out just "any policy" of Chase – he carried out an important administrative policy. Plaintiff admits that Chase maintained its Credit Policy to manage risks, and that he was vested with the authority to carry out that policy. (56.1 Resp. ¶¶ 8-9). This is plainly exempt administrative work as the courts and the DOL have concluded. 29

C.F.R. § 541.208(c) (stating that "credit manager" who makes credit decisions is exempt); 29

C.F.R. § 541.205(c) (stating that work involving "business research and control" is exempt).

**D.    Plaintiff's "Ancillary" Work Was Exempt Work.**

Plaintiff argues that he performed some work ancillary to his primary duty and that such

work was non-exempt work. (Pl. Br. at 12-13). He asserts that **_all_** job duties that are not bona

fide administrative work in their own right are non-exempt duties. (Pl. Br. at 11). Plaintiff's

argument is wrong for at least two separate reasons.

First, under the FLSA and its implementing regulations, only the "primary duty" – here,

evaluating the creditworthiness of loan applicants – matters for purposes of determining whether

Plaintiff performed administrative work.   See, e.g., 29 C.F.R. § 541.2 (finding employees

exempt "whose primary duty consists of" administrative work); Rutlin v. Prime Succession, Inc.,

220 F.3d 737, 742 (6th Cir. 2000) (performance of "collateral tasks, even if those tasks took

more time than his primary duties, does not change this fact [that his primary duties – those "that

were of principal importance to the employer"] – rendered him an exempt employee).

Second, under the FLSA, work that is ancillary to exempt administrative work – even if

such work would otherwise be non-exempt – is also considered exempt administrative work.  29

C.F.R. § 541.202(c) (stating that work that would "appear to be routine or on a fairly low level,

and which does not itself require the exercise of discretion and independent judgment, but which

has a direct and close relationship to the performance of the more important duties" is exempt

work); Jastremski v. Safeco Ins. Cos., 243 F. Supp. 2d 743, 756-757 (N.D. Ohio 2003) ("[I]f an

employee performs some non-exempt functions involving only the use of skill, but those

functions are 'directly and closely related to the employee's exempt functions,' that employee

remains exempt.").  Here, Plaintiff testified under oath that he spent close to 90 percent of his

time making credit decisions, including evaluating potential borrowers' financial information to

enable him to make those decisions.  (Whalen Aff. ¶ 21; Whalen Dep. 227-28.)  All of this work is clearly exempt work under the DOL's regulations:

> Another illustration is the credit manager who makes and administers the credit policy of his employer.  Establishing credit limits for customers and authorizing the shipment of orders on credit, including the decisions to exceed or otherwise vary these limits in the case of particular customers, would be exempt work of the kind specifically described in § 541.2.  ***Work which is directly and closely related to these exempt duties may include such activities as checking the status of accounts to determine whether the credit limit would be exceeded by the shipment of a new order, removing credit reports from the files for analysis*** and writing letters giving credit data and experience to other employers or credit agencies.

29 C.F.R. § 541.208(c)(emphasis added).

### E.  Plaintiff Did Not "Produce" Nor "Generate" Sales Of Chase's Products.

Plaintiff next asserts in conclusory fashion – without citation to any record evidence – that he "generate[d] credit product[s]."  (Pl. Br. 25).  Of course, this "conclusion" does not constitute "specific facts" under Fed. R. Civ. P. 56(e).  Moreover, this "conclusion" directly contradicts the sworn testimony of Plaintiff and each of his fellow four plaintiffs that they had no role in developing or selling Chase's products.  (Pl. Br. at 3-4; Pl. Supp. Stmt. ¶¶ 1, 15-16; Whalen Dep. 237, 344; see also McGraw Dep. 131-32; Smith Dep. 173; Post-Lombardo Dep. 248-250).  Of course, Plaintiff cannot resist summary judgment by attempting to contradict his own deposition testimony.  Margo v. Weiss, 213 F.3d 55, 60-61 (2d Cir. 2000); see also O'Bryant v. City of Reading, No. 05-4259, 2006 WL 2034590, at *4 (3d Cir. July 20, 2006) (holding that plaintiff's submission of a declaration that minimized her job duties, contrary to her deposition testimony, for the purpose of arguing that she did not exercise discretion and independent judgment, was not "an impediment to summary judgment").

Having testified under oath that he neither developed nor sold Chase's loan products, Plaintiff now argues that he "generated" loan products because, temporally, he made a credit decision on Chase's behalf ***before*** a customer can receive the loan product.  (Pl. Br. at 25).  This

9

does not mean that Plaintiff generated loan products any more than the fact that an employee who makes a credit decision about whether a customer qualifies to buy a refrigerator ***before*** the customer can take the refrigerator from the store either produces the refrigerator itself or generates a sale of that refrigerator. If Plaintiff's temporal argument were correct, then the DOL would not have concluded that credit managers are exempt, and the courts in Havey, Edwards, Hippen, and Brennan would not have concluded that the employees in those cases were exempt, because deciding whether a customer is creditworthy and deserving of credit always takes place before the purchase of the product. See Reich v. Haemonetics, 907 F. Supp. at 512, 514 (D. Mass. 1995) (holding that analysts who reviewed, and made recommendations regarding, sales and leasing agreements regarding medical equipment before the Company entered into each agreement were exempt).[5]

In the same vein, Plaintiff disparagingly describes himself as a "mere cog in a large industrial wheel" – in other words, that because Chase employed multiple Underwriters, their work necessarily involved the "day-to-day affairs" of the Company. (Pl. Br. 24). Plaintiff's argument, however, has been squarely rejected by the DOL's Regulations and the courts:

> Plaintiff argues that he was not performing work of substantial importance to his employer, describing himself as a cog in a great machine. However, the regulations state that a large employer may need a large number of exempt administrative employees performing the same job. This does not affect the determination of whether they meet this test, so long as the work of each such employee is of substantial importance to the management or operation of the business.

---

[5] Likewise, the DOL would never have found that loan officers were administrative workers. See also DOL Op. Ltr., FLSA2006-31, available in 2006 WL 2792445 (Sept. 5, 2006) (finding that loan officer is exempt). Loan officers "work with the borrower to create a loan package that best meets the goals of the borrower while still complying with the varied and complicated lender requirements," see DOL Op. Ltr. Feb. 16, 2001, available in 2001 WL 1558764 (finding that loan officer performs administrative work), and play a much more involved role than Underwriters in "getting Chase's product into the hands of customers." (Pl. Br. 26). Plaintiff's role in "representing the Company" (29 C.F.R. § 541) in making a credit decision on Chase's behalf – in stark contrast to the role of a loan officer whose interest is in maximizing commissions rather than controlling risk to Chase – is indisputably exempt work.

Jastremski, 243 F. Supp. 2d at 754; see also 29 C.F.R. § 541.205(c)(6)("[T]he fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work does not affect the determination" of whether they are administratively exempt employees."); Shaw v. Prentice Hall Computer Publishing, Inc., 151 F.3d 640, 645 (7th Cir. 1998) ("The work that a single employee can do is limited, and as a company grows larger and larger, the percentage of the total output represented by each employee's efforts becomes smaller and smaller.").[6]

**F.      Some Managers' Use Of The Terms "Production" Or "Operations" Is Legally Irrelevant.**

Plaintiff argues that because some managers used the word "production" to refer to the work that an Underwriter performed – i.e., producing decisions – that this makes the work "production" work under the FLSA. (Pl. Br. at 8-9). This, too, is not relevant to Plaintiff's exempt status.

---

[6]  In yet another attempt to avoid a discussion of his actual duties, Plaintiff argues that Plaintiff's compensation was not high enough for him to be exempt, and that other (in his words) "higher level positions" have been held to be non-exempt. (Pl. Br. 11, 33). First, the FLSA provided that employees who made as little as $13,000 annually could qualify for the exemption. 29 C.F.R. 541.1(f) (pre-August 2004 regulations). Plaintiff received both a base salary and incentive compensation as an Underwriter -- his salary was never less than $30,000, and his total compensation ranged from $36,384 to $65,179 annually. (Parmar Aff. I ¶ 3; Def. MSJ at 16). Thus, Plaintiff always made well more than the amount required to qualify for the administrative exemption (up to five times as much), and also made up to double the median income in Rochester during that time. See United States Census Bureau Statistical Abstracts, attached as Exhibit M to the Shaulson Aff. Plaintiff's assertion about the "level" of the employee at issue is also irrelevant. A subjective opinion about the "level" of a certain employee has no bearing on whether the employee performed duties that are related to his employer's business operations or the administration of his employer's business. Similarly, Plaintiff's argument that he should have been exempt because his job as an Underwriter was an "entry level position" also fails. (Pl. Br. at 32). Not only is the characterization of the job not relevant, but Plaintiff Post-Lombardo testified that the position was not "entry level" and that she worked for more than four years at Chase (and an intervening four years at AETNA Life Insurance) prior to finally being promoted to an Underwriter. (Post-Lombardo Dep. 17-19; see also Affidavit of Hansa Parmar dated May 16, 2007 ("Parmar Aff. II") ¶ 3).

First, Plaintiff admits that the DOL and a uniform body of case law provides again and

again that formal job titles and descriptions – much less informal references or labels – have no

effect on an employee's exempt status.  See, e.g., Pl. Br. at 15, 33; 29 C.F.R. § 541.201(b); 29

C.F.R. § 541.205(b) (providing that an "administrative assistant to an executive in the production

department" can perform administratively exempt work); Def MSJ at 27 (citing cases).

> Many more examples could be cited to show that titles are insufficient as yardsticks.  As
> has been indicated previously, the exempt or nonexempt status of any particular
> employee must be determined on the basis of whether his duties, responsibilities and
> salary must meet all the requirements [for the exemption].

29 C.F.R. § 541.201(b)(2).  Even where the employer has admitted that a plaintiff's duties

relate to the "production" of the employer's product – which is decidedly not the case here –

courts uniformly have concluded that the fact that work is referred to as "relating" to

production is hardly dispositive of whether an employee performs "production work" for

FLSA purposes:

> [T]he fact that defendant has admitted that plaintiffs' duties related to the "production" of
> submarines does not dispose of this issue.  Presumably the same could be said of almost
> every employee who worked for defendant.  As defendant points out, the
> administrative/production dichotomy focuses not on whether an employee worked for an
> enterprise engaged in production activity, but whether the employee's primary duty was
> producing the product in question.

Cooke v. Gen. Dynamics Corp., 993 F. Supp. 56, 61 (D. Conn. 1997) (internal citation omitted);

see, e.g., Edwards, 2004 WL 3119911 *5 (S.D. Miss. 2004) ("Edwards' assertion-that an

insurance company's products are its policies; that he was employed by an insurance company;

and that, therefore, he was a 'production' worker-must be rejected.").

Second, Plaintiff's argument is inconsistent with the undisputed record evidence, which

demonstrates that to the extent the term "production" was used at all, it was a shorthand for the

fact that Chase measured the "productivity" of Underwriters in terms of the number of credit

decisions they made, not because they produced the product.  (Cary Dep. 101-02; Parmar Dep.

227; Smith Dep. 225; Post-Lombardo Dep. 282). Plaintiff does not dispute either the testimony

of the managers or his fellow Plaintiffs that the term "production" was used because

Underwriters' productivity was measured. See Def. MSJ at 27-29.[7]

At the end of the day, Plaintiff has admitted that his primary duty was to evaluate the

creditworthiness of customers, that he spent close to 90 percent of his time making credit

decisions and reviewing financial documents to make those decisions, that he carried out Chase's

Credit Policy which was designed to manage credit risk, and that he did not develop or sell

Chase's products. Based on the DOL's Regulations and the case law, the Court should rule that

Plaintiff performed administrative work.

## II.    WHALEN EXERCISED DISCRETION AND INDEPENDENT JUDGMENT IN PERFORMING HIS JOB DUTIES.

As demonstrated in Defendant's moving papers, according to the DOL and a uniform

body of case law, Plaintiff's admitted primary duty of making credit decisions is exempt work

---

[7] Unable to show that any use by Chase managers of the term "production" strips Plaintiff of his exempt status, Plaintiff tries another wordplay. This time, Plaintiff argues that he and other Underwriters performed "production" work, rather than work in Chase's "operations," because of how Chase's managers used the word "operations" in referring to the Company's departments or business organization. Again, however, Plaintiff tries to rely on labels rather than what Plaintiff's duties were. As set forth above, whether Chase managers referred to Underwriters such as Plaintiff as being part of "Operations" or reporting at times to "Operations Managers" (which, in fact, they did), these labels do not determine whether Plaintiff performed work related to the "general business operations" of Chase as that term is defined by the FLSA. See 29 C.F.R. § 541.2(a)(1). In any event, Plaintiff's argument is based on misciting and selectively omitting record evidence. Plaintiff claims that the testimony of Chase managers Deby Lopa and Rita Prince support his claim that Underwriters did not perform "operations" work of Chase. (Pl. Br. at 26). Plaintiff's assertion, however, contradicts the actual testimony of Ms. Lopa and Ms. Prince, who clearly testified that Underwriters were considered to have worked in "operations." Both Ms. Lopa and Ms. Prince testified that Underwriters reported to "Operations Managers." (Lopa Dep. at 14; Prince Dep. at 9-11, 87; see also id. at 93 (defining the "Home Equity Department" as an "operations department"). Plaintiff's assertion also contradicts additional record evidence, including testimony by other witnesses and documents cited by Plaintiff himself, which makes clear that Chase did, in fact, consider Underwriters such as Plaintiff as part of its "Operations." (Warters Dep. at 8, 12 (testifying that "Underwriters are part of the operations"); see also id. at 17 (indicating that "Operations Managers" are responsible for managing Underwriters)).

involving the exercise of discretion and independent judgment. (Def. MSJ at 37-43).[8] As

explained below, none of the arguments Plaintiff makes in his opposition papers change this

result.

### A.    Plaintiff Misconstrues The DOL's Regulations On Point.

Plaintiff tries to avoid application of the DOL's Regulations which state, in the clearest of

terms, that an employee who administers the credit policy of his employer, "authoriz[es] the

shipment of orders on credit, including the decisions to exceed or otherwise vary these limits in

---

[8]  Plaintiff also now admits in his opposition papers that he was "[m]aking determinations as to
whether Chase should lend money or extend credit to applicants." See Pl. Supp. Stmt. ¶ 7; see
also Pl. Br. at 32 (describing his duties as "making decisions on files"). In addition to Plaintiff's
explicit admission that he used discretion (Def. MSJ at 37-43), Plaintiff exercised sufficient
discretion to qualify for the administrative exemption by granting exceptions and variances.
Whalen testified that it was *his decision* whether to grant an exception or variance on
applications that he underwrote, that he actually granted a variance or exception an estimated
15% of the time, and that he "*considered* granting an exception or variance [based on credit
score] for 25% of the files," in addition to the other types of exceptions and variances he
considered. (Whalen Dep. at 160, 240 ("You could make a decision on a file and say it met the
credit policies with a variance where another would say they did not feel they wanted to do a
variance and they could decide for a different amount without a variance, so people could come
to different conclusions."); 56.1 Resp. ¶ 21-22; Post-Lombardo Dep. 149, 175-76, 255-56
(testifying that discretion was used to decide whether to make a variance); Smith Dep. at 124-25,
159-60 (deciding whether to make a variance or exception required discretion and judgment);
Shaulson Aff. Exh. O, Credit Policy § 2.8.2 ("Balancing Compensating Factors with Borrower
Financial Profile Weaknesses. Each Financial profile weakness can be seen as adding a layer of
risk to the transaction. To consider a loan for approval, each borrower's financial-profile risk
should be countered and balanced by a corresponding compensating factor *(borrower financial-
profile strength)*. (1) All factors, strengths and weaknesses, need to be assessed by the
underwriter on the approval document when the borrower's request deviates from standard
underwriting guidelines, and (2) The borrower's credit file should exhibit sufficient evidence that
justifies the departure."); Young Stmt. ¶ 9 (To determine whether an exception should be made .
. . . I weigh the compensating factors against the size and type of the variance. I will look for
stronger or more compensating factors in the case of a large variance, where I would make a
smaller variance on less strong compensating factors.")).

Plaintiff also maintains that the Credit Policy had "tolerances" on the amount of discretion an
Underwriter could exercise when making an exception or variance. (Pl. Br. 5-6). First, the
record evidence demonstrates that any "tolerances" applied only to certain variances during
certain time periods – not to all variances at all times. (Parmar Aff. II ¶ 22). Moreover, Plaintiff
Elena Post-Lombardo testified that, even when a tolerance for a specific variance was in effect,
she could make a recommendation to a supervisor to exceed that tolerance in a particular case if,
in her judgment, such a recommendation was warranted. (Post-Lombardo Dep. 292-93).

the case of particular customers," and "review[s] credit reports" and other documents to perform

these functions, performs exempt work. 29 C.F.R. § 541.208(c); 29 C.F.R. § 541.202(c) (2004).

Plaintiff nevertheless suggests that § 541.208 is "not discussing independent judgment and

discretion but instead whether work is administrative or productive in nature." (Pl. Br. at 30

n.17).  This is difficult to square, however, with the express statement in the Regulations that the

described duties "would be exempt work of the kind specifically described in 541.2." 29 C.F.R.

§ 541.208(c).  29 C.F.R. § 541.2, in turn, describes exempt work as both administrative and

involving the exercise of discretion. 29 C.F.R. § 541.2. Thus, it is clear that the DOL considers

the duties described in § 541.208 to be exempt administrative work involving the exercise of

discretion and independent judgment.[9]

### B.    Chase's Credit Policy Did Not Prohibit, But Indeed Required, Plaintiff's Exercise of Discretion.

Plaintiff argues that despite his extensive decision-making authority, his job duties

nevertheless included no discretion because he was evaluating loan applications in "conformity

with prescribed standards." (Pl. Br. at 27 (citing 29 C.F.R. § 541.207(c)(1))).  Plaintiff's

argument, however, is contrary to the law and the undisputed record in this case.

---

[9]  Plaintiff's attempt to distinguish the cases cited by Defendant similarly fails.  While Plaintiff claims that the Underwriter in Edwards was exempt because of his "negotiation" responsibilities (Pl. Br. 29-30), the court makes clear that his underwriting duties – Edwards' primary duty – involved the exercise of discretion. Edwards 2004 WL 3119911, at * 5.  Likewise, while Plaintiff tries to distinguish Haemonetics by claiming that the Business Analysts there had "complete discretion" (Pl. Br. 30, n. 16), the court makes clear that the Business Analysts "develop expertise in operating within [Haemonetics'] guidelines, and in using computers to apply [Haemonetics'] pre-set profit margins." Haemonetics, 907 F. Supp. at 518.  Plaintiff's attempt to take issue with the decision in Havey similarly fails.  An Underwriter's "percolation" on a credit decision before making it is entirely consistent with the DOL's definition of "discretion" – "comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered". 29 C.F.R. § 541.207(a). As Plaintiff admits:  "Plaintiff agrees that if the holding of Havey was adopted in this case, it would be unlikely Plaintiff could prevail." (Pl. Br. at 21).

Very few employees in any enterprise, even high-level executives, have unbounded discretion.  Discretion is always delimited by policies from the next level of management without detracting from the exercise of discretion within those parameters.  Plaintiff does not dispute that an employer can maintain policies as to how its business should run, and can require exempt employees to abide by those policies, without compromising the exempt status of those employees.  (Def. MSJ at 44-47).  For example, not only has the DOL provided that the employee need not have "unlimited authority," but the Agency has also spoken directly on the acceptability of manuals and policies:   "Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status."  29 C.F.R. § 541.704 (2004).  The courts are clear that the scope of an administrative employee's discretion can be "limited" by the employer's policies or other guidance and still qualify for the exemption.  See, e.g., Havey, 2005 WL 1719061, at *7 (finding that "[t]he fact that an automated program guided their decision-making process or directed loan approval is not sufficient to permit a jury to find that Plaintiffs exercised no judgment and discretion in their duties"); Renfro v. Indiana Michigan Power Co., 233 F.Supp.2d 1174, 1187 (W.D. Mich. 2002) ("The evidence presented indicates that planners exercise discretion and independent judgment during the course of their work even though they are required to follow company and regulatory policies."); see also cases cited at Defendant's MSJ at 45-46.

The Second Circuit has expressly held that an employer can require an exempt employee to adhere to even "detailed instructions" and "detailed guidelines" without stripping the employee of his exempt status:  "Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made."  Donovan v. Burger King Corp., 675 F.2d 516, 522 (2d Cir. 1982).  Under this controlling authority, further

confirmed by the DOL Regulations, Plaintiff simply cannot establish that the Credit Policy

removed all discretion from his job.  (Pl. Br. 31-37).

    First, Plaintiff testified that Underwriters "are using their judgment on whether something

meets the credit policy or does not meet the credit policy."  (Whalen Dep. 222; 56.1 Resp. ¶ 18).

This sworn admission alone refutes any argument that the Credit Policy stripped him of all

discretion.  (See Post-Lombardo Dep. 137-38 (testifying that she used judgment – which she

defined as "surveying the situation and deciding how to proceed – on every file"); McGraw Dep.

85 (testifying that there were "a million different ways you could handle" a particular file);

Smith Dep. 159-60 (deciding whether to make a variance or exception required discretion and

judgment); Post-Lombardo Dep. 149, 175-76, 255-56 (same)).

    Second, the Credit Policy states over and over again that it is only a guide, that decisions

ultimately reside with the Underwriter, and that Underwriters must use their own discretion and

judgment.  See, e.g., Shaulson Aff. Exh. O (Credit Policy § 2.5.4) (providing that a credit risk

score is only "a part of the decision making process.  It must only be used to supplement, not to

replace, an informed decision which has been based on an appropriate level of analytical review

and the use of a considered objective judgment"); see also Def. MSJ at 48-49.  In other words,

following the Credit Policy means, by definition, that an Underwriter is using his or her

"considered objective judgment" to make an "informed decision."[10]  In fact, Plaintiff was

commended on a performance evaluation that his "knowledge of the credit policy has assisted

him to be creative, attentive to detail and solve complicated problems."  (Shaulson Aff. Exh. R

(JPMC 001360-001365)).

---

[10]  Although Plaintiff says that he sometimes would consult with a supervisor about questions he
had, that only proves the point that the Credit Policy did not dictate every decision-point in
Plaintiff's job.  (Whalen Dep. 63-65).  Indeed, Plaintiff himself testified that when he would
discuss a question with his supervisor, the supervisor would specifically encourage him "to use
[his] judgment on whether something fit the credit policy . . ."  (Whalen Dep. 342-43).

Despite Plaintiff's understandably motivated attempt to deprecate his duties, the terms of

the Credit Policy (as confirmed by Whalen's testimony) are clear concerning the Underwriter's

discretion and the need to exercise judgment:

- A credit risk score is only "a part of the decision making process. It must only be used to supplement, not to replace, an informed decision which has been based on an appropriate level of analytical review and the use of a considered objective judgment." (Shaulson Aff. Exh. O (Credit Policy, § 2.5.4); Whalen Dep. 173-74);

- "There will always be situations that fall into gray areas with respect to the underwriting of a final decision on a file." (Shaulson Aff. Exh. O (Credit Policy § 2.8));

- "[T]he judgment of the underwriter plays a critical role in the determination of borrower income . . . ." (Shaulson Aff. Exh. O (Credit Policy § 2.2.6); Whalen Dep. 153);

- "At underwriter's discretion, another appraisal from another appraiser may be obtained." (Shaulson Aff. Exh. O (Credit Policy § 2.6.17), ¶ 6c; Whalen Dep. 173).

- At best, the [underwriter's] decision is based upon a sum probabilities; it is not an exact science. Because of these uncertainties, credit risk analysis is perceived as an art; not as a science. . . .[T]he underwriter must recognize that it is his/her responsibility to use sound judgment and to seek advice/expertise, when necessary, in making lending decisions." (Shaulson Aff. Exh. O (Credit Policy § 2.8); Whalen Dep. 174).[11]

---

[11] Courts have universally held that requiring an employee to follow a policy or procedure which itself directs the employee to use his or her judgment demonstrates that they exercise sufficient discretion to be exempt. See, e.g., Mulverhill v. State of New York, No. 87-CV-853, 1989 WL 154827 at *4 (N.D.N.Y. Dec. 19, 1989); see also cases cited in Def. MSJ 47. The Mortgage Bankers Association described the process of underwriting to the Federal Reserve System Credit Scoring Committee as follows:

The ultimate decision of whether to lend to any specific applicant, is not a "science" involving strict mathematical formulas. Rather, it is an "art" that relies heavily on various underwriting factors that are assigned differing weights depending on the experience or risk preference of the lender or investor. There are a myriad of factors that come into play in mortgage lending determinations. Some of the more common factors analyzed by underwriters are loan-to-value ratios, debt-to-income ratios, bank reserves, down-payment size, down-payment source, loan type, loan duration, among many others. Credit scoring is just one factor in the analysis. The "art" of underwriting does not lie in assigning numerical values to any of these factors, along with "pass" or "fail" ratings. Underwriting requires that each factor be accounted for an interpreted in light of the other factors and in the context of each applicant and property. In the end, the final decision is based on a judgment call regarding the full set of circumstances that are unique to each borrower and each transaction.

18

Third, Plaintiff testified that he, in fact, exercised judgment in the actual performance of

his job duties.  In addition to testifying that he used his discretion in determining whether a loan

application met the Credit Policy or not, Plaintiff testified to no less than ten specific examples

of how he exercised his discretion and independent judgment.  (Pl. Br. at 35-36).  Not

surprisingly, Plaintiff now attempts to minimize those sworn admissions with a late-offered

affidavit.  (Pl. Br. at 36; see generally Affidavit of Andrew Whalen dated Feb. 12, 2007).  The

policies cited in Plaintiff's affidavit, however, serve only to further demonstrate the discretion

Plaintiff exercised.

For example, Plaintiff refers in his affidavit to a specific portion of the Credit Policy

describing "derogatory credit occurrences," arguing that "[t]here was no 'discretion' in

determining whether something was a derogatory credit item.  The Credit Policy specifically

listed derogatory credit occurrences."  (Whalen Aff. ¶ 30.)  This very section, however, calls on

an Underwriter to use his judgment in determining whether a failure to pay constitutes a

derogatory credit item, explicitly provides that the list of sample derogatory credit items

contained in the Policy is not all-inclusive, and further provides the philosophy behind why

derogatory credit items are important to an Underwriter's analysis of the file:

> The manner in which the borrower has managed his/her previous credit is a strong
> indicator of future performance.  A history of derogatory credit and/or an instance of a
> major derogatory credit item *increase the risk* associated with the loan request.  For these
> reasons, the *derogatory credit occurrences must be carefully considered in the analysis
> of the loan request*. . . . The following list of occurrences indicates areas of a borrower's
> credit history, which are defined as serious or major derogatory credit.  *However, such
> serious derogatory credit is not limited to these events.  It may include other
> occurrences*, such as a pattern of late payments to creditors over a period of time, or,

---

April 24, 2002 Letter from MBA to Federal Reserve System's Mortgage Credit Partnership
Credit Scoring Committee ("MBA Letter"), a copy of which is attached as Exhibit N to the
Shaulson Aff.; see also Smith Dep. at 157 (testifying that "there will always be situations that fall
into gray areas with respect to the underwriting [of] a final decision on a file"); Davis Dep. at 43
(same); Statement of Mary Ellen Bark ¶ 3, attached to Gonnell Aff. as Exh. J ("The performance
of an underwriter's job duties is more of an art than a science.")

multiple accounts with derogatory payments in relation to the number of accounts that are open.

(Whalen Aff. Exh. D at JPMC 002143) (emphasis added).  Thus, while the Credit Policy certainly provides guidance in assisting an Underwriter in determining whether a failure to pay constitutes a sufficiently serious derogatory credit item and, indeed, even gives several examples (such as a bankruptcy), it is undisputed that the ultimate determination of derogatory credit – and its effect on whether a particular loan request would be granted by Chase or not – was Plaintiff's responsibility.

Plaintiff makes the same argument with respect to his review of real estate appraisals, asserting that Chase's policies set all the parameters for reviewing a real estate appraisal. (Whalen Aff. ¶ 53)  The policies cited by Plaintiff, however, identify numerous judgment calls to be made by the Underwriter when reviewing an appraisal, such as:  (1) "[t]he comparable properties should be similar to the subject property in architectural style, appeal, and attractiveness, but may not always be [and] [i]f the comparable properties do not 'look' like the subject property, the underwriter should carefully analyze the appraiser's data and should look for comments from the appraiser regarding the comparable selections" (Whalen Aff. Exh. H at JPMC 002194)); (2) if the Underwriter identifies "[a]ny unusual negative or cautionary comment" on the appraisal, they then determine whether the explanation of such comments by the appraiser are "satisfactory" to them (Whalen Aff. Exh. H at JPMC 002195); (3) "[a]t underwriter's discretion, another appraisal from another appraiser may be obtained" (Whalen Aff. Exh. H at JPMC 002195).  The policy also provides a list of "red flags" where an Underwriter should consider engaging in an even more in-depth and careful review of the appraisal.  (Whalen Aff. Exh. I at JPMC 000352).  This list of "red flags" not only identifies some potential problem areas, but also explains the reason why the red flag issue may be troubling – a step that would surely be unnecessary if the appraisal review was completely

20

mechanical and non-discretionary. <u>Id.</u> As these policies make clear, an Underwriter's review of an appraisal is another way in which Plaintiff exercised discretion.

In sum, Plaintiff's belated attempt to minimize his duties does not change the fact that: (1) those duties clearly involved the "comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered" as contemplated by the DOL Regulations (29 C.F.R. § 541.207(a)); (2) Plaintiff's substantial authority to make decisions as to whether, in his words, "Chase should lend money or extend credit to applicants" (Pl. Br. at 28, 32); or (3) Plaintiff's admission that Underwriters "are using their judgment on whether something meets the credit policy or does not meet the credit policy." (Whalen Dep. 222).[12]

### C.    Two Underwriters Could Reach Different Conclusions On The Same File.

Next, Plaintiff argues that he could not exercise discretion because two underwriters would necessarily reach the same conclusion on the same file. (Pl. Br. at 5, 34). Plaintiff's argument cannot create an issue of fact for trial, however, because it directly contradicts his own earlier sworn testimony about his own actual job duties. <u>See</u> <u>supra</u> at 9. Plaintiff testified that "two reasonable people who both knew Chase's Credit Policy could come to different conclusions on the same loan request and that the two conclusions could both be reasonable 'within the meaning of the credit policy'". (56.1 Resp. ¶ 24; <u>see also</u> Whalen Dep. 241-42).[13]

---

[12] Plaintiff's argument that the Credit Policy stripped him of all discretion is akin to maintaining that judges exercise no discretion in adjudicating cases because they must follow the law and judicial precedent. Just as no two cases are the same, Plaintiff testified that no two loan requests for which he made a credit decision were the same (Whalen Dep. 195), and both judges and Plaintiff exercise discretion in their decision-making despite rules and prior precedents. <u>Donovan v. Burger King Corp.</u>, 675 F.2d 516 (2d Cir. 1982).

[13] This was not the first time that the five Plaintiffs have contradicted their own previous statements. Judge Payson, in fact, has already taken note of Plaintiff Davis's contradictory statements:

In an effort to contradict his own sworn testimony, Plaintiff claims that Deb Lopa and Rita Prince testified that only one correct decision could be made for a file. (Pl. Br. 34). Plaintiff's claim, however, is based upon a deliberate omission of record testimony. Although Defendant may have hypothetically liked any "identical" files to be decisioned the same, both Ms. Lopa and Ms. Prince testified they had absolutely no expectation that this would, could, or ever did actually happen. Deb Lopa, for example, testified as follows:

> Q. Let's assume they use the same information; the same information is present in both files and the underwriters use the same information. Should I get a different decision a week later from a different underwriter than I received from one the week before?
> A. Should you? No. Could you? Yes.
>
> \*     \*     \*
>
> A. [I]t's analytical and, as I said, you will get three people looking at the same application, and you may have three different approaches to that end decision.
> Q. By "approaches," you mean whether a payoff is made or whether there's a counter; you don't mean --
> A. Or it could be one person may decline, and another person may ask for an

---

> According to defendant, Davis testified at his deposition that the only decisions he made in discharging his job responsibilities at Chase were "to sit down at [his] desk," "when to take a break" and "when to go to lunch." ***By contrast***, a version of his resume produced by plaintiff described his responsibilities as "underwriting and making ultimate approval or denial final decisions for all home equity loans and lines of credit applications."

Opinion dated January 16, 2007, at 3 n.2 (Docket No. 100) (internal citations omitted and emphasis added). More significantly, at the outset of this litigation and in an effort to obtain collective action certification of their claims (Docket No. 13), all five Plaintiffs testified under oath in affidavits prepared by Plaintiff's counsel that all Chase Underwriters performed the same "principal job duty" – "evaluating the creditworthiness of customers." (Whalen Aff. ¶ 21; Davis Aff. ¶ 19, attached to Shaulson Aff. as Exh. K; McGraw Aff. ¶ 21, attached to Shaulson Aff. as Exh. L; Post-Lombardo Aff. ¶ 20, attached to Gonnell Aff. as Exh. P; Smith Aff. ¶ 20, attached to Gonnell Aff. as Exh. S). Then, in their depositions, Plaintiffs contradicted their earlier sworn testimony to the Court on the central issue in this litigation – their primary duty as Underwriters at Chase – by testifying that they did not evaluate the creditworthiness of customers. (Whalen Dep. 216-18; see also Davis Dep. 35). Even ***Plaintiff's counsel*** offered his own "testimony" during Plaintiff's deposition: "[Plaintiff's] job was ***not*** to determine how creditworthy a customer was." (Whalen Dep. at 220 (emphasis added)). In opposition to Defendant's summary judgment motion, after Defendant pointed out Plaintiffs' earlier affidavit testimony, Plaintiff has come full circle and admits once again, consistent with his pre-litigation resume and earlier testimony, that his "principal job duty" was to "evaluat[e] the creditworthiness of [Chase's] customers." (56.1 Resp. ¶ 3).

explanation and you're going to get that, or you have a story like I described earlier and, you know, someone else may end up approving that loan.

(Lopa Dep. at 72-73, 76-77).  In fact, on the very pages cited by Plaintiff, Ms. Lopa further

testified that:

> Q.  And so the underwriter should always be looking to find a way to say yes, correct?
> A.  They should.  That doesn't mean they're all going to say yes.
> Q.  And when you sit down with them and say, "I found a way to make this file be a yes and you found a way to make the file be a no," the underwriter's decision to have the file be a no was not the correct approach, right?
> A.  It was not an incorrect approach; it was a different approach.

(Lopa Dep. at 114-15).  Similarly, Rita Prince testified:

> Q.  You wouldn't want a person to call in and get a different answer from a different -- depending upon which underwriter they happened to pick up and call; correct?
> A.  It does happen.
> Q.  Is that what you wanted to happen -- did Chase want that to happen?
> A .  I can't answer that.  Of course you want consistent answers; but because you have people with different comfort levels, different levels of underwriting experience, different levels of knowledge of the credit policy, different levels of lending authority, I mean, exceptions -- there's just differences.

Prince Dep. at 40; see also Cary Dep. at 55, 84-85 ("We can't guarantee that everyone used the

exact same compensating factors on every single file that may have been similar to another" and

"[t]he underwriter has the authority to make an exception or a variance, and if they felt strongly

about it and they wanted to base it on that compensating factor [that they felt the person would

repay] and they had the authority to do so.  Now, if I was reviewing the file, I may not agree with

it, but they had the authority to make that decision themselves.").[14]

The testimony of Plaintiffs and Chase's managers that no two files are the same and two

reasonable Underwriters can reach different decisions is only confirmed by the fact that Plaintiffs

disagreed even among themselves about how specific files should be underwritten.  When shown

---

[14]  Manager Rita Prince's testimony is confirmed by what she wrote on one of Plaintiff's performance reviews:  "Andy consistently strives to meet the customer's needs by looking at *ways to make the deal work* under the credit guidelines" and "[a]pplying *creativity* to make a deal work is a must in the CMMC channel."  (Prince Dep. Exh. 28 (emphasis added)).

files in their depositions that were underwritten by Plaintiff Whalen, Plaintiffs Elena Post-

Lombardo and Dan McGraw both testified that they would have made different credit decisions

on those specific loan requests than Plaintiff Whalen had.  See, e.g., Affidavit of Hansa Parmar

dated September 14, 2006 ("Parmar Aff. I") ¶ 10 (citing Post-Lombardo Dep. at 291 (testifying

that she "would not have granted this variance" granted by Plaintiff); Parmar Aff. I ¶ 11 (citing

McGraw Dep. at 94 (testifying that he would have "looked to have either paid off existing debt

or counteroffered or potentially ma[d]e a combination of the two," rather than approving the loan

requested by the borrower with a variance as Mr. Whalen did).[15]

### D.  Encouraging Underwriters To "Say Yes" Demonstrates The Importance of Judgment and Sound Exercise of Discretion by Underwriters.

Plaintiff also argues that he did not use his discretion because Chase encouraged him to

find a way to say "yes" to approve as many loan requests as possible.  (Whalen Dep. 281; Pl.

Discr. Br. at 4; Pl. Br. 34 n. 21).  The fact that Chase indisputably encouraged its Underwriters to

look for ways to "try" to approve loans demonstrates not only that the Underwriters, and not

Defendant, held the ultimate responsibility for approving or declining the loan requests, but also

that Underwriters could reach different conclusions on a particular loan request.  (Prince Aff. ¶ 9

("Underwriters [including Plaintiff, whom she supervised] are encouraged to use their judgment

to make an exception or variance, or counteroffer, or other means to make a customer's deal

work if possible."))  If Chase's Credit Policy dictated a single outcome on any given file,

Defendant would have had no reason to encourage Underwriters to look for creative ways to

---

[15]  Other Underwriters, including the Plaintiffs in this action, have also concurred with Plaintiff that Underwriters could reach different conclusions on the same file.  (See, e.g., Post-Lombardo Dep. 123, 323; McGraw Dep. 44 (testifying that two underwriters could have different opinions as to whether the borrower's stated income level was reasonable for the line of work the borrower performed); Statement of Thomas Young at ¶ 10, attached to Gonnell Aff. as Exh. X ("Because the exception process is for loan requests outside of the guidelines, two similar underwriters could reach a different decision as to whether an exception should be made on a particular loan request.")).

24

approve loans.  (Def. MSJ 42-43; McAllister v. Transamerica Occidental Life Insurance Company, 325 F.3d at 997 (8th Cir. 2003) (claims coordinators exercised discretion and independent judgment even where they were directed to "bend over backward" to seek ways to pay claims)).[16]

### E.   Plaintiff Was Evaluated By Chase On His Exercise of Discretion.

Without regard to the evidence in the record, Plaintiff argues that Underwriters were not evaluated on their use of "discretion and independent judgment." (Pl. Br. at 36). Whether Underwriters were separately evaluated on their use of discretion is not relevant to whether they, in fact, used such discretion. Plaintiff nonetheless claims that "Chase's evaluation of an Underwriter's file review was limited to the issue [sic] whether the Underwriter 'Met Credit Policies' or 'Did Not Meet Credit Policies.'" (Id.)

As Plaintiff has admitted, however, his determination as to whether a loan request met, or did not meet, Chase's Credit Policy – itself involved the use of discretion. (Whalen Dep. 222). Thus, reviewing him on his "credit decision" as to whether a file met the Credit Policy necessarily involved reviewing his discretion and judgment. In fact, Plaintiff has admitted under oath that his "credit decision [was] evaluated as part of a QC [review] process." (Whalen Dep. 241). Plaintiff's testimony is corroborated by the record evidence that the review process did, in

---

[16] Similarly, Plaintiff argues that the fact that he needed to "[b]e able to defend each decision according to the business credit policy to both internal and external customers" as he described in his resume somehow is evidence that he was constrained by the Credit Policy. (Pl. Br. at 33 n.19). To the contrary, if there was only "one answer" for an acceptable decision on a loan request and that "one answer" was dictated by Chase's Credit Policy, Plaintiff would have no certainly have no need to "defend" or, in his words "explain," how and why he reached the decision he did. (Whalen Dep. 239). Moreover, in connection with his "defense" of his credit decisions to "internal customers," Plaintiff also testified that he had "disagreements" with loan officers regarding his credit decisions. (Whalen Dep. 352-55). During those "disagreements," he testified that loan officers asked him to "do something differently to meet the credit policy, whether it was making a counteroffer, granting an exception, granting a variance, one-upping a file, having a supervisor review your decision." (Whalen Dep. 354). These "disagreements" are further evidence that there were multiple ways, and not just one, to make a credit decision on a given file.

fact, review an Underwriter's use of discretion.  Manager Hansa Parmar, for example, testified

that "[t]he credit quality [or credit risk management review] is looking at the decision that was

made on the file ensuring that the underwriter applied judgment and discretion, and if exceptions

and variances that were made on the file were documented."  (Parmar Dep. 49.)  Chase's review

forms further demonstrate that an Underwriter's decision-making was reviewed by Chase.  The

forms that were used to evaluate Plaintiff's decisions, for example, asked questions of the

reviewer regarding the quality of the decision he made:  "Was ***appropriate judgment*** used in

evaluating all components of the credit file?" (Shaulson Aff. Exh. P (JPMC 001040)) and "Did

the decision made expose the bank to an unacceptable credit/compliance risk?"  (Shaulson  Aff.

Exh. Q (JPMC 000581-582)).  Thus, Plaintiff's discretion was evaluated by Chase.

### F.       Plaintiff's Attempt To Average The Time He Spent Making Decisions On Loan Requests Proves Nothing.

Plaintiff testified under oath that his primary duty as an Underwriter was to evaluate the

creditworthiness of Chase's customers and that he spent close to 90 percent of his time making

credit decisions, including evaluating potential borrowers' financial information to enable him to

make those decisions.  (Whalen Aff. ¶ 21; Whalen Dep. 227-28.)  Plaintiff now argues that he

"only needed to spend (from start to finish) approximately 14 to 19 minutes on each file."  (Pl.

Br. at 32.)  The amount of time he spent making a credit decision on each file, however, is not

relevant to the question of whether his primary duty -- evaluating the creditworthiness of

customers, which he admits he spent close to 90% of his time doing -- is exempt.  Moreover, the

***average*** amount of time Plaintiff claims he spent on a file tells the Court nothing.  Chase does

not dispute that some applications are requests that were easier to underwrite and took little time

to approve (e.g, such as an applicant with no derogatory credit history, high income, and who

wants to borrow a small percentage of the value of his or her home), while many other loan

requests are significantly more difficult to underwrite – and, thus, require more time (Parmar

26

Aff. II ¶ 20)).  The fact that Plaintiff may have spent little time on these easy approvals, however, means that he devoted even more time to difficult files that fell in the "gray area."  (Smith Dep. 157, 198-99 (testifying that there were some "easily-decisioned files" and some "situations that fall into gray areas")).  Indeed, Plaintiff testified that he spent as much as 3-4 hours making a credit decision with respect to some files, and that his decision-making on a particular loan request could span multiple days.  (Whalen Dep. at 318-19).

G.    **Plaintiff Made Decisions Of Substantial Importance to Chase.**

Playing more word games, Plaintiff argues that "Chase certainly cannot point to any decision that an Underwriter would make that would be of substantial importance **_to the generation of credit products_**."  (Pl. Br. at 36 (emphasis added)).  This argument is a red herring because, as Plaintiff has admitted, he played no role whatsoever in the generation of credit products.  In any event, it is undisputed that Plaintiff performed work of substantial importance, as he had the authority to approve or deny a loan without any higher-level review up to as much as $500,000 per loan request, and in doing so he made decisions involving over two and a half billion dollars in loans and lines of credit in just over three years.  (Whalen Dep. 202, 259, 321; Parmar Aff. I ¶ 4); see 29 C.F.R. § 541.205(a) (exempt work is "of substantial importance to the management or operation of the business of his employer or his employer's customers"); see also cases cited at Def. MSJ at 20, 34, 38-39.  The fact is that Plaintiff's decision-making is at significantly higher levels than the decisions found to be of substantial importance to other employers.  See, e.g., In re Farmers Ins. Exchange, 466 F.3d 853, 863 (9th Cir. 2006) ("What matters is that [the Company] bears the financial consequences of its adjusters' coverage determinations."); see also 29 C.F.R. § 541.205(b) (providing that "administrative assistant" is exempt).

27

### H.   **Plaintiff Was Not A Clerical Worker.**

As a last-ditch effort to avoid summary judgment on the issue of discretion, Plaintiff tries to liken his job duties to those performed by employees – like clerical workers – whose duties are simply not comparable to his.  (Pl. Br. at 28).  These arguments are baseless.

First, Plaintiff selectively quotes from the DOL Regulations' language that the term discretion and independent judgment "***does apply*** to the kinds of decisions normally made by persons ... who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise." 29 C.F.R. § 541.207(d)(2) (emphasis added).  Although not cited by Plaintiff, the DOL goes on to say in the same Regulation that "***The regulations*** in subpart A of this part, however, *do not require the exercise of discretion and independent judgment at so high a level.*"  Id.  As an example of this principle, the Regulations provide that an administrative assistant who "arranges interviews and meetings" and "handles callers" exercises sufficient discretion to satisfy the administrative exemption.  Id.  It is clear from the record that Plaintiff's decision-making authority required the use of substantially more discretion than an administrative assistant's handling of phone calls.

Second, Plaintiff's job duties are not comparable to those of the other employees to whom Plaintiff tries to compare himself.  (Pl. Br. at 28-29, 33).  As set forth in Defendant's moving papers, those employees are ***not*** decisionmakers with authority to bind their employer.  (Def. MSJ at 49-52).  It is not the primary duty of loan officers or loan originators to make a binding credit decision on behalf of their employers.  See, e.g., DOL Op. Ltr. Feb. 1, 2001, available in 2001 WL 1558764; see also Post-Lombardo Dep. 249 (testifying that loan officers were responsible for selling loans).[17]  Similarly, inspectors and investigators are also not

_____

[17] Without any evidentiary support, Plaintiff claims that loan officers somehow make credit evaluations at a "higher level" than those made by Underwriters.  (Pl. Br. at 33).  Loan Officers do ***not*** engage in the extensive credit evaluation that Underwriters do and, more importantly,

comparable to Plaintiff because they do not make final decisions on behalf of their employer. See cases cited at Def. MSJ at 50-51.[18]

That Plaintiff chooses to compare his job to that of a clerical worker, a loan officer, and an insurance inspector – rather than to the exempt employees described in the Regulations and the case law who actually make credit decisions – is telling.  Plaintiff simply cannot escape his own sworn testimony that he made credit decisions that bound Chase to the tune of over two billion dollars, that he exercised discretion in doing so, and that he specifically followed the provisions of the Credit Policy requiring him to exercise his own judgment and discretion.  Accordingly, Defendant is entitled to a summary judgment ruling that Plaintiff exercised discretion and independent judgment in the performance of his job.

## III.   PLAINTIFF WAS AN ADMINISTRATIVELY EXEMPT EMPLOYEE DURING HIS "TRAINING PERIOD."

Defendant's moving papers demonstrate that Defendant is entitled to summary judgment that the work Plaintiff performed both during, and after, his "training period" is exempt.  With respect to his training period, Plaintiff's only argument in response is that "plaintiff did not have any lending authority during the initial training period."  (Pl. Br. at 37).  This argument misses the mark, however, because Plaintiff has already conceded that he made decisions during this period by making recommendations on loan applications, including whether variances or exceptions should be made to make the deal work.  (Whalen Dep. 180.)  The DOL Regulations address this exact situation:  "[t]he decisions made as a result of the exercise of discretion and

---

Loan Officers do not make credit decisions binding Chase like Underwriters.  DOL Op. Ltr., FLSA2006-31, 2006 WL 2792445 (Sept. 5, 2006).

[18]  Although Plaintiff invokes the language from the Regulations regarding "inspectors" (Pl. Br. at 11, n. 5), it is undisputed that Plaintiff was not an "inspector," as he did not perform inspections and his job duties had nothing to do with insurance risk.   What Plaintiff did was make credit decisions, precisely the duties described as exempt in the Regulations.  29 C.F.R. § 541.207.

independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(e). Moreover, the decision need not have "finality that goes with unlimited authority and a complete absence of review." Id.; see also Haemonetics, 907 F. Supp. at 518 (business analysts did not need to possess ultimate authority to exercise discretion and independent judgment). Accordingly, Plaintiff was exempt, and is not entitled to overtime compensation, during his "training period."

## IV.    PLAINTIFF'S "SOCIAL POLICY" ARGUMENT IS NOT RELEVANT TO HIS OVERTIME CLAIM.

As set forth in Defendant's moving papers, Plaintiff's "social policy" argument regarding the "spreadability" of his work is of no moment. First, Plaintiff has admitted that the work of Underwriters was not "spreadable" because, in his words: "The uw's are exempt employees which requires them to work until the 'job' has been completed." (Affidavit of J. Thomas Nelson, dated July 6, 2006 Exh. D.; Whalen Dep. 377-78.)

In any event, nowhere in the FLSA or the DOL Regulations is the "spreadability" of the work a factor in determining exemption status. However, in Section 251 of the FLSA, entitled "Congressional findings and declaration of policy," Congress did express specific concern regarding the use of overtime claims by employees to seek "windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay," as well as concern regarding "the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in [the activity]." 29 U.S.C. § 251(a)(4-5). Thus, Defendant's discussion of Plaintiff's compensation as it relates to Congress's policy justifications for the FLSA is surely not a "non sequitur," as Plaintiff claims, because Congress expressly stated its concern about windfall payments to employees above and beyond their agreed-to compensation. Id. Here, there is no

30

dispute that Plaintiff agreed to work as an Underwriter for Chase with no promise of overtime compensation and that his salary and incentive compensation were up to five times the required level for exemption status and more than double the median income in Rochester. (Whalen Dep. 359 ("I was told I was to be paid salary and no overtime"); Parmar Aff. II ¶ 4; Shaulson Aff. Exh. M). There is likewise no dispute that Plaintiff's sole motivation in this lawsuit is to seek a windfall – when asked about his compensation as an Underwriter at Chase in his deposition, Plaintiff testified that he "was okay with it," but that "[o]ne could always want more." (Whalen Dep. 392.) For the reasons set forth in Defendant's moving papers and herein, Plaintiff was an exempt employee under the governing Regulations and case law and he should not be permitted to seek an undeserved windfall.

Dated: May 17, 2007

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: _____
    Sam S. Shaulson
    Carrie A. Gonell

101 Park Avenue, 37th Floor
New York, New York 10178
(212) 309-6000
(212) 309-6273 (Fax)

and

**JPMORGAN CHASE LEGAL DEPARTMENT**

Todd Gutfleisch
One Chase Manhattan Plaza
26th Floor
New York, New York 10006
(212) 552-0913
(212) 552-1630 (Fax)

Attorneys for Defendant JPMorgan Chase Bank

**JONES DAY**
Samuel Estreicher
222 East 41st Street
New York, NY 10017-6702
(212) 326-3488
(212) 755-7306 (Fax)