UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MICHAEL J. DAVIS, et al., on behalf of themselves and all others similarly situated | Civil Action No. 01-CV-6492L(B) |
| Plaintiffs, *versus* | Hon. David G. Larimer Action Filed: 10/04/2001 |
| JPMORGAN CHASE & CO., JP MORGAN CHASE BANK and CHASE MANHATTAN MORTGAGE CORPORATION, Defendants. |  |

**OBJECTIONS TO CLASS ACTION SETTLEMENT BY**

**CYNTHIA COLE, DARIN TAKAHASHI, AND STEVE McDANIEL**

JAMES F. CLAPP, *pro hac vice*
jclapp@sdlaw.com
ZACH P. DOSTART, *pro hac vice*
zdostart@sdlaw.com
DOSTART CLAPP & COVENEY, LLP
4370 La Jolla Village Drive, Suite 970
San Diego, California 92122-1253
Telephone: 858-623-4200
Facsimile: 858-623-4299

Attorneys for Objectors

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  STATEMENT OF FACTS ...........................................................................................3

    A. The Objectors ........................................................................................................3

    B. Factual and Procedural Background ......................................................................4

III.  TERMS OF THE SETTLEMENT.................................................................................9

IV.  THE COURT'S ROLE IN EVALUATING THE SETTLEMENT ................................12

V.  OBJECTION 1: THE RELEASE OF CLAIMS IS OVERBROAD.................................13

    A. The Release Extends Beyond the Factual Predicate of this Lawsuit ............................14

    B. The Release is Invalid Because the *Davis* Plaintiffs Are Settling Claims They Do Not Possess for Zero Consideration...........................................................................................18

VI.  OBJECTION 2: THE PAYMENT TO THE CALIFORNIA CLASS MEMBERS PER WORK MONTH IS INADEQUATE.......................................................................21

VII.  OBJECTION 3: THE *DAVIS* PLAINTIFFS ARE INADEQUATE CLASS REPRESENTATIVES .....................................................................................................23

    A. The *Davis* Plaintiffs Cannot Represent California Underwriters..................................24

    B. The *Davis* Plaintiffs Cannot Represent Hourly Underwriters.......................................27

    C. The *Davis* Plaintiffs Cannot Represent Auto Loan Underwriters.................................27

VIII.  OBJECTION 4: THE FACT THAT UNAWARDED ATTORNEYS' FEES REVERT TO CHASE IS IMPROPER .............................................................................28

IX.  OBJECTION 5: THE CURRENT BRIEFING SCHEDULE PREVENTS OBJECTORS FROM COMMENTING ON THE MOTION FOR FINAL APPROVAL AND CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES ..........30

X.  OBJECTION 6: THE SETTLING PARTIES HAVE FAILED TO SHOW THAT THE SETTLEMENT MEETS THE *GRINNELL* FACTORS ...........................................31

XI.  CONCLUSION.............................................................................................................32

# TABLE OF AUTHORITIES

**Page**

## CASES

Acosta v. Trans Union, LLC
    243 F.R.D. 377 (C.D. Cal. 2007) ........................................................................ 13

Amchem Products, Inc. v. Windsor
    521 U.S. 591 (1997)................................................................................ 24, 25, 26

Arellano v. T-Mobile United States, Inc.
    2011 U.S. Dist. Lexis 21441,  (N.D. Cal. March 3, 2011) .............................. 13

Boeing Company v. Van Gemert
    444 U.S. 472 (1980)......................................................................................... 29

Central States Southeast and Southwest Health and Welfare Fund v. Merck-Medco
    Managed Care, L.L.C.
    504 F.3d 229 (2d Cir. 2007)............................................................................. 23

City of Detroit v. Grinnell Corp.
    495 F.2d 448 (2d Cir. 1974)..................................................................... 3, 31, 32

Cole v. J.P. Morgan Chase & Co.
    C.D. Cal. Case No. SACV10-00632 ........................................................ passim

D'Amato v. Deutsche Bank
    26 F.3d 78 (2d Cir. 2001) .......................................................................... 30, 32

Davis v. J.P. Morgan Chase & Co.
    587 F.2d 529 (2d Cir. 2009)..................................................................... passim

Diaz v. Electronics Boutique of America, Inc.
    2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005) ........................ 17, 27

Ebert v. JP Morgan Chase & Co.
    S.D. Tex. H-10-894................................................................................... 6, 7

Glass v. UBS Financial Services, Inc.
    331 Fed. Appx. 452 (9th Cir. 2009).................................................................. 29

Goldberger v. Integrated Resources, Inc.
    209 F.3d 43 (2d Cir. 2000)............................................................................... 31

Grant v. Bethlehem Steel Corp.
    823 F.2d 20 (2d Cir. 1987)................................................................................12

In re Agent Orange Products Liability Litigation
    818 F.2d 226 (2d Cir. 1987)............................................................................. 31

In re Auction Houses Antitrust Litigation
    2001 U.S. Dist. Lexis 1713 (S.D.N.Y. Feb. 22, 2001) ................................................... 20

In re Independent Energy Holdings PLC Securities Litigation
    2003 U.S. Dist. Lexis 21322, (S.D.N.Y. Nov. 23, 2003) ................................................. 1

In re UnitedHealth Group PSLRA Litigation
    643 F.Supp.2d 1107 (D. Minn. 2009) .............................................................................. 1

In re Warner Communications Securities Litigation
    789 F.2d 35 (2d Cir. 1986) ............................................................................................. 13

Karvaly v. eBay, Inc.
    245 F.R.D. 71 (E.D.N.Y. 2007) ..................................................................................... 17

Maywalt v. Parker & Parsley Petroleum Co.
    67 F.3d 1072 (2d Cir. 1995)............................................................................................ 32

McDaniel v. JP Morgan Chase Bank
    C.D. Cal. Case No. CV10-10044 .............................................................................. passim

Mercury Interactive Corp. Securities Litigation v. Mercury Interactive Corp.
    618 F.3d 988 (9th Cir 2010) .......................................................................................... 30

Mirfasihi v. Fleet Mortgage Corp.
    356 F.3d 781 (7th Cir. 2004) ......................................................................................... 12

Morisky v. Public Services Electric & Gas Co.
    111 F.Supp.2d 493 (D.N.J. 2000) .................................................................................. 28

Myers v. Hertz Corp.
    624 F.3d 537 (2d Cir. 2010).......................................................................................... 28

National Super Spuds, Inc. v. New York Mercantile Exchange
    660 F.2d 9, 19 (2d Cir. 1981)........................................................................... 13, 18, 19, 20

Ortiz v. Fibreboard Corp.
    527 U.S. 815 (1999).......................................................................................................... 24

Pickle v. J.P. Morgan Chase & Co.
    S.D.N.Y. Case No. 10-CV-2791 ............................................................................... 5, 6, 7

Reynolds v. Benefit National Bank
    288 F.3d 277 (7th Cir. 2002) ........................................................................................... 1

Smith v. Sprint Communications Co., L.P.
    387 F.3d 612 (7th Cir. 2004) ........................................................................................ 26

Stubbs v. McDonald's Corp.
    227 F.R.D. 661 (D. Kan. 2005)....................................................................................... 28

Urso v. Wells Fargo Bank, N.A.
    Case No. C 06-1770 MHP, slip op. at pages 12-14 (N.D. Cal. March 9, 2011)............... 22

Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.
    396 F.3d 96 (2nd Cir. 2005)........................................................................... 13

White v. Auerbach
    500 F.2d 822 (2d Cir. 1974)............................................................................. 1

Zimmerman v. Zwicker & Assocs., P.C.
    2011 U.S. Dist. Lexis 2161, (D.N.J. Jan. 11, 2011)........................................ 13


**STATE CASES**

Bell v. Farmers Ins. Exchange
    87 Cal.App.4th 805 (2001) ...................................................................... 22, 28

Bright v. 99 Cents Only Stores
    189 Cal.App.4th 1472 (2011) ....................................................................... 16

Eicher v. Advanced Business Integrators, Inc.
    151 Cal.App.4th 1363 ................................................................................... 22


**STATUTES**

Cal. Civ. Code section 3289(b)........................................................................ 21

Cal. Lab. Code sections 200 et seq. ..................................................................15

Cal. Lab. Code sections 201 and 202................................................................14, 15

Cal. Lab. Code section 203 ................................................................. 14, 21, 24

Cal. Lab. Code section 204 ............................................................................ 14

Cal. Lab. Code section 218.6 ...........................................................................21

Cal. Lab. Code sections 221 and 223................................................................14, 15

Cal. Lab. Code section 226 ............................................................................ 14

Cal. Lab. Code section 226.7 ...........................................................................22, 24

Cal. Lab. Code section 227.3 .................................................................... 14, 15

Cal. Lab. Code section 230 ............................................................................ 15

Cal. Lab. Code section 232 ............................................................................ 15

Cal. Lab. Code sections 300 et seq. ..................................................................15

Cal. Lab. Code section 351 ............................................................................ 15

Cal. Lab. Code sections 400-410 ........................................................................ 15

Cal. Lab. Code sections 430-435 ........................................................................15

Cal. Lab. Code section 432.2 ............................................................................ 17

Cal. Lab. Code section 432.8 ............................................................................17

Cal. Lab. Code section 450 ................................................................................15

Cal. Lab. Code section 510(a) ...................................................................... 14, 24

Cal. Lab. Code section 512 ................................................................................14

Cal. Lab. Code section 515(d) .......................................................................21, 24

Cal. Lab. Code sections 1171 through 1205 .......................................................16

Cal. Lab. Code section 1182.12 ........................................................................ 16

Cal. Lab. Code section 1194.2 ..................................................................... 14, 16

Cal. Lab. Code section 1198 ..............................................................................16

Cal. Lab. Code section 1199 ..............................................................................14

Cal. Lab. Code section 1774 ..............................................................................14

Cal. Lab. Code Private Attorneys General Act of 2004
    Cal. Lab. Code sections 2698 et seq. .................................................12, 14, 16

Cal. Lab. Code section 2699(i) ....................................................................... 17

Cal. Lab. Code sections 2802 .....................................................................14, 16

Cal. Lab. Code section 2804 ............................................................................ 16

## FEDERAL STATUTES

29 C.F.R. section 778.114............................................................................... 24

29 U.S.C. sections 201 et seq................................................................... passim

29 U.S.C. section 216(b)....................................................................................5

29 U.S.C. section 256 ....................................................................................... 7

## <u>OTHER AUTHORITIES</u>

Wage Order 4-2001...................................................................................................................... 16

## <u>RULES</u>

Fed. R. Civ P.  Rule 23  ........................................................................................................ passim

Fed. R. Civ. P. 23, 2003 Advisory Committee Notes, page 68 .................................................... 31

Local Rule 7(b)(2)(B) .................................................................................................................. 8

## <u>REGULATIONS</u>

8 Cal. Code Regs. 11040............................................................................................................... 16

I.     INTRODUCTION

Nobody likes objectors in class action settlements.  In one egregious case, a district court characterized class action objectors as "remoras" whose goal was to "hijack as many dollars for themselves as they can wrest from a negotiated settlement."  In re UnitedHealth Group PSLRA Litigation, 643 F.Supp.2d 1107, 1108 (D. Minn. 2009).

This is not such a case.  In 21 years of practice, including almost 15 years as a plaintiffs' wage and hour class action attorney, this is the first time that Objectors' counsel has ever objected to a class action settlement involving overtime pay.  Affidavit of James F. Clapp, filed herewith, paras. 2-3.  The reason for this objection is not to extort money from Class Counsel or the defendant, but to protect the rights of California class members in a proposed settlement that appears to violate the clear holdings of the United States Supreme Court and the Second Circuit Court of Appeals.

"It is well settled that objectors have a valuable and important role to perform in policing class action settlements."  In re Independent Energy Holdings PLC Securities Litigation, 2003 U.S. Dist. Lexis 21322, at *2 (S.D.N.Y. Nov. 23, 2003) citing White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974). "It is desirable to have as broad a range of participants in the class action fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally."  Reynolds v. Benefit National Bank, 288 F.3d 277, 288 (7th Cir. 2002). Objectors hope that the Court will view their objection in this light.

As discussed below, the Settlement proposed by plaintiffs Michael J. Davis, Elena Lombardo, Carol Smith, and Andrew Whalen (the "Davis plaintiffs") and defendant JP Morgan Chase & Co. ("Chase") (collectively, the "Settling Parties") cannot be approved for several reasons.[1]  First, the proposed release of federal and state wage and hour claims is overbroad.  The

---

[1]     The terms of the Settlement are memorialized in the "Joint Stipulation and Settlement Agreement" ("Stipulation"), Docket 185-1.  Schedules 1 and 2 to the Stipulation were later filed as Docket 190-1.

Settlement compensates class members <u>only</u> for those months they were employed as exempt underwriters by Chase.  However, the proposed release of claims includes claims that arose <u>after</u> Chase reclassified the underwriters as non-exempt employees in February 2009.   Under established Second Circuit law, the release cannot be approved because claims arising from the underwriters' status as non-exempt employees (such as off-the-clock claims) do not arise from the "identical factual predicate" as the exempt misclassification claims that have been alleged in this lawsuit.

Second, the Settlement provides insufficient compensation to California class members. By virtue of the Second Circuit's holding in <u>Davis v. J.P. Morgan Chase & Co.</u>, 587 F.2d 529, 535 (2d Cir. 2009), Chase's liability under both the FLSA and California law was effectively established.  However, it appears that California class members will receive settlement payments that represent only 15% of the value of their California claims.   There is no justification for giving Chase what appears to be an 85% discount.

Third, the <u>Davis</u> plaintiffs are inadequate class representatives of the giant class defined in the Settlement.  The <u>Davis</u> plaintiffs cannot represent California underwriters because their interests are adverse to those of the California underwriters.  There is no dispute that the claims of the California underwriters are stronger than the claims of the <u>Davis</u> plaintiffs and the class members in other states.  However, because the settlement fund is fixed, the <u>Davis</u> plaintiffs have an interest in <u>undervaluing</u> the claims of the California underwriters in order to maximize the value of their own claims.  This inherent conflict of interest precludes the <u>Davis</u> plaintiffs from fairly and adequately protecting the California underwriters.   Similarly, there has been no showing that the <u>Davis</u> plaintiffs, who were employed only as exempt residential loan underwriters, are adequate representatives of the 208 different underwriter positions in the 7 different Chase divisions covered by the Settlement.  In particular, the <u>Davis</u> plaintiffs cannot represent Chase's non-exempt underwriters (such as Objector Darin Takahashi) who have hourly-based claims, nor can they represent Chase's auto loan underwriters (such as Objector Steve McDaniel) who performed a completely different job.

2

Fourth, the Settlement provides that Class Counsel has the right to move for attorneys' fees of up to 33 and 1/3% of the Maximum Settlement Amount (or $14 million).  However, as the Settlement is structured, if the Court awards less than this amount, the unawarded fees revert to Chase rather than to the class members.  This is improper.  As courts and plaintiffs' lawyers have recently come to recognize, allowing unawarded attorneys' fees to revert to the defendant removes the incentive for class members to challenge the fee request and serves to isolate attorneys' fees from scrutiny.  Furthermore, this reversionary structure is inconsistent with the "common fund" doctrine, in which attorneys' fees are paid from the same fund from which the class members are paid.

Fifth, under the current briefing schedule, Objectors are required to file their objections more than three weeks before the motions for final approval and for attorneys' fees are due. Objectors filed a motion for reconsideration of the briefing schedule, Docket 209, but the Court has not yet ruled on that motion.  The current briefing schedule is prejudicial to Objectors in this case since the Settling Parties failed to make any showing in their preliminary approval motion as to what the settled claims would be worth if the lawsuit proceeded to trial.  Furthermore, Objectors have no idea what Class Counsel will ask for in terms of attorneys' fees.  In the interests of fairness, Objectors should have the right to respond in writing after the motions for final approval and for attorneys' fees are filed.

Finally, the Settling Parties have the burden of proving that the Settlement is fair and reasonable in light of the factors outlined in City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974).  To date, the Settling Parties have made no showing that the Settlement is fair under the Grinnell factors.

For all of these reasons, the Settlement should not be approved.

II.  STATEMENT OF FACTS

A.  The Objectors.

This Objection is being filed on behalf of class members Cynthia Cole, Darin Takahashi, and Steve McDaniel.  Ms. Cole is the lead plaintiff in Cole v. J.P. Morgan Chase & Co., C.D.

Cal. Case No. SACV10-00632, which alleges an FLSA collective action on behalf of Chase's residential loan underwriters throughout the United States as well as a Rule 23 class action under California law on behalf of Chase's residential loan underwriters who were employed in California.  Ms. Cole was employed by Chase as an exempt Senior Underwriter in California from November 2002 until June 2008.  Affidavit of Cynthia Cole, filed herewith, para. 2.

Darin Takahashi is one of the named plaintiffs in <u>Cole</u>.  Mr. Takahashi was employed by Chase as an exempt Senior Underwriter in California from September 2005 until January 2009 and then as a <u>non</u>-exempt Senior Underwriter in California from March 2009 until December 2009.  Affidavit of Darin Takahashi, filed herewith, para. 2.  Mr. Takahashi has claims arising from his status as a non-exempt underwriter that are being released, but not compensated, under this Settlement.  Takahashi Affidavit, para. 4.

Steve McDaniel was employed by Chase as an auto loan underwriter in California from January 2006 until August 2007.  Affidavit of Steve McDaniel, filed herewith, para. 2.  Mr. McDaniel is the lead plaintiff in <u>McDaniel v. JP Morgan Chase Bank</u>, C.D. Cal. Case No. CV10-10044, which alleges an FLSA collective action on behalf of Chase's auto loan underwriters throughout the United States and a Rule 23 class action under California law on behalf of Chase's auto loan underwriters in California.  Mr. McDaniel explains that the job of an auto loan underwriter is different from that of a residential loan underwriter in that his job involves more routine work and less discretion.  <u>Id.</u> at paras. 4-6.  Accordingly, as discussed below, the overtime claims of auto loan underwriters are arguably stronger than those of the residential loan underwriters.

B.       Factual and Procedural Background.

<u>Davis</u> was originally filed on October 4, 2001.  The original Complaint alleged claims under the Fair Labor Standards Act, 29 U.S.C. section 201 <u>et seq.</u> ("FLSA") as well as the New York Labor Law on behalf of individuals who were employed as "underwriters" by defendant JPMorgan Chase.  Docket 1.  The Complaint alleged a collective, "opt-in" action under 29

U.S.C. section 216(b) on behalf of underwriters employed throughout the United States and a Rule 23 "opt-out" class action on behalf of underwriters employed in New York.  Id.

Despite the Complaint's broad use of the term "underwriter," as far as Objectors can tell, the Davis plaintiffs were employed only as residential loan underwriters.[2]  There is no evidence that the Davis plaintiffs had any role in reviewing or approving any other types of loans, such as auto loans.  Furthermore, the Davis plaintiffs were employed by JP Morgan Chase only in the State of New York.  The Complaint did not allege state wage and hour claims under the laws of any state other than New York.

Pursuant to a Stipulation and Order dated December 18, 2002, the Settling Parties agreed to litigate the claims of plaintiff Whalen as a "test case."  Docket 31.[3]  On December 22, 2002, Whalen filed a Second Amended Complaint that dismissed the FLSA collective action as well as the Rule 23 class claims under the New York Labor Law.  Docket 33.  The only claim that remained was an individual claim under the FLSA.  For the next several years, Whalen and Chase litigated Whalen's claim as an individual FLSA claim.  During that time, the only change to the operative complaint occurred on January 27, 2004, when Whalen filed a Third Amended Complaint.  Docket 42. The Third Amended Complaint did not allege any new claims.

In mid-2006, Whalen and Chase filed cross-motions for summary judgment as to Chase's claim that Whalen was administratively exempt under the FLSA.  Docket 72, 90.  On August 6, 2008, the Court denied Whalen's motion for summary judgment and granted Chase's motion. Docket 114.  Judgment was entered in favor of Chase on August 8, 2008.  Docket 115.  Whalen appealed.  On November 20, 2009, the Second Circuit reversed the judgment and held that

---

[2]    The Davis plaintiffs did not file affidavits in support of their motion for preliminary approval and their request to be appointed as class representatives.

[3]    Docket 31 is sealed.  On June 9, 2011, plaintiffs' counsel in Pickle v. J.P. Morgan Chase & Co., S.D.N.Y. Case No. 10-CV-2791, wrote a letter to this Court asking that Docket 31 be unsealed.  On June 20, 2011, the Court denied that request.  Docket 216.

Whalen was not administratively exempt under the FLSA.  Davis v. J.P. Morgan Chase & Co., 587 F.2d 529, 535 (2d Cir. 2009).

While the instant case was still an individual FLSA claim by Whalen, two FLSA collective actions were filed on behalf of Chase underwriters throughout the United States.  On March 18, 2010, a collective action was filed in the Southern District of Texas entitled Ebert v. JP Morgan Chase & Co., S.D. Tex. H-10-894, and on March 29, 2010, a collective action was filed in the Southern District of New York entitled Pickle v. J.P. Morgan Chase & Co., S.D.N.Y. Case No. 10-CV-2791.  Not until April 8, 2010 did the Davis plaintiffs file a Fourth Amended Complaint that alleged an FLSA collective action and a Rule 23 class action under the New York Labor Law.  Docket 136.  Shortly thereafter, on May 10, 2010, Cynthia Cole filed her lawsuit in the Central District of California entitled Cole v. J.P. Morgan Chase & Co., C.D. Cal. Case No. SACV10-00632.  Cole was the first lawsuit to allege claims under California law on behalf of Chase underwriters.  (Subsequently, on May 19, 2010, the Pickle plaintiffs filed a First Amended Complaint in which they also alleged Rule 23 claims under California law.)  As the Cole plaintiffs have repeatedly pointed out, at the time they filed their lawsuit, they were unaware that any other collective actions had been filed against Chase.  Chase first disclosed the existence of the Ebert, Pickle, and Davis collective actions to the Cole plaintiffs' counsel on June 2, 2010. Clapp Affidavit, para. 4.[4]

Based on their review of the docket in this action, the Cole plaintiffs learned that a mediation had been scheduled before Michael Dickstein.  Beginning in early June 2010, the Cole plaintiffs asked the Settling Parties for permission to attend the mediation to protect the unique interests of the California class members. The Settling Parties refused that request.  Alternatively, the Cole plaintiffs asked for assurances that the Settling Parties would not attempt to compromise

---

[4]    Throughout these proceedings, Chase has repeatedly mischaracterized the Cole, Ebert, and Pickle lawsuits as "copycat" actions.  In fact, in terms of chronology, the Davis action is the third-filed FLSA collective action and the third lawsuit (after Cole and Pickle) to purport to allege claims under California law.

the California claims without the Cole plaintiffs' consent.  The Settling Parties refused to give those assurances and refused to disclose what claims would be negotiated during the mediation. Clapp Affidavit, para. 5.  Accordingly, on September 17, 2010, the Cole plaintiffs filed a motion to intervene in this action.   Docket 158.

Meanwhile, the Pickle plaintiffs filed a motion with the Judicial Panel on Multidistrict Litigation to coordinate the lawsuits against Chase.  The hearing on the MDL motion occurred on July 29, 2010.   At the hearing, the Davis plaintiffs and Chase announced that they had reached a global settlement of the overtime claims against Chase, which included the California claims that were asserted in Cole.  On August 6, 2010, the MDL Panel issued an order denying the request to coordinate the lawsuits against Chase.   In its order, the MDL Panel wrote: "Plaintiffs in the non-settling actions should reasonably anticipate an opportunity to object to the purported nationwide settlement and direct any concerns regarding the further adjudication of their claims to Judge David G. Larimer at a fairness hearing concerning the proposed settlement in Davis."  Docket 208 at page 4.  The Cole, Pickle, and Ebert actions remain stayed in their respective courts pending a ruling by this Court on the Settlement.[5]

By December 2010, five months after their announcement at the MDL hearing, the Settling Parties still had not yet filed their motion for preliminary approval.  Accordingly, on December 29, 2010, Steve McDaniel, who was employed by Chase as an auto loan underwriter (not a residential loan underwriter) in California, filed an action in the Central District of California entitled McDaniel v. JP Morgan Chase Bank, C.D. Cal. Case No. CV10-10044.

---

[5]    Throughout these proceedings, Chase has repeatedly tried to impugn the motives of the Cole plaintiffs and their counsel, arguing that the Cole plaintiffs filed a motion for conditional certification in their lawsuit in order to "wrest control" of this action from the Davis plaintiffs. See Chase's Opposition to Motion to Intervene, Docket 176 at pages 1-2.  These charges are baseless.  The Cole plaintiffs filed their motion for conditional certification because the statute of limitations on an FLSA claim continues to run on an employee's claim until he or she files a consent to join the lawsuit (opts-in).  29 U.S.C. section 256.  Since Docket 31 is sealed, the Cole plaintiffs had no way of knowing whether their FLSA claims were covered by a tolling agreement in this case.

Prompted by Chase's need to respond to the <u>McDaniel</u> action, the Settling Parties finally executed the Stipulation in this case.  However, in an attempt to prevent Objectors from scrutinizing the Settlement, the Settling Parties filed the Stipulation and the motion for preliminary approval on Friday, February 11, 2011 at approximately 9:00 p.m. Eastern time and set the hearing on the motion for Tuesday, February 15, 2011 at 10:00 a.m., on just one court day's notice. Docket 183-185.[6]  To make matters even more difficult, the Settling Parties failed to include with their filing the schedules to the Stipulation that described what positions were covered by the Settlement (Schedule 1) and what claims were being released under the Settlement (Schedule 2).  Those schedules were not filed until Monday, February 14, 2011 at approximately 8:30 p.m. Eastern time, just a few hours before the preliminary approval hearing. Docket 190.[7]

Despite the abbreviated schedule, Objectors filed an opposition to the motion for preliminary approval on February 14, 2011 (Docket 187) and traveled from San Diego to this Court to appear at the preliminary approval hearing on February 15, 2011 at 10:00 a.m.  At the end of the hearing, the Court took the motion for preliminary approval under submission and authorized Objectors to file objections to the proposed class notice.  On February 25, 2011, Objectors filed their objections to the class notice.  Docket 198.

On April 6, 2011, the Court entered an order preliminarily approving the Settlement, denying Objectors' motion to intervene, and denying Objectors' request for discovery.  Docket 208.  However, the Court's order was very clear on two points.  First, the Court stated that

---

[6]     Local Rule 7(b)(2)(B) states that a party opposing a motion shall have at least fourteen days following service of the motion to file and serve responding papers.  At the time they filed their preliminary approval motion, the Settling Parties had known for several months (since at least September 17, 2010 when the <u>Cole</u> plaintiffs filed their motion to intervene) that the <u>Cole</u> plaintiffs would likely oppose preliminary approval.

[7]     In connection with these filings, the <u>Davis</u> plaintiffs also filed a Fifth Amended Complaint on February 11, 2011, which alleged generalized claims under unspecified "state laws" for failure to pay overtime, delay in wage payments, and failure to compensate for meal and rest breaks.  Docket 181.

Objectors would have a full opportunity to voice their objections to the Settlement – and the Court would thoroughly consider those objections – at the final fairness hearing:

> "Again, to the extent that the proposed intervenors have particular objections to the terms of the proposed settlement, there is no reason why those concerns cannot be fully and adequately aired at the fairness hearing and in the context of the Court's decision whether to finally approve the settlement." Docket 208 at 8.

Second, although the Court granted conditional certification of the proposed settlement class, the Court promised that it would make "a more searching inquiry" as to the propriety of class certification at the final fairness hearing:

> "To the extent that class members who do not opt out believe that any differences between New York law and the law of their jurisdiction renders the plaintiffs here inadequate class representatives, such concerns can be fully aired at the fairness hearing." Docket 208 at 10.

The Court's preliminary approval order set a deadline of June 21, 2011 for filing objections to the Settlement. The Court scheduled the final fairness hearing for July 21, 2011 at 9:00 a.m. The deadline for the Settling Parties to file their motion for final approval and for Class Counsel to file its motion for attorneys' fees, litigation costs and expenses, and for class representative enhancements is July 14, 2011. Docket 208 at 14-15. On April 15, 2011, Objectors filed a motion for reconsideration of the briefing schedule, pointing out that the schedule offered class members no opportunity to respond to the motion for final approval and motion for attorneys' fees. Docket 209. In response to the motion for reconsideration, the Davis plaintiffs offered to file their motion for attorneys' fees on or before June 23, 2011 and permit Objectors to file any response on or before July 7, 2011. Docket 211 at 5. However, the Court has not yet ruled on the motion for reconsideration and has not adjusted the briefing schedule.

III.   TERMS OF THE SETTLEMENT

For purposes of this objection, the relevant terms of the Settlement are as follows:

1.     The "Maximum Settlement Amount" that Chase will pay under the Settlement is $42 million. Stipulation, para. 1.20.

2.      The "Net Settlement Amount" is the amount that will be divided among class members who submit claim forms (defined in paragraph 1.27 as "Participating Claimants"). Id., para. 2.2.2. The Net Settlement Amount is equal to the Maximum Settlement Amount less: (1) "Administrative Costs," and (2) a reduction for class members who opt out of the Settlement. Id., para. 1.2.1. "Administrative Costs" means the amount set aside from the Maximum Settlement Amount to pay Class Counsel's attorneys' fees, litigation costs and expenses, enhancements to the named plaintiffs, a payment to the California Labor and Workforce Development Agency, costs of notice, and a reserve for late claims. Id., para. 1.1.

3.      Class Counsel has the right to move the Court for an award of attorneys' fees equal to 33 1/3% of the Maximum Settlement Amount ($14 million) plus up to $115,000 in litigation costs and expenses. Id., para. 2.9.1. Chase has agreed not to oppose this motion. Id. However, in the event that the Court grants less than $14 million in attorneys' fees, the unawarded amounts revert to Chase and not to the class members. Id. "In the event that the Court (or any appellate court) awards less than the amount requested for attorneys' fees … only the awarded amounts shall be paid and shall constitute satisfaction of the obligations of this paragraph and full payment thereunder, and the amount of any such reduction will not get paid out by Chase." Id. Thus, as this Settlement is structured, class members do not benefit if the Court awards less than $14 million in attorneys' fees.

4.      Each Participating Claimant will receive a pro rata share of the Net Settlement Amount based on the Participating Claimant's length of service in "Work Months" in a "Covered Position" according to Chase's records; except that, Participating Claimants who were employed in California will receive an allocation that is four (4) times the allocation of other Participating Claimants for each Work Month in a Covered Position while employed in California. Id., para. 2.2.2. "Work Months" means the number of calendar days a class member was employed by Chase in a Covered Position, divided by 365/12, rounded to the nearest whole number. Id., para. 1.46. "Covered Position" means any of the 208 underwriter positions in any of the 7 different Chase divisions listed in Schedule 1. Id., para. 1.11 and Schedule 1 (filed with the Court as

Docket 190-1).   However, for the purposes of the Settlement, a Participant Claimant is considered to have been employed in a Covered Position "only for the time period during which the Covered Position was treated as exempt from overtime" by Chase.  Stipulation, para. 1.11. This is important, because Chase reclassified its underwriters as non-exempt and began paying them overtime in February 2009.  Takahashi Affidavit, para. 2.  Thus, Participating Claimants are not receiving any compensation for those Work Months they were employed by Chase as non-exempt underwriters after February 2009.

5.     According to the class notice, Participating Claimants who were employed in a Covered Position outside of California will receive a minimum of $202.19 per Work Month, and Participating Class Members who were employed in a Covered Position in California will receive a minimum of $808.76 per Work Month.  Takahashi Affidavit, Exhibit 1, page 2.

6.     Participating Claimants are deemed to release all "Released Federal Law Claims." Stipulation, para. 2.8.2.  "Released Federal Law Claims" are defined as "any and all federal wage and hour claims … by a Class Member that accrued on any date up through and including the date on which the Participating Claimant executes the Qualifying Settlement Claim Certification and Consent to Join Settlement Form [i.e., the claim form] …."  Id., para. 1.33.  Thus, although Participating Claimants are receiving compensation only for those Work Months they were employed as exempt underwriters (i.e., before the reclassification in February 2009), the release of Released Federal Law Claims extends through the date the Participating Claimants execute the claim form.

7.     Class members who do not opt-out of the Settlement (defined in paragraphs 1.37 and 1.38 as "Settlement Class Members") are deemed to release all "Released State Law Claims."  Id., para. 2.8.1.  "Released State Law Claims" are defined as "any and all state law wage-and-hour claims … by a Class Member that accrued on any date up through and including the Preliminary Approval Date, or in the case of Class Members who complete, properly execute, and timely return the [claim form], the date on which the Class Member executes the [claim form], for any type of relief, including without limitation, claims for wages, damages,

11

premium pay, unpaid costs, penalties (including late payment penalties), liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief, including, without limitation, the following categories of allegations: ….."   Id., para. 1.34. Paragraph 1.34 then gives six non-exhaustive examples of the types of state law claims that are being released.  Paragraph 1.34 concludes by stating that the "Released State Law Claims are the claims meeting the above definition under any and all applicable statutes, regulations, or common law, including without limitation those set forth in the compendium of state specific wage and hour laws set forth in attached Schedule 2, which includes claims under the California Labor Code Private Attorneys General Act of 2004 ('PAGA') on behalf of the State of California."   Stipulation, para. 1.34.  Thus, the effect of the release of state law claims is as follows: class members who do not opt out are deemed to release any and all state law wage and hour claims that exists in their favor through the later of the preliminary approval date or the date they execute the claim form.  Although Participating Claimants are being compensated only for those Work Months they were employed as exempt underwriters, the release of state law claims includes those claims that arose after Chase reclassified the underwriter positions as non-exempt in February 2009, and also includes all other state wage and hour claims that are listed in Schedule 2.

IV.   THE COURT'S ROLE IN EVALUATING THE SETTLEMENT

In evaluating a proposed class action settlement, the Court owes "a fiduciary responsibility to the silent class members."  Grant v. Bethlehem Steel Corp., 823 F.2d 20, 23 (2d Cir. 1987).  "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole."  Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781, 785 (7th Cir. 2004).

Nevertheless, it is not the Court's job to dictate the terms of a class action settlement. The district judge "should approve or disapprove a proposed agreement as it is placed before him

and should not take it upon himself to modify its terms." In re Warner Communications Securities Litigation, 789 F.2d 35, 37 (2d Cir. 1986).

Finally, the fact that a class action settlement permits dissatisfied class members to opt-out is not a "cure all" for an otherwise deficient settlement. Acosta v. Trans Union, LLC, 243 F.R.D. 377, 388 (C.D. Cal. 2007); Zimmerman v. Zwicker & Assocs., P.C., 2011 U.S. Dist. Lexis 2161, at *23 (D.N.J. Jan. 11, 2011); Arellano v. T-Mobile United States, Inc., 2011 U.S. Dist. Lexis 21441, at *7-8 (N.D. Cal. March 3, 2011).

V.      OBJECTION 1: THE RELEASE OF CLAIMS IS OVERBROAD

Under controlling Second Circuit law, a class action release may only extend to claims that are based on the "identical factual predicate" as the claims that have been alleged in the lawsuit. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 107 (2d Cir. 2005). Since this lawsuit was filed on October 4, 2001, this case has always been about Chase's misclassification of underwriters as exempt employees. See Davis, 587 F.3d at 530 ("This appeal requires us to decide whether underwriters tasked with approving loans, in accordance with detailed guidelines provided by their employer, are administrative employees exempt from the overtime requirements of the Fair Labor Standards Act.") Although Chase reclassified the underwriters as non-exempt employees in February 2009, the Settling Parties never litigated any off-the-clock, minimum wage, or similar hourly-based claims arising from the underwriters' status as non-exempt employees. Because the release of claims set forth in the Stipulation extends far beyond the factual predicate of this lawsuit, the release is overbroad.

Furthermore, Second Circuit law prohibits a class representative from releasing claims that he or she does not possess for zero consideration. National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9, 19 (2d Cir. 1981). The four class representatives in this case ended their employment with Chase before Chase reclassified its underwriters as non-exempt employees in February 2009. Nevertheless, the class representatives have negotiated a settlement that purports to release all state and federal wage and hour claims, including those hourly-based claims arising from the underwriters' status as non-exempt employees after

13

February 2009.  Moreover, as the Settlement is structured, class members are being compensated solely for those Work Months they were employed as exempt underwriters and are receiving zero consideration for those Work Months they were employed as non-exempt underwriters. Under Super Spuds, the release is invalid.[8]

A.      The Release Extends Beyond the Factual Predicate of this Lawsuit.

The factual predicate of this lawsuit has always been Chase's misclassification of underwriters as exempt employees and the resulting failure to pay them overtime compensation. In their joint motion for preliminary approval of the Settlement, Docket 184, the Settling Parties summarized plaintiffs' claims as follows:

> "Plaintiffs allege that defendants misclassified them as exempt from the overtime requirements of the Fair Labor Standards Act ('FLSA') and state law, and as a result, plaintiffs were not paid overtime at time and one-half their regular rate of pay when they worked more than forty hours per week.  In particular, plaintiffs claim that they performed job duties relating to approving loans, evaluating whether to issue loans to individual loan applicants and/or evaluating loan applications under credit guidelines and approving loans if they meet standards, and that these duties do not render them exempt from the overtime requirements under the FLSA and state law. Plaintiffs therefore seek overtime compensation, liquidated damages, interest, penalties and all other relief provided for under law." Docket 184 at 2.

Although plaintiffs' claims are limited to those arising from the underwriters' misclassification as exempt employees, the release of claims extends far beyond the factual predicate of this lawsuit.  Page 1 of Schedule 2 (Docket 190-1) lists the California claims that are

---

[8]      Just a few days ago, Objectors learned the reason why Chase insisted on a release that wipes out the wage and hour claims of Chase's non-exempt underwriters.  On October 13, 2010, a law firm called Sullivan & Christiani, LLP sent a letter to the California Workforce Development Agency, with a copy to Chase, indicating that the Sullivan firm intended to commence a lawsuit against Chase on behalf of Chase's hourly employees in California for violations of California Labor Code sections 201, 203, 204, 221, 226, 226.7, 510, 512, 1774, 1194, 1199, and 2802  as well as the California Wage Orders.  See Exhibit 1 to Clapp Affidavit. This letter is a prerequisite to filing an action under the California Labor Code Private Attorneys General Act, Cal. Lab. Code section 2698 et seq.  Chase plainly intended to pre-empt the filing of any claims on behalf of Chase's non-exempt underwriters.

being released under the Settlement.  They include claims that are based on the underwriters'
status as <u>non</u>-exempt employees as well as claims that have nothing whatsoever to do with the
payment of employees.

First, Schedule 2 releases all claims under the "California Payment of Wages Law," Cal.
Lab. Code sections 200 <u>et seq.</u> That law regulates the payment of wages to all California
employees, including those who are <u>non</u>-exempt.  Sections 201 and 202 set forth deadlines for
paying terminated employees (including non-exempt employees) their final paychecks. Section
203 establishes a penalty for failing to meet the deadlines set forth in Sections 201 and 202.
Section 204 requires that <u>non</u>-exempt employees receive semi-monthly payments of their
accrued wages.  Sections 221 and 223 prevent an employer from recovering or offsetting wages
that were previously paid to an employee.  Section 226 requires an employer to provide itemized
wage statements to its employees and sets forth special requirements for non-exempt employees.
Section 227.3 requires an employer to pay a terminated employee for all of his or her vested
vacation time.  Section 230 prevents an employer from discharging an employee for serving on
jury duty.  Section 232 prevents an employer from discharging an employee for disclosing the
amount of wages he or she earns to other employees.  These claims extend far beyond the factual
predicate of this lawsuit.

Next, Schedule 2 releases all claims under California Labor Code sections 300 <u>et seq.</u> and
400 <u>et seq.</u>  Section 300 regulates assignments of wages and generally prohibits an employer
from taking deductions from an employee's wages unless the deductions are authorized in
writing by the employee and are for the payment of taxes, insurance premiums, or health
benefits.  Sections 300(b) and (g).  Section 351 prohibits an employer from sharing in a gratuity
received by an employee.  Sections 400-410 generally prevent an employer from requiring an
employee to post a bond as a condition of employment.  Sections 430-435 regulate employment
applications and, for example, prohibit an employer from requiring an applicant to take a lie
detector test or disclose certain marijuana convictions.  Section 450 prevents an employer from

requiring an employee to patronize its business.  These claims have nothing to do with the facts alleged in this lawsuit.

Next, Schedule 2 releases all claims arising under California Labor Code sections 1171 through 1205.   Section 1182.12 establishes the California minimum wage at $8.00 per hour. Section 1194.2 allows an employee to recover liquidated damages for minimum wage violations. Minimum wage claims have nothing to do with the factual predicate of this lawsuit: i.e., the underwriters' misclassification as exempt employees.  In addition, Section 1198 makes it illegal for an employer to violate any order of the California Industrial Welfare Commission ("IWC"). The IWC has established 17 different wage orders for various industries in California.  Chase's business falls under Wage Order 4-2001, "Professional, Technical, Clerical, Mechanical and Similar Occupations."   See 8 Cal. Code Regs. section 11040.   In addition to regulating the payment of overtime, Wage Order 4-2001 requires, inter alia, that employers: (1) pay minimum wages and reporting time pay to non-exempt employees; (2) maintain employee records; (3) refrain from deducting from an employee's wages except in certain situations; (4) provide and maintain employee uniforms; (5) provide meal and rest periods; and (6) provide seats to employees if their job reasonably permits the use of a seat.  These claims bear no relationship to the facts alleged in this case.

Furthermore, Schedule 2 releases all claims under California Labor Code sections 2802 and 2804.   Section 2802 requires an employer to reimburse its employee for all reasonable expenses incurred in the course of his or her employment, and Section 2804 invalidates any agreement to waive the protections of Section 2802.  Claims for unreimbursed business expenses were never litigated in this case and are not based on the same factual predicate.

Finally, Schedule 2 releases all claims under the California Labor Code Private Attorneys General Act of 2004 ("PAGA"), California Labor Code sections 2698 et. seq.  PAGA was adopted by the California Legislature to permit aggrieved employees to enforce the California Labor Code by bringing private attorney general actions.  Bright v. 99 Cents Only Stores, 189 Cal.App.4th 1472, 1480 (2011).  Under PAGA, an employee who is injured by any violation of

16

the California Labor Code may bring a private attorney general action for penalties, 75% of which are paid to the California Workforce Development Agency.   Cal. Lab. Code section 2699(i).   Paragraph 1.34 would insulate Chase from any private attorney general claim arising from <u>any</u> violation of the California Labor Code, even beyond those sections that are listed in Schedule 2.

Because the proposed release extends beyond claims that are based on the underwriters' misclassification as exempt employees, the release cannot be approved.   In <u>Diaz v. Electronics Boutique of America, Inc.</u>, 2005 U.S. Dist. Lexis 30382, at *12 (W.D.N.Y. Oct. 13, 2005), the court held that the wage and hour claims of exempt employees are fundamentally distinct from the claims of non-exempt employees, since exempt claims "involve an analysis of daily duties and responsibilities and the time spent on each," whereas non-exempt claims "involve an examination of hours worked, payroll records, and [the employer's] knowledge and/or permission of alleged overtime hours worked."   <u>Id.</u>   The court found that there was "no factual nexus" between the claims of the exempt and non-exempt employees.   <u>Id.</u>   By the same token, there is no factual nexus between the claims of exempt and non-exempt underwriters in this case. Furthermore, there is even <u>less</u> of a nexus between the claims of exempt underwriters and the claims of prospective job applicants who are forced to take lie detector tests or disclose marijuana convictions.   Cal. Lab. Code sections 432.2, 432.8 (which claims are released in Schedule 2).

 <u>Karvaly v. eBay, Inc.</u>, 245 F.R.D. 71 (E.D.N.Y. 2007), is directly on point.   In that case, the plaintiffs alleged that certain representations about the use of the "PayPal" online payment system were false.   The parties agreed to a class action settlement in which the defendant would release "any and all claims based upon any of the laws, regulations, statutes, or rules evidenced and referenced by" the Second Amended Complaint.   <u>Id.</u> at 88.   The district court refused to grant preliminary approval because the release:

> "[W]ould encompass a vast expanse of potential claims that have no
> relation to the acts and practices at issue here. As written, the

release would constitute a waiver of claims completely unrelated to this action that could be brought under any of the statutes or common-law theories that are alleged in the Second Amended Complaint. Though mindful of the 'general policy favoring settlement of litigation,' the Court is forced to conclude that a general release that purports to strip millions of individuals of their rights to sue the defendants upon a wide range of offenses that have nothing to do with the misconduct alleged in the present action, for no more consideration than PayPal's agreement to make certain superficial changes to its website, is an offense to the principle of due process so egregious as to render the proposed settlement untenable even at this preliminary stage." Id. at 88-89.

Because the release extends beyond the factual predicate of this lawsuit, the Settlement cannot be approved.

B.    The Release Is Invalid Because the *Davis* Plaintiffs Are Settling Claims They Do Not Possess for Zero Consideration.

The four named plaintiffs were employed only as exempt residential loan underwriters. Nevertheless, the Davis plaintiffs have negotiated a settlement that releases all state and federal wage and hour claims, including those arising from the underwriters' status as non-exempt employees after February 2009.   Stipulation, paras. 1.33 and 1.34.   Furthermore, as the Settlement is structured, Participating Claimants are being compensated solely based on the number of Work Months they were employed as exempt underwriters.   Id., paras. 2.2.2, 1.11. Those individuals who were employed as both exempt and non-exempt underwriters (such as Objector Takahashi) are being forced to release their off-the-clock and other hourly-based claims in exchange for zero additional consideration.

Super Spuds is directly on point.  Super Spuds was a class action seeking damages for the loss in value of future contracts.  The complaint alleged claims on behalf of class members who had liquidated their futures contracts between April 13 and May 7, 1976.  Super Spuds, 660 F.2d at 17.  However, in addition to releasing claims based on liquidated contracts, the class action settlement purported to bar the class members from asserting claims based on futures contracts that had not been liquidated as of May 7, 1976.  Id. at 14.  One class member, Richards, objected to the settlement on the ground that it would undermine the separate class action he had filed on

behalf of holders of unliquidated contracts.  Id. at 15.  The district court overruled Richards' objection, and he appealed.  The Second Circuit held that the class representatives did not have the authority to represent members of the class with respect to claims based on unliquidated contracts, since none of the class members held any unliquidated contracts.  Id. at 17.  "The named plaintiffs in a class action cannot 'cannot represent a class of whom they are not a part.'" Id. (citations omitted).  Furthermore, the Second Circuit held that it was improper for the class representatives to negotiate a settlement that would release claims based on unliquidated contracts for zero additional consideration.  Id. at 19.  A class action settlement "cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of the claims assertable by the class."  Id.

In a previous filing, Chase attempted to distinguish Super Spuds on the ground that, in that case, there were class members who would receive "nothing at all" in exchange for their releases, whereas in this case, all class members will receive something based on the number of months they were exempt.  Docket 201, page 5.   There is no basis for this purported distinction in the facts of Super Spuds.  The Super Spuds class consisted of "all persons who held net long positions in May 1976 Maine Potato Futures Contracts and who had liquidated their long positions between April 13, 1976 and the close of trading on May 7, 1976." Super Spuds, 660 F.2d at 14.  Class members like the objector, Richards, were required "to release claims based on both liquidated and unliquidated contracts in return for payments that were to be determined solely on the basis of contracts they had liquidated." Id.  By definition, anyone in the Super Spuds class held at least one contract that had been liquidated between April 13, 1976 and May 7, 1976.  However, those class members who also held unliquidated contracts, like the objector, Richards, would have been barred from asserting claims based on those unliquidated contracts for zero additional consideration. The Super Spuds court held that the named plaintiffs could not give away claims based on unliquidated contracts for nothing, especially since the named plaintiffs did not possess claims based on unliquidated contracts.  Similarly, in this case, the

Davis plaintiffs cannot give away the hourly-based claims for nothing, especially since the Davis plaintiffs do not possess those claims.

In re Auction Houses Antitrust Litigation, 2001 U.S. Dist. Lexis 1713 (S.D.N.Y. Feb. 22, 2001), aff'd 42 Fed. Appx. 511 (2d Cir. 2002), is also on point.  In that case, the district court refused to approve a class action settlement that would have impaired the rights of class members to assert claims that had not been raised in the lawsuit. The plaintiffs alleged that the defendants conspired to fix prices in auctions that occurred in the United States.  Later, separate class actions were filed alleging that defendants conspired to fix prices in auctions outside the United States.  Id. at *12-13.  The parties in the original actions then reached a settlement, which would have foreclosed class members who had claims arising from foreign auctions (which the district court referred to as "Mixed Class Members") to relinquish their right to pursue those claims in the United States courts.  Id. at *17.  Relying on Super Spuds, the district court refused to approve the settlement, since claims based on foreign auctions were never litigated in the original action and the named plaintiffs did not have the same interests as the Mixed Class Members with respect to the foreign auctions.  Id. at *55.[9]

The rule of Super Spuds and Auction Houses is that a class representative cannot release a claim that he or she does not possess for zero consideration.  Because the Davis plaintiffs do not possess claims arising after the reclassification of underwriters as non-exempt employees, they cannot release those claims for nothing.  The proposed release is invalid.

/////

/////

---

[9]     In its opinion affirming the district court's ruling, the Second Circuit noted: "In the twenty-one years since Super Spuds, we have never affirmed the approval of a class action settlement which included the uncompensated impairment of non-class claims unless the non-class claims were based on the identical factual predicate as the class claims."  In re Auction Houses Antitrust Litigation, 42 Fed.Appx. 511, 519 (2nd Cir. 2002) (emphasis in original).

VI.    OBJECTION 2: THE PAYMENT TO THE CALIFORNIA CLASS MEMBERS PER
       WORK MONTH IS INADEQUATE

The Settlement provides that Participating Claimants who were employed in California
will receive a pro rata share of the Net Settlement Amount that is four (4) times greater than the
amount received by Participating Claimants in other states.   The class notice estimates that
Participating Claimants who were employed in California will receive a minimum of $808.76 per
Work Month, whereas Participating Claimants who were employed outside of California will
receive a minimum of $202.19 per Work Month.   Takahashi Affidavit, Exhibit 1.

The payment to California class members is inadequate, as it represents less than 15% of
Chase's exposure on the California class members' claims.    To illustrate this point,
Mr. Takahashi's damages under California law would be calculated as follows: Mr. Takahashi
was employed as an exempt Senior Underwriter in California from September 2005 until January
2009 and then as a non-exempt Senior Underwriter from March 2009 to December 2009.   His
average annual salary was approximately $74,000.   During the period he was an exempt
employee, Mr. Takahashi worked an average of 55 hours per week.   Takahashi Affidavit, para. 3.
Under California law, his overtime rate of pay was $74,000 / 52 weeks / 40 hours x 1.5 = $53.37
per hour.   Cal. Lab. Code section 515(d) (overtime rate of pay is calculated based on a 40 hour
week).   At 15 hours of overtime per week, Mr. Takahashi is entitled to $800.48 per week of
overtime pay (15 x $53.37), or $3,468.75 per month ($800.48 x 4.333 weeks/month), or
$142,218.75 ($3,468.75 x 41 months) of overtime pay during his entire tenure as an exempt
Senior Underwriter.   Under California law, pre-judgment interest on unpaid wages accrues at the
rate of 10% per annum.   Cal. Lab. Code section 218.6; Cal. Civ. Code section 3289(b).
Assuming that unpaid overtime wages are earned monthly, pre-judgment interest on
Mr. Takahashi's unpaid overtime is approximately $58,072.66.   Under Cal. Lab. Code section
203, Mr. Takahashi is entitled to waiting time penalties equal to 30 days' pay, or approximately
$8,538.46 ($74,000 / 260 days x 30).   He estimates that he missed approximately 10 lunch breaks
per month while he was an exempt Senior Underwriter (Takahashi Affidavit, para. 3.), which

means that under Cal. Lab. Code section 226.7(b), Mr. Takahashi is entitled to an additional 10 hours of straight time pay per month, for a total of $14,586.54  ($74,000 / 52 weeks / 40 hours = $35.58 x 10 x 41 months = $14,586.54).  Therefore, his total claim under California law for the period he was an exempt Senior Underwriter is approximately $223,416.41.  See Clapp Affidavit, para. 8 and Exhibit 2 thereto.  Under the Settlement, Mr. Takahashi is entitled to receive a minimum of $35,585.44 ($808.76 x 44 Work Months), which represents approximately 15.93% of the value of his exempt-based claims.[10]

There is no justification for discounting the claims of the California class members by almost 85%.  Just as the Second Circuit held in Davis, 587 F.3d at 535, California courts have held that employees who are engaged in routine "production work" are not exempt under California's administrative exemption.  Bell v. Farmers Ins. Exchange, 87 Cal.App.4th 805, 820-22 (2001) (holding on summary judgment that claims adjusters are non-exempt production workers and recognizing the distinction between exempt administrative employees and non-exempt employees whose primary duty is producing the goods or services the employer exists to sell); Eicher v. Advanced Business Integrators, Inc., 151 Cal.App.4th 1363, 1372-73 ("Employees engaged in an activity that constitutes the company's primary purpose are likely [non-exempt] production workers."); Urso v. Wells Fargo Bank, N.A., Case No. C 06-1770 MHP, slip op. at pages 12-14 (N.D. Cal. March 9, 2011) (holding on summary judgment that residential loan officers are non-exempt production workers under California law), attached as Exhibit 6 to the Clapp Affidavit.  Furthermore, California courts routinely rely on federal authorities in construing California's overtime exemptions.  Bell, 87 Cal.App.4th at 814-15, 821-22 (approving of the use of federal authorities as an aid to interpretation of California's administrative exemption); Urso at 14 (relying in part on Davis, 587 F.3d at 535).  Therefore,

---

[10]    As discussed in paragraphs 10 and 11 and Exhibits 4 and 5 of the Clapp Affidavit, Objectors Cole and McDaniel will receive approximately 13.74% and 14.94% of the value of their California claims, respectively.

based on <u>Davis</u>, there is little doubt that the California class members would have prevailed on their claims for unpaid overtime under California law.  There was no reason for Chase to receive an 85% discount when liability had already been established.  <u>See</u> <u>Central States Southeast and Southwest Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.</u>, 504 F.3d 229, 248 (2d Cir. 2007) (vacating district court's approval of a class action settlement because the parties failed to articulate the basis for a 55% discount).[11]

Furthermore, the Settlement requires California class members like Mr. Takahashi, who were employed as both exempt and non-exempt underwriters, to give up their hourly-based claims for nothing.  Mr. Takahashi estimates that between March 2009 and December 2009, he worked approximately 5 hours per week of off-the-clock overtime without receiving overtime pay.  Takahashi Affidavit, para. 4.  He also worked through lunch approximately 5 times per month.  <u>Id.</u>  His off-the-clock overtime pay claim is worth $11,562.50 ($53.37 per hour x 5 hours/wk = $266.83 per week or $1,156.25 per month x 10 months = $11,562.50).  Pre-judgment interest on that claim is approximately $2,167.97.  His claim for missed meal breaks is worth approximately $1,778.85 ($35.58 x 5 missed breaks per month x 10 months = $1,778.85).  Thus, in exchange for waiving hourly-based claims worth at least $15,509.31, Mr. Takahashi is receiving nothing in return.  Clapp Affidavit, para. 9 and Exhibit 3.  There is no justification for giving Chase a 100% discount on these hourly-based claims.

## VII.   OBJECTION 3: THE *DAVIS* PLAINTIFFS ARE INADEQUATE CLASS REPRESENTATIVES

The <u>Davis</u> plaintiffs are inadequate class representatives in three respects.  First, they cannot represent California underwriters because their economic interests are fundamentally at odds with those of the California underwriters.  Second, they cannot represent non-exempt

---

[11]   The reason for this steep discount, Objectors submit, is that the payments to the California class members were diluted to satisfy the claims of class members in other states as well as the claims of underwriter positions that were never litigated in this case.  This is one of the pitfalls of a giant class action settlement.

underwriters because they do not share the same types of claims as non-exempt underwriters. Third, they cannot represent auto loan underwriters because the job of a residential loan underwriter is markedly different from that of an auto loan underwriter.

    A.    The *Davis* Plaintiffs Cannot Represent California Underwriters.

When a district court is asked to certify a class in the settlement context, the elements of Rule 23 demand "heightened attention" so as to protect the absent class members. Ortiz v. Fibreboard Corp., 527 U.S. 815, 849 (1999). Fed. R. Civ. P. 23(a)(4) requires that the named plaintiffs "fairly and adequately protect the interests of the class." Id.; Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between the named parties and the class they seek to represent." Amchem, 521 U.S. at 625.

In this case, the Settlement cannot be approved because there is an inherent conflict of interest between the Davis plaintiffs and the California class members. As discussed above, California class members have rights and remedies that the Davis plaintiffs and class members in other states do not have. For example, California calculates the overtime rate of pay based on a 40 hour workweek instead of by using the FLSA's "fluctuating workweek" method. Compare Cal. Lab. Code section 515(d) to 29 C.F.R. section 778.114. This difference alone increases the damages available to California class members by a factor of four or more.[12] Unlike the FLSA, California law also permits the recovery of daily overtime for any hours worked over 8 per day as well as double overtime for any hours worked over 12 per day. Cal. Lab. Code section 510(a). Furthermore, California class members have claims for waiting time penalties under Cal. Lab. Code section 203 and meal and rest break wages under Cal. Lab. Code section 226.7 that the

---

[12]    For example, in Mr. Takahashi's case, his FLSA overtime claim under the "fluctuating workweek" method would be calculated as follows: His overtime rate of pay would be $74,000 / 52 weeks / 55 hrs/wk x 0.5 = $12.94 per hour. At 15 hours of overtime per week, Mr. Takahashi's FLSA overtime wages would be $194.06 per week or $840.84 per month, as compared to $3,468.75 per month under California law.

<u>Davis</u> plaintiffs and class members in other states do not have.  Because the <u>Davis</u> plaintiffs do not possess claims under California law, they have no interest in ensuring that California class members receive their fair share of the settlement fund.  To the contrary, because the Net Settlement Amount is fixed, the <u>Davis</u> plaintiffs have an interest in <u>undervaluing</u> the claims of the California class members in order to maximize the value of their own claims.  Consequently, the interests of the <u>Davis</u> plaintiffs are not aligned with those of the California class members.  This conflict of interest precludes certification of the class and approval of the Settlement.

The U.S. Supreme Court's decision in <u>Amchem</u> is directly on point.  <u>Amchem</u> involved a proposed classwide settlement of asbestos claims.  The named plaintiffs, who had diverse medical conditions arising from asbestos exposure, "sought to act on behalf of a single giant class rather than on behalf of discreet subclasses." <u>Amchem</u>, 521 U.S. at 626.  The Court explained that, except for the question of trial manageability, the elements of Rule 23 "demand undiluted, even heightened, attention in the settlement context." <u>Id.</u> at 620.  The purpose of Rule 23 in the settlement context is to protect absent class members from class certification decisions that are based on the district court's "gestalt judgment or overarching impression of the settlement's fairness." <u>Id.</u> at 621.  In other words, according to <u>Amchem</u>, the overall "fairness" of the proposed settlement is irrelevant to the issue of whether a settlement class should be certified under Rule 23.  <u>Id.</u>

Analyzing Rule 23(a)(4)'s adequacy requirement, the <u>Amchem</u> court found that there was an inherent conflict of interest between those class members who were currently injured (whose goal was to receive "generous immediate payments") and those class members who had been exposed to asbestos but had not yet manifested symptoms (whose goal was to ensure "an ample, inflation-protected fund for the future"). <u>Id.</u> at 626.  Furthermore, the Court found that differences in state law compounded the disparities in the class members' claims. <u>Id.</u> at 625. Because the settlement made allocation decisions between class members who had diverging interests, the Court held that the class representatives could not adequately represent the entire class. <u>Id.</u> at 627.  "The settling parties, in sum, achieved a global compromise with no structural

assurance of fair and adequate representation for the diverse groups and individuals affected." Id. Accordingly, the Amchem court disapproved the settlement.[13]

In this case, as in Amchem, the Davis plaintiffs propose to represent a "single giant class" of approximately 5,200 underwriters in 208 different underwriting positions in 7 different Chase divisions throughout the United States.   As in Amchem, however, the interests of the class members within the single giant class are not aligned.   Because the amount of the settlement fund is fixed, class members are essentially "competing" over a limited supply of money.   The Davis plaintiffs, who were employed in New York, have an interest in undervaluing the claims of California class members in order to maximize their own recovery.   Conversely, the California class members have an interest in reducing the monthly payments to class members in New York and other states in order to make more funds available to satisfy their own claims.   Thus, as in Amchem, there is a structural conflict of interest between the California class members and the class members in other states that precludes the Davis plaintiffs from representing the entire class.   Furthermore, under Amchem, this conflict of interest is fatal to the Settlement even if the Court and the Settling Parties believe the payment of $808.76 per Work Month is "fair" to the California class members.   Id. at 621.   California class members have a right to negotiate for as high a settlement payment as they can get; they cannot do so because the Settlement fails to provide them with separate representation.[14]

---

[13]      The Seventh Circuit's decision in Smith v. Sprint Communications Co., L.P., 387 F.3d 612 (7th Cir. 2004) is also instructive.   In that case, the parties reached a nationwide class action settlement in which the amount of each class member's recovery was based on an analysis of state law by independent property law experts.   The Seventh Circuit disapproved the settlement in part because the district court failed to appoint separate class representatives to represent the different subgroups within the class.   "Although [the analysis by property law experts] may tend toward a more equitable division of funds, it does not provide the 'structural assurance of fair and adequate representation' prior to the settlement itself that Rule 23 demands.   Amchem, 521 U.S. at 527.   Law professors are no substitute for proper class representatives."   Smith, 387 F.3d at 614.

[14]      The Settling Parties will argue that, in the past, Objectors' counsel has obtained approval of nationwide wage and hour settlements without a representative from each state.   However, (footnote continued)

B.      The *Davis* Plaintiffs Cannot Represent Hourly Underwriters.

As discussed above, as the Settlement is structured, individuals who were employed as both exempt and non-exempt underwriters (like Mr. Takahashi) are being forced to release their hourly-based claims for zero additional consideration.   The <u>Davis</u> plaintiffs are inadequate representatives of individuals who possess hourly-based claims because hourly-based claims are fundamentally different from claims that are based on misclassification as an exempt employee.

<u>Diaz</u>, discussed in Section V(A) above, is directly on point.   In that case, the named plaintiffs sought to represent an FLSA collective group and a Rule 23 class consisting of exempt store managers as well as non-exempt assistant store managers and sales associates.   The plaintiffs argued that they were similarly situated to the entire class because they were all subject to the defendant's "company-wide plan of not paying their employees overtime or other wages for work performed." <u>Diaz</u>, 2005 U.S. Dist. Lexis 30382, *11.   The court refused to certify either the FLSA collective group or the Rule 23 class because the two named plaintiffs were not similarly situated to each other, and thus were not similarly situated to the other class members. <u>Id.</u> at *12.   There was no factual nexus between the named plaintiffs' claims. <u>Id.</u>

In this case, as in <u>Diaz</u>, the <u>Davis</u> plaintiffs cannot represent class members who have hourly-based claims because there is no factual nexus between those claims and claims based on misclassification as an exempt employee.

C.      The *Davis* Plaintiffs Cannot Represent Auto Loan Underwriters.

Objector Steve McDaniel has filed his own class action lawsuit against Chase on behalf of Chase's auto loan underwriters.   As Mr. McDaniel explains in his Affidavit, the job of an auto loan underwriter at Chase is different from that of a residential loan underwriter.   In particular, an auto loan underwriter's job involves more routine work and less discretion than a

---

Objectors' counsel has never sought approval of a nationwide settlement without a class representative from California.   The rights of the California class members are too unique to allow them to be unrepresented in the settlement process.   Clapp Affidavit, para. 12.

that of a residential loan underwriter.  McDaniel Affidavit, paras. 4-6.  Accordingly, auto loan underwriters arguably have stronger overtime claims than residential loan underwriters like the Davis plaintiffs.   See Bell, supra, 87 Cal.App.4th at 828 (holding that claims adjusters were not administratively exempt because their duties were restricted to the "routine and unimportant").  The Davis plaintiffs cannot represent class members like Mr. McDaniel who were employed in a different job and whose claims are based on different facts.

In Morisky v. Public Services Electric & Gas Co., 111 F.Supp.2d 493 (D.N.J. 2000), the court refused to certify an FLSA collective action and a Rule 23 state law class because the seven named plaintiffs, who worked in five different positions, were not similarly situated to the other class members.  The court found that the plaintiffs had made "no showing that the job responsibilities of the named plaintiffs are the same or similar to those of the remaining members of the proposed class…." Id. at 498.  In this case, as in Morisky, there is no evidence that the job of a residential loan underwriter is sufficiently similar to that of an auto loan underwriter to permit the Davis plaintiffs to serve as representatives for all auto loan underwriters throughout the United States.  See also Stubbs v. McDonald's Corp., 227 F.R.D. 661, 665 (D. Kan. 2005) (holding that second assistant managers could not represent first assistant managers in an FLSA collective action); Myers v. Hertz Corp., 624 F.3d 537, 549 (2d Cir. 2010) (upholding the district court's order denying certification because the duties of a station manager could not be generalized to all station managers throughout the United States).

## VIII.   OBJECTION 4: THE FACT THAT UNAWARDED ATTORNEYS' FEES REVERT TO CHASE IS IMPROPER

The Settlement permits Class Counsel to request an award of attorneys' fees of up to 33 and 1/3% of the Maximum Settlement Amount (or a total of $14 million), and Chase will not oppose that request.  Stipulation, para. 2.9.1.  However, to the extent that the Court awards less than the full 33 and 1/3% fee, the unawarded amount is not paid to the Participating Claimants; instead, any unawarded fees revert to Chase.  Id.

In recent years, courts have become increasingly suspect of class action settlements in which the parties set aside a particular amount for class counsel's attorneys' fees, and any fees that are not awarded by the court revert to the defendant.[15]  In Glass v. UBS Financial Services, Inc., 331 Fed. Appx. 452, 456 (9th Cir. 2009), an appeal of a nationwide wage and hour settlement, the Ninth Circuit wrote:

> "We agree that the reversion clause, as pertaining to attorneys' fees, is problematic because it acts as a device to isolate fees from scrutiny. [Citation.] In addition to being favorable to class counsel, the reversion clause is favorable to [defendant], which will receive the ultimate benefit of any reduction by the court. Because the reversion clause creates incentives for the negotiating parties to make the attorneys' fees a larger percentage of the total recovery, the district court is required to ensure that that the class members' interests were not compromised in favor of those of class counsel." Id. (Internal quotes and cites omitted.)

Ordinarily in class action settlements, "after the court determines the reasonable amount of attorneys' fees, all the remaining value of the fund belongs to the class rather than reverting to the defendant." Glass at 456 n.2 citing Staton v. Boeing Co., 327 F.3d 938, 970 (9th Cir. 2003). This conclusion is consistent with the "common fund" doctrine for awarding attorneys' fees. Under the common fund doctrine, "a litigant or lawyer who recovers a fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Company v. Van Gemert, 444 U.S. 472, 478 (1980).  In this case, however, the proposed attorneys' fees will not be paid "from the fund as a whole" but from separate fund called "Administrative Costs" (Stipulation, para. 1.11) in which the class members have no interest.   See Staton, 327 F.3d at 970 (disapproving a class action settlement involving a "putative common fund," in which defendant agreed to pay class counsel's fees separate and

---

[15]     Until approximately two years ago, such clauses were common in the Ninth Circuit. However, courts and plaintiffs' counsel now recognize that, in common fund cases, unawarded attorneys' fees are the property of the class and therefore should be paid to the class instead of to the defendant.  Clapp Affidavit, para. 13.

apart from the money paid to the class).   Because class members will not benefit from any reduction in the proposed fee, they have no incentive to scrutinize the fee to ensure it is not excessive.   Accordingly, the structure of the Settlement serves to isolate the attorneys' fees from scrutiny, to the detriment of the class members.   This aspect of the Settlement should be disapproved.

IX.     OBJECTION 5: THE CURRENT BRIEFING SCHEDULE PREVENTS OBJECTORS
         FROM COMMENTING ON THE MOTION FOR FINAL APPROVAL AND CLASS
         COUNSEL'S MOTION FOR ATTORNEYS' FEES

         Under the current briefing schedule, Objectors must file their objections to the Settlement by June 21, 2011, but the motion for final approval and Class Counsel's motion for attorneys' fees are not due until July 14, 2011, one week before the final fairness hearing.   Docket 208 at 14-15.   This schedule prevents Objectors from reviewing and commenting on these motions. Objectors have requested reconsideration of this briefing schedule (Docket 209), but the Court has not ruled on Objectors' request.

         The current briefing schedule is prejudicial to Objectors in this case.   The Settling Parties made no showing in their preliminary approval papers as to what the settled claims would be worth if the case proceeded to trial.   See D'Amato v. Deutsche Bank, 26 F.3d 78, 86 (2d Cir. 2001) (in evaluating a settlement, one factor the district court must consider is the size of the settlement fund as compared to the "best possible recovery" the class could achieve). Presumably, the Settling Parties will attempt to make this showing in their final approval motion, but the current briefing schedule prevents Objectors from responding to that showing in writing.

         Furthermore, Rule 23(h) requires that class counsel's motion for attorneys' fees be filed before the deadline for objections.   Mercury Interactive Corp. Securities Litigation v. Mercury Interactive Corp., 618 F.3d 988, 993-94 (9th Cir 2010).   In Mercury, the district court set a briefing schedule requiring that objections to the attorneys' fee motion be filed before the filing of the fee motion itself.   The court stated that this practice "borders on a denial of due process" because it deprives objecting class members of a full and fair opportunity to contest class

counsel's fee motion.  <u>Id.</u>  The court based its decision in the Advisory Committee Notes to the 2003 amendments to Rule 23(h), which state that "in setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion."  <u>See</u> Fed. R. Civ. P. 23, 2003 Advisory Committee Notes, page 68.

In this case, Objectors have no basis for evaluating Class Counsel's fee request because it is unclear as of this writing what Class Counsel will ask for.  Paragraph 2.9.1 of the Stipulation permits Class Counsel to request "up to" 33 and 1/3% of the Maximum Settlement Amount. Class Counsel might request the full 33 and 1/3%, or it might request a lower amount. Furthermore, it is unclear how Class Counsel will attempt to justify its fee request.  If Class Counsel moves for fees under the "percentage of recovery" method, a 33 and 1/3% fee might or might not be excessive.  <u>See</u> <u>Goldberger v. Integrated Resources, Inc.</u>, 209 F.3d 43, 48 (2d Cir. 2000) (noting that, by the 1970s, "the routine award of fees in the 20% to 30% range … had led to a perception that the percentage approach tended to yield to little for the client-class, and an unjustified 'golden harvest of fees' for the lawyer").  On the other hand, if Class Counsel requests fees under the lodestar method, there might be questions about the reasonableness of Class Counsel's hours, its rates, and the propriety of a multiplier.  <u>See</u> <u>In re Agent Orange Products Liability Litigation</u>, 818 F.2d 226, 231-38 (2d Cir. 1987) (evaluating class counsels' hours, rates, and multipliers in the context of a motion for fees under the lodestar method).  The current briefing schedule prevents Objectors from reviewing Class Counsel's fee request and contesting it if appropriate.

Accordingly, the Court should grant Objectors' motion for reconsideration (Docket 209) and permit Objectors to respond in writing to the motion for final approval and Class Counsel's motion for attorneys' fees.

X.     <u>OBJECTION 6: THE SETTLING PARTIES HAVE FAILED TO SHOW THAT  THE SETTLEMENT MEETS THE <em>GRINNELL</em> FACTORS</u>

In evaluating the reasonableness of a class action settlement, the Court must apply the so-called <u>Grinnell</u> factors: "(1) the complexity, expense and likely duration of the litigation; (2) the

reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974). Of all of these factors, the most important is the comparison of the settlement amount to the likely result of the litigation. Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1079 (2d Cir. 1995); D'Amato, 26 F.3d at 86 (court must evaluate settlement in light of the "best possible recovery" the class could achieve at trial).

Here, the Settling Parties have made no showing what the settled claims would be worth if the case proceeded to trial. The claims could be worth $42 million, or they might be worth $420 million. Furthermore, the Settling Parties have made no effort to justify whatever discount the Davis plaintiffs gave to Chase to secure the Settlement. Without this basic information, the Settlement cannot be approved.

XI.    CONCLUSION

For all of the foregoing reasons, the Court should not approve the Settlement.
Dated: June 21, 2011

By: s/ James F. Clapp
    JAMES F. CLAPP, *pro hac vice*
    jclapp@sdlaw.com
    ZACH P. DOSTART, *pro hac vice*
    zdostart@sdlaw.com
    DOSTART CLAPP & COVENEY, LLP
    4370 La Jolla Village Drive, Suite 970
    San Diego, California  92122-1253
    Telephone: 858-623-4200
    Facsimile: 858-623-4299

    Attorneys for Objectors

443426.1